# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

USDC- BALTIMORE
'25 AUG 22 AM11:57

| | | |
|---|---|---|
| **CUI FANG** | ) | |
| **Plaintiff** | ) | |
| | ) | **Case No:** |
| **v.** | ) | |
| | ) | **25 CV2768** |
| | ) | ABA |
| **HEIDI M. ANDERSON** | ) | |
| **RONDALL ALLEN** | ) | **COMPLAINT FOR** |
| **ASAD AZEMI** | ) | **DECLARATORY AND** |
| **JASON CASARES** | ) | **INJUNCTIVE RELIEF** |
| **ALEXANDRA GINTA MARTIN** | ) | **AND** |
| **JAY A. PERMAN** | ) | **JURY DEMAND** |
| **MATTHEW A. TAYLOR** | ) | |
| **UNIVERSITY OF MARYLAND EASTERN SHORE** | ) | |
| **UNIVERSITY SYSTEM OF MARYLAND** | ) | |
| | ) | |
| | ) | |
| **UMES, 11868 College Backbone Rd** | ) | |
| **Princess Anne, MD 21853** | ) | |
| | ) | |
| **Defendants** | ) | |

---

## VERIFIED COMPLAINT

Plaintiff is an award-winning computer science lecturer at UMES. She cared deeply about her students and taught them with high academic standards. Defendant 3, and Iranian national, bullied her and violated maternity leave protections because he wanted to hire other Iranians. He and other individual defendants were also willfully and maliciously sabotaging academic standards and engaging in fraud with federal funds: faking enrollment, grading, and attendance requirements to deceive the government and taxpayers. After she reported fraud to the University System of Maryland Hotline and federal agencies, and filed a complaint of discrimination, Defendants retaliated against her. Defendants conducted a sham investigation, violated all due process and fair investigation requirements, and found that her allegations were "not substantiated." Plaintiff


HD
Rcv'd by: AK

1

appealed highlighting the fatal errors committed by the Defendants in their investigation. While the appeal was still pending and unresolved, Defendants abruptly terminated her appointment unlawfully. Defendants' actions are willful and malicious, and the termination occurred because they knew that their fraud was exposed. Defendants knew that they were engaging in fraud, there were no lawful grounds to terminate Plaintiff's employment, they were violating Plaintiff's constitutional and legal rights, but did it anyway. Defendants act as if they are above the law and can get away with blatantly unlawful actions. This lawsuit is being brought to hold them accountable for their egregiously unlawful actions, to prevent them from victimizing other innocent employees and students, and to provide Plaintiff with legal remedies.

## JURISDICTION AND VENUE

1.  This is a civil action arising under the laws and Constitution of the United States. This court has jurisdiction pursuant to 28 U.S.C. §§ 1131 and 1367. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02. This court has authority to award costs and expert fees under 42 U.S.C. § 1988.

2.  Venue lies in this district court pursuant to 28 U.S.C. § 1391(b) because the defendants are Maryland residents and their unlawful actions individually and collectively were conducted within Maryland.

## PARTIES

3.  Plaintiff, Ms. Cui Fang, a Maryland resident, has been employed as a Lecturer in the Department of Computer Science and Engineering Technology at the University of Maryland Eastern Shore since 2021.

4.  Defendant 1, Heidi M. Anderson, took office as President of the University of Maryland Eastern Shore (UMES) in 2018. She is being sued both in her personal and official capacities and is a Maryland resident.

5.  Defendant 2, Rondall Allen, was appointed Provost by Defendant 1 in about 2022. He is being sued in both his personal and official capacities and is a Maryland resident.

6.  Defendant 3, Asad Azemi, an Iranian national, was appointed Chair of the Department of Computer Science at UMES in 2022. He is being sued in both his personal and official capacities and is a Maryland resident.

7.  Defendant 4, Jason Casares, is the head of the Office of Institutional Equity (OIE) at UMES. He is being sued in both his personal and official capacities and is a Maryland resident.

8.  Defendant 5, Alexandra Ginta Martin, is the Assistant Director of OIE at UMES. She is being sued in both her personal and official capacities and is a Maryland resident.

9.  Defendant 6, Jay Perman, is the Chancellor of the University System of Maryland. He is being sued in both his personal and official capacities and is a Maryland resident.

10. Defendant 7, UMES, is a public university within the University System of Maryland (USM), operating at 11868 College Backbone Rd, Princess Anne, MD 21853.

11. Defendant 8, University System of Maryland, is a public university system with twelve constituent institutions funded by the State of Maryland.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

12. Defendant 1 knows Plaintiff at a personal level even prior to Plaintiff's employment at UMES. Plaintiff was a student at UMES and completed two master's degrees there.

13. Whilst Plaintiff was a student, she worked as a personal trainer at the UMES gymnasium.

14. In Spring 2021, Summer 2021 and the start of Fall 2021, while the Plaintiff was a student at UMES and working as an assistant at the UMES gym, she was assigned to provide training support to Defendant 1, Heidi Anderson. The assignment occurred after the coach declined to continue working with Anderson, citing difficulties in her attitude and communication.

15. Heidi Anderson, who is obese, expressed a desire to lose weight. As part of her assigned duties at the UMES gym, Plaintiff assisted Anderson by guiding her through a structured weight-loss training program developed by a certified coach.

16. Plaintiff encouraged Anderson on multiple occasions to join group training sessions attended by other female staff and students, which were designed to provide a supportive and motivating environment. However, Anderson refused to participate in those sessions, stating that she did not consider them worthwhile and claimed she could perform as well as the group trainer.

17. During one-on-one sessions, Plaintiff followed the training regimen provided by the coach, but Anderson often complained about the intensity of the exercises. On several occasions, she unilaterally adjusted the workout routine, deciding for herself what to do and how much to complete. Over time, Anderson appeared resentful and developed personal hostility toward the Plaintiff, despite Plaintiff's professional efforts to support her fitness goals.

18. Since Plaintiff's appointment as a Lecturer, she has been a conscientious and highly effective teacher in the Department of Computer Science and Engineering Technology.

19. Ms. Fang was recognized as an excellent faculty based on UMES students' surveys. She won university-wide recognition in 2022. (**EXHIBIT 5**)

20. Defendant 2, Rondall Allen, is the Provost of UMES. He is responsible for managing the academic operations of the university and supervises all academic faculty. Allen is a close associate of Anderson, does not possess requisite knowledge or expertise, blindly implements Anderson's commands, and knowingly violates accreditation standards.

21. Rondall Allen was appointed Provost despite serious maladministration in his previous role as the Dean of the School of Pharmacy and Health. Because of his maladministration, the Physician Assistant program lost accreditation, had an overwhelmingly high turnover of faculty, and the Pharmacy program's student enrollment collapsed precipitously.

4

22. Defendant 4, Jason Casares, is the Title IX Director and the head of the Office of Institutional Equity. Based on publicly available documents via Google, he has a record of alleged sexual assault and abusing university investigations and was forced to resign from previous employment. UMES and USM knew this. Based on information and belief, he has been engaging in a pattern of civil rights violations against faculty and staff at UMES and is the subject of complaints to Heidi Anderson, Jay Perman, and the USM. (**EXHIBIT 1**)

23. Alexandra Ginta Martin, Defendant 5, is the Assistant Director of OIE. She is an intimate associate of Jason Casares and implements his directives.

24. Matthew A Taylor, Defendant 7, is the General Counsel of UMES. He is directly involved in OIE investigations, appeals, and sanctions. Based on information and belief, Taylor provides misleading or false legal opinions to enable violations of civil rights and other laws to facilitate illegal schemes by the other individual defendants.

25. The arrival of Defendant 3, Asad Azemi, an Iranian national, started a series of problems for faculty members in the Department.

26. Based on information and belief, Defendant 3 had been pushed out of similar roles at other universities for engaging in unlawful and problematic bullying behaviors. Defendant 8 did not conduct the appropriate background investigations or ignored the red flags which should have stopped them from appointing Azemi as the Department Chair.

27. Since his arrival, Azemi expressed a preference for hiring Iranians and manipulated hiring processes to create vacancies for his friends. (**EXHIBIT 2, 3**)

28. In Spring 2024, Azemi used another Iranian faculty member as the search committee chair for the CS associate/assistant professor position. During the on-campus interviews with candidates, this Iranian faculty member bluntly stated: 'This is not really an interview, just a conversation.' More than 80% of these candidates were Iranian. According to one of the Iranian candidates,

during their interview with Azemi, he directly told them that they would be offered the position. Azemi even manipulated the search committee's online interview evaluation results by moving an Iranian female candidate who ranked 13th up to the campus interview stage, while candidates ranked 6th through 12th were denied the opportunity. Because of this, HR immediately dissolved the entire search committee, and afterwards the review of CS associate/assistant professor candidates was taken over by the engineering department. Other Defendants knew about Azemi's discrimination but recklessly ignored it.

29. In Fall 2023, Dr. Azemi asked Plaintiff to upload all teaching materials developed by her for CSDP 221 and CSDP 222 and then unilaterally took over her teaching duties without discussion. He appropriated Plaintiff's intellectual property without her consent and created a hostile environment for her when she tried to teach her own course.

30. Azemi ordered Plaintiff to collaborate with graduate students for an online course design for CSDP 221/222, where she developed syllabi, quizzes, and exams, but was never compensated for this work.

31. During Winter 2024, Plaintiff was assigned as secondary instructor with a $1500 contract. Despite pointing out students enrolled without prerequisites and serious academic integrity issues in how the courses were conducted, Plaintiff's concerns were dismissed. During the course design, more than half the graduate students and Plaintiff expressed serious concerns about the 14 days online self-study courses, Azemi ignored them.

32. Dr. Azemi has a pattern of deliberately sabotaging academic standards pertaining to grading, attendance, and enrollment in violation of specific requirements of the Higher Education Act and ABET Accreditation.

33. Azemi encourages cheating and apparently fraudulent practices to maintain a false facade of enrollment to pad his salary and deceive the federal government (which provides funding) and accreditors.

34. In Spring 2024, Plaintiff's section of CSDP 221 was cancelled citing low enrollment (3), whereas other faculty members' courses in winter 2025 and summer 2025 were not cancelled even though the enrollments were only 3 students. Plaintiff was reduced to a support role under Dr. Azemi's section, while being asked to follow his material and grading structure, regardless of discrepancies and student confusion.

35. Dr. Azemi frequently reviewed lecturers' activities on Canvas (the learning management system), requiring weekly updates and materials to be visible to him, adding to an atmosphere of constant surveillance and intimidation inconsistent with academic practices.

36. Azemi violated university policies and academic standards, and gave students lenient exam retake options, open submissions, and unsupervised online exams, resulting in inflated or fake grades. It appears that Dr. Azemi was deliberately encouraging rampant academic misconduct and cheating to maintain deceptive enrollment numbers for courses in the department. It was evident that these "students" did not attend any classes but were somehow being awarded grades. (**EXHIBIT 12**)

37. For instance, students who previously failed Plaintiff's properly graded CSDP 221 course later enrolled in Plaintiff's CSDP 222 class, only to withdraw after just several days—subsequently opting for Dr. Azemi's significantly lighter version of CSDP 222 because they got grades without apparently doing anything to learn. This pattern raises serious concerns regarding the academic rigor and integrity of Dr. Azemi's instruction.

38. In one course, Plaintiff was ordered to stop reviewing flowcharts, but students were later assessed on them without sufficient instruction. Over 95% failed those assignments.

39. Despite attendance being part of grading policy and the official university rules, many students did not attend at all, and Teaching Assistants and Plaintiff were instructed not to deduct grades or drop them as required by the policy and the law.

40. Multiple students failed quizzes and exams, yet some were reassured by Dr. Azemi they would pass the course. Azemi undermined the grading and attendance policies to these students to continue their enrollment despite the rules clearly mandating otherwise.

41. Azemi himself has loudly proclaimed at public settings that UMES students are not fit to study the discipline when there were discussions about retention - showing the deliberate nature of his actions to violate academic and attendance rules.

42. Dr. Azemi described UMES students as being "like dogs who need to be trained."

43. Dr. Azemi instructed Plaintiff to learn from a male graduate student for upcoming Python courses despite her past experience successfully teaching CSDP 101, 120, and 150 and her graduate education and projects in that area. There was no lawful basis for such a demand. It was intended to humiliate her and create a hostile working environment.

44. Azemi required that Plaintiff complete and upload all lecture content for CSDP 120 by end of Spring 2024 and for CSDP 150 by end of Summer 2024—even though she was to be outside the U.S. during the summer.

45. Azemi deliberately manipulated teaching allocations to create uncertainty and disrupt Plaintiff's preparation. For instance, he deliberately made Fall 2024 course assignments unclear and unstable. Despite seven students being enrolled in CSDP 221, Plaintiff was told verbally to prepare Python instead, with no official course assignment.

46. Throughout the summer, when Plaintiff checked her HawkWeb, she noticed that her Fall 2024 teaching assignments kept changing — CSDP 221, CSDP 120, no courses, CSDP 101 — and none of these changes were ever communicated to her by email.

47. The Winter 2024 online CSDP 221 and CSDP 222 courses lasted only 14 instructional days—an unrealistic period to achieve outcomes comparable to a 15-week regular term. No lectures were delivered by the instructor (Azemi); instead, all materials were posted on Canvas. Students had no coding assignments, no midterms, and no projects—only open-topic quizzes. It was like a correspondence course and academic fraud in violation of the HEA and ABET and MSCHE Accreditation standards.

48. Azemi apparently encouraged cheating: each quiz allowed two attempts, with the second attempt occurring after students received the answers to the questions directly from Dr. Azemi. In some cases, when Plaintiff graded according to the rubric, Dr. Azemi would override her scores and regrade directly to raise student grades to pass those who had failed the course. This was done with an intent to deceive and not out of any concern for students or their learning.

49. In CSDP 490 (Senior Project), Dr. Azemi and Plaintiff co-supervised students who reused the same group project across two semesters. New students were expected to complete what the previous group had started. Many students plagiarized code from the internet and were unable to answer basic syntax questions during presentations. Their final submissions failed to produce a working database-connected app.

50. Despite Plaintiff's concerns and the fact that those students merited failing grades (F) based on plagiarism and non-performance and specific UMES rules, Dr. Azemi awarded nearly all students a grade of B or higher. These are false grades and violate UMES rules and HEA requirements.

51. Jane Doe, a student who failed Plaintiff's CSDP 222 course in both Spring and Fall 2023, complained to Dr. Azemi in Spring 2024. Without informing Plaintiff, he approved her to retake a final exam and later asked Plaintiff to sign off on changing her grade from F to C. Plaintiff refused due to lack of justification and documented her poor attendance and

performance. Dr. Azemi told Plaintiff he would "take care of it," and Plaintiff was later asked to sign a HelloSign request to change the grade, which she declined. (**EXHIBITS 4, 6**)

52. Dr. Azemi did not award fake grades in violation of the rules due to sympathy for UMES students – he frequently spoke about them in a denigrating way. He violated the rules for his own personal benefit – to collect a high salary based on deception about enrollment.

53. In October 2024, Azemi tried to coach students to provide negative feedback about faculty who were seeking to apply the correct academic standards including the Plaintiff, for his nefarious purposes.

54. Plaintiff took a legally approved 12-week parental leave beginning in the end of 2024. During this period, Defendant 3, Dr. Azemi, began reassigning her responsibilities and, without discussion or consent, removed her from teaching duties. This occurred despite her continued attempts to clarify work expectations and prepare for her return after the leave.

55. Upon returning from maternity leave, Plaintiff found that all of her Fall 2025 teaching assignments had been removed, and she was offered only non-instructional tasks, despite the department scheduling over 30 courses and claiming to be short of teaching faculty.

56. On March 21, 2025, Plaintiff attended a meeting she had requested to clarify Spring teaching assignments. To her complete surprise, Ms. Hairston from HR was in the room. She was not told in advance it would be in a conference room or involve Ms. Hairston. The meeting took a confrontational tone and focused on removing her teaching responsibilities. Dr. Azemi's harsh manner caused her to break down in tears. (**EXHIBIT 14**)

57. Plaintiff was offered three options: (1) a non-teaching full-time position, (2) a part-time adjunct role, or (3) no renewal of contract. This abrupt change in direction, made without performance-based justification, directly contradicts her contract as a Lecturer, which defines her role as continuing and teaching-focused. Dr. Azemi knew his actions were unlawful.

58. Azemi continued to intimidate and harass her after this meeting, mandating her to be in the office for 40 hours per week even though he himself is rarely at work.

59. On March 31st, 2025, and April 14th, 2025, Plaintiff emailed the USM Chancellor and Board of Regents to inform them about fraudulent practices and the hostile working environment in her Department.

60. On April 14th, 2025, Defendant 6, Jay Perman's assistant, responded asking Plaintiff to contact OIE. Perman completely ignored the complaint about fraud despite it being his legal duty to investigate it and take corrective action.

61. Plaintiff replied to this email expressing her apprehension about being sent to OIE because the director – Jason Casares – has a publicly known reputation for alleged sexual assault. Further, Plaintiff was aware that OIE has a very bad reputation for abusing investigation processes at UMES under the direction of Casares. This follows patterns reported by the media about Casares previously. (**EXHIBIT 7**)

62. Defendant 6 ignored Plaintiff's email and did not provide a response.

63. On March 25th, 2025, Plaintiff filed a complaint via the USM Fraud Hotline with information about enrollment, grading, and attendance fraud in specific courses. (**EXHIBIT 8**)

64. Plaintiff observed that the Hotline was set-up in a way that was difficult to use and designed to prevent complaints. It gave errors, did not work many times, and seemed designed to confuse those who tried to submit complaints. This contrasted with other agencies where the hotlines worked easily. (**EXHIBIT 9**)

65. Based on information and belief, Jay Perman learned about these complaints and developed animosity toward Plaintiff because he wanted to conceal and cover up fraud and protect his close associate, Heidi Anderson.

66. The USM Hotline staff never contacted Plaintiff to get more information or investigate, despite an investigation into UMES supposedly being ongoing under Perman about fraud and illegal activities by Heidi Anderson and her gang.

67. The maintenance of the fraud is compatible with Jay Perman's personal interests to collect a high salary of over $1.4 million, pretend importance, and gain social standing.

68. The knowing failure to investigate fraud is compatible with Perman's interests to not do the required work to perform his duty of care mandated by the USM statutes. Perman knew that he would be embarrassed if the fraud were to be publicly revealed because of scandals at other universities under his watch. Perman was apprehensive that if the enrollment, attendance, and grading fraud at UMES is revealed, there may be other whistleblowers who would come forward at other USM institutions where his maladministration has enabled such practices. Plaintiff's determination to expose fraud earned Perman's ire and generated his ulterior motive to retaliate against Plaintiff in cahoots with the other individual defendants who operated as one gang with the same interests that were not aligned with the interests of UMES or USM. Each knew they were acting unlawfully but did it anyway.

69. Jay Perman has been personally notified about fraud, civil rights violations, and other serious illegal activities committed by Heidi Anderson, Rondall Allen, Jason Casares, Alexandra Ginta Martin, Asad Azemi, and Matthew Taylor by numerous whistleblowers (**EXHIBITS 10, 11**). Perman cannot plead lack of knowledge and has no qualified immunity because of a direct knowledge, reckless disregard, and personal aiding, abetment, and enablement of unlawful acts.

70. Plaintiff also filed complaints with the US Department of Education Office of Inspector General, Office of Civil Rights, and Department of Justice.

71. Previously, Plaintiff had exposed cheating enabled by Azemi and Casares under the pretext of providing "accommodations" to students who had special needs.

72. Plaintiff had shown evidence that students were cheating on exams that were supposed to be proctored. Casares and Azemi were angry at being caught and exposed and developed a retributive animus toward Plaintiff.

73. On March 25th, 2025, Plaintiff filed a bullying, harassment, and discrimination complaint with OIE and sought supportive measures. (**EXHIBIT 13**)

74. From the moment of filing, it appeared that OIE staff – Jason Casares and Alexandra Ginta Martin – were hostile and biased toward her because of their friendship with Azemi.

75. During the initial meeting with Ginta Martin, she was seeking to ask trick questions to deceive Plaintiff into providing responses that were designed to be twisted to help Azemi.

76. Ginta Martin's questions about the facts, how bullying occurred, and what discrimination Plaintiff experienced were not neutral or open-ended.

77. Ginta Martin's questions were leading and slanted to assist Azemi.

78. Shortly after the meeting, Plaintiff emailed Ginta Martin with a transcript of her recollection of the meeting and the key facts supporting bullying and harassment to ensure that the accurate facts were recorded. (**EXHIBIT 15**)

79. Ginta Martin was unhappy that her deceptive and manipulative tactics were exposed and a record of what Plaintiff had stated in her interview was now documented.

80. Plaintiff requested supportive measures during the pendency of the investigation. Jason Casares declined because of prior animus and bias. (**EXHIBIT 17**)

81. Jason Casares and Alexandra Ginta Martin claimed to conduct an investigation and issued a report on August 1st, 2025 finding that Plaintiff's allegations were not substantiated. (**EXHIBIT 16**)

82. Prior to the report, Plaintiff asked for evidence to be sent to her for examination but was denied although it was costless, easy, and legally required for Defendants to send it. (**EXHIBIT 18**)

83. Plaintiff appealed this finding and submitted a memorandum on August 8th, 2025. (**EXHIBITS 19, 20**)

84. Plaintiff appealed that the OIE report is "biased, deceptive, and violative of due process protections in addition to the letter and spirit of UMES and USM policies." (**EXHIBIT 20**)

85. Plaintiff asserted "Casares and Martin did not interview the witnesses provided by Ms. Cui Fang despite the ability and the witnesses' willingness to meet by Zoom. OIE interviewed extraneous and irrelevant witnesses who had no direct knowledge of any relevant facts in an attempt to assist Azemi."

86. Plaintiff wrote, "Casares and Martin gave credence to unsupported and unsubstantiated claims made by Azemi but dismissed claims made by Ms. Cui Fang. This is both a violation of due process and an act of gender based discrimination violating Title VI and Title IX."

87. The appeal memorandum stated "Casares and Martin's biased investigation breached UMES's promise to not discriminate against Ms. Cui Fang based on gender enshrined in its promise to apply Title IX to the US Department of Education. This promise is cascaded to all employees and students by way of contracts and official UMES documents."

88. Plaintiff appealed that "Casares and Martin's biased investigation violated UMES contractual promises of good faith and fair dealing contained in the employment contract with Ms. Cui Fang."

89. Plaintiff explained biased witness selection:

"Martin and Casares intentionally did not interview witnesses who had direct knowledge about Azemi's bullying and violation of UMES policies. Ms. Cui Fang provided a list of witnesses who had knowledge of the facts but Martin and Casares made every effort to not learn the truth from them. They made perfunctory contact with these witnesses and did not offer them proper opportunities to testify. The witnesses wanted to ensure that the truth was recorded and wished to speak with a recording device because of their knowledge about Martin's deceptive tactics. Martin is known to make up statements or distort what people say in an attempt to help her allies. Martin knew that Ms. Cui Fang's witnesses would provide highly damaging information about Azemi's bullying and therefore did not want them to speak. OIE has provided no evidence that Cui Fang's witnesses refused to speak to them.

14

90. Further, Plaintiff explained:

"Martin used highly suspicious and deceptive tactics to select other witnesses who had no direct knowledge of any relevant facts in an effort to protect Azemi. The investigation claims that "other witnesses were identified by other witnesses and/or selected independently to serve as comparators." OIE is not in any position to "independently" select – that is not their role and they are biased. There is no provision in the rules to select witnesses as "comparators." What are "comparators?" The selection process for student witnesses demonstrates clear bias and a lack of impartiality. Of the three students selected for interviews:
•  Two had poor academic performance in my class, which may have affected their perspectives and introduced negative bias.
•  One of them had an attendance rate of less than 50%, which significantly limits their exposure to the course content and teaching methodology.
•  The other withdrew from the CSDP 222 course more than one month after the semester began and therefore did not complete the class.
•  The third student had never officially enrolled in any of my courses at all and, as such, cannot meaningfully evaluate my instruction."

91. Plaintiff challenged the selection of witnesses who were used to assess her teaching quality:

"This is an investigation about bullying and toxic workplace created by Azemi. It is not an investigation about my teaching quality. Martin and Casares have no qualifications to assess teaching quality and that is not their role at the university."

92. Plaintiff challenged Casares and Martin's qualifications or ability to assess teaching quality in computer science:

"If a qualified person in academic leadership and teaching excellence at UMES intended to evaluate my teaching performance fairly, they would have had to take a random sample or a representative range of students from all performance levels and attendance rates. In addition, as is standard practice in higher education, an assessment of teaching quality would have required an objective viewing of teaching in the classroom by an expert in that discipline."

93. Plaintiff noted violations by OIE in witness selection and evidence gathering:

"[OIE] engaged in a fishing expedition beyond their jurisdiction and competence to help Azemi by interviewing individuals with low performance, minimal engagement, or no actual experience in my class. These individuals had no connection with the subject matter of the investigation – my allegations of bullying by Azemi.

Moreover, despite my explicit mention of my graduate teaching assistant (TA) during meetings with OIE—someone who directly observed my instruction and student interactions—the TA was never contacted or interviewed.

This omission was deliberate and biased. It reflects a troubling disregard for relevant, first-hand perspectives that could have provided a more balanced and accurate assessment of my teaching."

15

94. Plaintiff asserted that the report was biased because OIE wanted to retaliate against her because she complained to the USM Chancellor and Board: "Ms. Cui Fang brought her complaint to the attention of the USM Board of Regents because the reputation of OIE is very bad on the UMES campus. This was done in anticipation of bias and retaliation. And that is exactly what transpired. The OIE's report itself references the complaint to USM Board of Regents and the whole slant of the investigation was tainted by a retaliatory animus."

95. Plaintiff noted OIE's bias in changing goalposts and the investigation was done in an "incompetent manner applying different yardsticks to achieve their previously determined outcome favoring Azemi. When they know that Azemi will be found guilty because the evidence is conclusive, they change the goalposts and claim that the matter is outside their jurisdiction whereas on similar matters that can help Azemi they are happy to make unsupported conclusions."

96. Plaintiff highlighted OIE's double standards and policy violations:

"OIE's claim that my concerns fall under "academic misconduct" and thus outside their purview is a clear error. Dr. Azemi repeatedly justified his retaliatory actions and reassignment decisions by attacking my academic qualifications and teaching performance — not through a fair or documented process, but through unilateral and punitive measures. His performance and qualifications are worse than mine.

His conduct, under the pretext of "academic standards," involved a pattern of public shaming, stripping me of teaching responsibilities, and forcing me into a non-teaching role immediately upon return from maternity leave — all without any prior warnings, performance evaluations, or opportunity for remediation.

This is textbook retaliation, not an academic review process. There are processes for academic evaluations that require the input of academic experts in particular disciplines specified by UMES academic policies. Azemi did not follow these policies but arbitrarily made up his claims for retaliatory purposes."

97. Plaintiff noted OIE's specious attempts to use technical excuses:

"Dr. Azemi's actions — including the abrupt cancellation of my evaluation meeting immediately after he was officially notified of my complaint — clearly indicate retaliatory behavior. They are temporally proximate and there is no other reasonable explanation for his abrupt change. His own email correspondence shows awareness of my report. The idea that he acted without knowledge is not credible.
Lastly, if the OIE disregards retaliatory actions simply because the form checked "gender identity" rather than "retaliation". This is an absolute lie because they have not followed their own policies repeatedly. For instance, they provided no notice that they were assessing my teaching as required by the policy and conducted a fishing expedition with weak students to defame me."

98. Plaintiff exposed biased and deceptive tactics used by Ginta Martin since the beginning:

"the fact that multiple individuals report similar patterns of mistreatment by the same supervisor are highly relevant by the university and USM's own policies and practices. They show there is a pattern and that the environment is hostile and toxic. For example, Azemi has used extremely disparaging and racially tinged language to describe UMES students analogizing them to "dogs." He has publicly claimed UMES students are not smart enough to study math and computer science. This created a toxic work environment for the whole department.

OIE lied to claim that "you cannot represent others". I did not need to represent others. My statement should have prompted a proper investigation into the experience of others in the department. I believe Martin and Casares are concealing known facts about bullying by Azemi using manipulative tactics."

99. Plaintiff exposed Defendants' lies about her performance given that there had never been any adverse performance evaluations concerning her:

"If Dr. Azemi was genuinely concerned about instructional quality based on the student complaints, why did he not observe or raise any of these issues during his own multiple in-person visits? He had direct access to my materials and classroom setting but never addressed any of the alleged issues during or after his appearances."

100.    Plaintiff exposed the fraud that came out from Azemi's own witness in the OIE report:

"One of the witnesses Dr. Azemi provided, Ms. Muna, is a staff member who has never taught any computer science courses. She once came to my office demanding that I include exact exam questions in the review materials I gave students. This suggestion is cheating and academic fraud. It directly conflicts with academic accreditation and fair assessment practices. If this expectation reflects a new departmental or university retention strategy, why was it never communicated to faculty formally? Such standards—if real—should have been disclosed clearly and uniformly."

101.    Plaintiff highlighted disparate treatment and discrimination:

"From Fall 2023 to Spring 2024, I co-instructed the capstone course CSDP 490 with Dr. Azemi. During that time, several senior students expressed frustration that they had not achieved the expected learning outcomes in earlier required courses—stating openly that they felt unprepared or had "learned nothing." This is unsurprising since Azemi has dubious competence and was violating academic standards.

Despite these concerns clearly pointing to issues with instruction in other courses taught by different faculty members, Dr. Azemi did not conduct any classroom observations, slide reviews, or unsolicited in-person teaching for those instructors. He made no attempt to verify the quality of instruction or course delivery in those cases.

By contrast, he repeatedly subjected me alone to intrusive oversight—including demanding my teaching materials without guidance, unexpectedly entering my classroom to lecture using my slides, and never offering an explanation to me or my students.

This selective application of oversight raises serious concerns of unequal treatment. If instructional quality and student outcomes were the genuine concern, such reviews should have

17

been applied uniformly across all faculty involved. The fact that only I was singled out for this level of scrutiny suggests targeted monitoring rather than fair academic administration."

102.    Plaintiff pointed out that OIE had ignored theft of her intellectual property by Azemi.

103.    Plaintiff's appeal memo highlighted bias by OIE in ignoring clear evidence:
"Between Spring 2024 and Fall 2024, multiple Teaching Assistants (TAs) raised serious concerns about student cheating to Dr. Azemi via email and in grading reports. Despite repeated efforts, they never received any response. As course instructors, we also reported instances of cheating to Dr. Azemi, but he consistently ignored or dismissed our concerns. On May 14, 2025, during the department's weekly Python meeting, Dr. Azemi explicitly stated: "Cheating is not an issue. Cheating is a way for students to learn to solve a problem."

This statement was deeply alarming, especially given the academic integrity standards we are expected to uphold. Furthermore, in the CSDP 490 senior capstone course, Dr. Azemi repeatedly encouraged students to use ChatGPT to search for solutions for linking databases and Python—without providing any clear academic guidelines for responsible or ethical AI use.

This directly contradicts the email sent by Dr. Dunn to all Computer Science faculty, which emphasized the importance of academic honesty and strictly forbade falsifying academic work."

104.    Plaintiff's appeal exposed OIE's bias and deception by victim-blaming:
"Labeling my reaction as "personal" ignores the power imbalance at play. It is not a "personal issue" to object when one's professional autonomy is repeatedly violated. It is not "aggression" to demand fair treatment. What Dr. Azemi calls a "very long email" was a reasoned, well-documented explanation of how his behavior diverged from university norms and targeted me unfairly.

It is deeply troubling that the OIE report adopted his framing of events without recognizing the context of discrimination and retaliation I was responding to. This shift in focus—from his conduct to my reaction—is itself an example of OIE's bias."

105.    Plaintiff's appeal highlighted Ginta Martin's lying and deception and violation of policy:
"... several statements attributed to me were taken out of context and written in a deceptive manner to convey a false impression, such as characterizing my professional objections as "aggression" or "overreaction." I also pointed out that the report failed to address key incidents of differential treatment — for example, Dr. Azemi's repeated, unannounced classroom takeovers of my courses using my teaching materials, a practice never applied to any other faculty.

Although my initial complaint letter did not include screenshots or emails, it did provide a detailed timeline and comprehensive written narrative of the discriminatory and retaliatory actions I experienced. Furthermore, during the intake and interview meetings with the OIE, I made every effort to provide accurate responses.

I pointed out early in the investigation that Martin's statements about what I had alleged did not match what I stated in the meeting.

To avoid further confusion, I explicitly requested that OIE send follow-up questions via email so I could respond clearly and accurately in writing. Despite this request, OIE never followed up with written questions and made no further effort to clarify why they were deceptive and manipulative.

The next communication I received was a notice to review the Preliminary Investigative Report.

This lack of communication and refusal to accommodate my request for written follow-up questions directly undermined the accuracy and fairness of the investigation, and it placed me at a disadvantage in documenting and clarifying my claims. It is an absolute violation of procedural due process."

106.    Plaintiff's appeal showed OIE misrepresenting academic fraud:
"From Fall 2021 to Fall 2024, some of the courses I taught had relatively high DFW (Drop, Fail, Withdraw) rates, with the highest being 71.43% for CSDP 222 in Spring 2022. There is nothing surprising about this. Grades reflect the performance of students. UMES students come with very low high school GPAs and SAT/ACT scores. A student who has a 2.0 GPA in high school·and a lifetime of very poor academic performance cannot be expected to miraculously score an A in an advanced computer science course. If such grades are seen, it immediately should raise red flags.

Dr. Azemi created Winter and Summer online versions of CSDP 222 that were significantly less rigorous—featuring online-only exams, no projects, and midterms that used the same set of questions twice. Students would first take the exam, receive feedback from the instructor, and then retake the exact same questions to obtain a higher grade. This is textbook academic fraud. The grades do not reflect academic performance and the whole scheme is designed to deceive."

The DFW rate for the Winter 2024 course dropped to 0%.

107.    Plaintiff exposed the hollowness of Casares and Ginta Martin's "finding" that Azemi was engaging in "team teaching" when it was in fact discrimination:
"Azemi claims experience at Penn State. But upon checking, Azemi did not work at the main Penn State campus. Penn State has many small rural campuses that are essentially like community colleges and do not have the same standards or reputation or rankings. This claim alone shows him for what he is: deceptive and manipulative. Regardless of Dr. Azemi's prior experience at a very small rural Pennsylvania State University's minor campus, UMES does not follow such a team-teaching structure. Furthermore, if Dr. Azemi truly regarded this as a standard practice, why was it only applied to me and not uniformly to all faculty under his supervision? This selective implementation highlights a clear pattern of disparate treatment. I repeatedly raised this concern—that I was being singled out—but OIE has consistently dismissed or ignored this core issue. Instead of acknowledging the discriminatory nature of this unequal treatment, OIE has attempted to frame it as a leadership style, thereby undermining the credibility and fairness of the investigation."

108.    Plaintiff exposed OIE's deliberate omission of original complaint about discrimination:

"In my formal complaint submitted to the Office of Institutional Equity (OIE), I explicitly identified Item 7: "Additional Concerns and Misleading Student Feedback Collection" as a critical issue. I clearly stated that the student feedback process conducted under Dr. Azemi's direction was biased and misleading.

However, this point was completely ignored in the final investigation report. No inquiry was made into this concern, nor was any response provided. Meanwhile, the report relied heavily on the same problematic student feedback—without assessing its integrity—as evidence to evaluate my teaching performance.

This selective consideration of evidence severely violates procedural fairness, especially when the ignored information was part of my official complaint. The investigative office had an obligation to examine my allegation and respond to it accordingly. By failing to do so, the investigation denied me a fair opportunity to clarify and defend myself.

Moreover, this omission raises serious questions about the objectivity and neutrality of the findings, as it reflects a clear imbalance in how the evidence was reviewed and interpreted. The students selected by Dr. Azemi to participate in the so-called "retention survey" from my course had, in fact, very poor attendance records. Over 80% of those students had attendance rates below 30%. The TA and I had repeatedly sent emails regarding their absences, with Dr. Azemi CC'd on these messages. Furthermore, our bi-weekly grading and behavior reports— submitted to Dr. Azemi—clearly documented these students' chronic problems, including not attending class, not submitting assignments, not responding to communications, and failing to take exams."

109. Plaintiff's appeal highlighted that a mandate to pass 90% of the students irrespective of their actual academic performance is fraud:
"... the department expects a minimum passing rate of 90%. This expectation was shared verbally in response to instructors raising concerns about widespread cheating. Dr. Azemi stated that "UMES students are very weak—if we fail them, we will lose them," which he used to justify ignoring cheating reports and urging leniency in grading. However, this 90% retention metric is not listed in any official UMES policy, departmental meeting notes, or faculty contract I have received."

110. Plaintiff exposed discrimination and defamation by Azemi in denigrating Plaintiff's work:
"while Dr. Azemi publicly undermined my qualifications and effectiveness, he privately relied on my intellectual contributions and assigned me critical curriculum development responsibilities. At the same time, he removed my direct teaching duties and used his authority to reassign courses I was originally scheduled to teach. His actions suggest he was lying, and he retained the benefits of my work while denying me equal professional standing and recognition."

111. Plaintiff highlighted a series of violations of her maternity leave protections – ignoring emails, not clarifying work expectations after her return, stripping her of teaching duties without cause, discriminatory work assignments, etc.

20

112.    Plaintiff highlighted the retaliatory and unlawful role change by Azemi that was ignored by OIE's report:
"I was not informed about the removal of my Fall 2025 teaching responsibilities until March 20, when I noticed I had no assigned courses and emailed the department. The secretary replied that Dr. Azemi would address this in the March 21 meeting. This clearly was not a case of transparent leadership or fair, timely communication about a role reassignment within the 90-day window, but rather a deliberate delay and concealment of critical employment information."

113.    Plaintiff showed that Azemi's attempt to force her into an administrative role was accompanied by a threat of firing:
"Dr. Azemi suggested I could learn administrative work from the secretary and stated that I was "part of the team." He even added that the position could be reframed as "Department Chair Supporter" or "Project Coordinator"—titles more consistent with staff roles—while explicitly noting that I would not receive any staff benefits.

Dr. Azemi also emphasized that if I did not accept the reassignment, he would find a replacement. This was obviously a threat."

114.    Plaintiff exposed the discrimination based on race, nationality, and gender:
"Dr. Azemi's actions are unlawful discrimination based on gender and race. He has been desperately trying to hire Iranians – his nationality – and trying to fire me to create a vacancy for his scheme.

There are significant inconsistencies that expose his false claims. Two male lecturers in the department, both of whom also had no prior experience teaching Python, were never required to learn from a male graduate assistant before teaching the course. In contrast, I was explicitly instructed to study from a male graduate assistant.

In teaching CSDP 101, I was required to independently create my own lecture slides, whereas these male lecturers were allowed to directly use materials updated by a TA. Even the quiz and exam banks were prepared and maintained by graduate students on their behalf. These disparities reflect a clear lack of consistent application of any "framework" and indicate a gender-biased, inequitable distribution of workload and resources."

115.    Plaintiff highlighted the role change being motivated by retaliatory animus as evidenced by the temporal proximity and contextual evidence:
"... reassignment occurred after I had filed a complaint with Ms. Hairston in Spring 2024 regarding Dr. Azemi's inappropriate demands. Specifically, he directed me to complete course development for CSDP 120 during Spring 2024 and for CSDP 150 during Summer 2024, even though I was not scheduled to teach either course. My requests for clarification and objections to these unreasonable assignments were ignored.

Later, in November 2024, in accordance with HR policy, I formally notified the department chair that I would be on partial maternity leave during Spring 2025. The subsequent removal of my teaching responsibilities appears to be a retaliatory action, not one based on any "reasonably objective and bona fide criteria ..."

116.    Plaintiff exposed Azemi's retaliatory cancellation of her performance evaluation:

"the department policy requiring faculty to complete an annual evaluation, I submitted my Faculty Evaluation Form for 2024–2025 on time before the April 28 deadline. Dr. Azemi confirmed receipt and scheduled my in-person evaluation meeting for May 1 at 2:45 PM, consistent with standard procedures for all faculty. However, at 12:12 PM on May 1, I was abruptly notified by the department secretary via email that my evaluation meeting had been canceled without any stated reason. The email stated, "We will get back to you with a new date and time once it has been scheduled." As of today, I have not received any follow-up or rescheduled meeting date.

This cancellation coincided with Dr. Azemi's receipt of the formal OIE complaint notification regarding my discrimination concerns, which was confirmed by Ms. Martin in my OIE meeting on the same day. Given the context and timing, this last-minute cancellation and the failure to reschedule my evaluation appear to be retaliatory."

117. Plaintiff concluded with a request for an impartial investigation:
"the serious and fatal errors committed by OIE and the manifest bias, the appeal authority is requested to throw out OIE's report and order a new impartial investigation of the toxic and hostile workplace environment created by Asad Azemi. It is known that Azemi was fired from his previous employment because of similar complaints by faculty. OIE's deception cannot make UMES blind to these objective facts."

118. On August 12th, 2025, Alexandra Ginta Martin emailed Plaintiff stating that Azemi had also appealed the OIE report and provided 5 days to respond to his appeal. This deadline was August 19th, 2025 at 5 pm. (**EXHIBIT 21**)

119. Azemi's appeal was essentially an attack on Plaintiff and he wanted her to be punished for complaining against him. OIE never previously informed Plaintiff about his complaint.

120. On August 19th, 2025, at 2:11pm, prior to the 5pm deadline for the appeal response, Heidi Anderson abruptly emailed Plaintiff to terminate her employment. (**EXHIBIT 22**)

121. Heidi Anderson provided no reason, blatantly violated Plaintiff's constitutional and legal rights, and USM policies. The abrupt unlawful firing whilst the appeal process was ongoing is illegal retaliation.

## STATEMENT OF CLAIMS

### COUNT 1: VIOLATION OF DUE PROCESS 42 U.S.C. § 1983

122. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

123.    42 U.S.C. § 1983 provides a civil right of action for deprivations of constitutional protections taken under color of law.

124.    Defendant UMES is a public university operating in the State of Maryland.

125.    A public university, when conducting a disciplinary proceeding and hearing, must provide the accused with prompt, meaningful and specific notice of the violation and charges against them, and the accused must have a meaningful opportunity to be heard.

126.    To satisfy the Due Process Clauses of the United States and/or Maryland Constitutions, an investigation and hearing must be a real one, not a sham or pretense.

127.    Plaintiff had a constitutionally protected property interest in being able to rely upon UMES's policies and procedures.

128.    Plaintiff has a constitutionally protected property interest in these Defendants' adherence and compliance with UMES's policies and procedures.

129.    Plaintiff and UMES had a mutual understanding that she would be disciplined under the University's policies only if it was proven that she had violated those policies.

130.    Natural justice and fairness dictate that individuals must have an opportunity to know what the law and policies are in order to conform their conduct accordingly; settled expectations cannot be disrupted.

131.    Defendants individually and collectively knew or ought to have known that Plaintiff could not be fired without following their own investigatory policies pursuant to a retaliatory and concocted complaint submitted by Asad Azemi that she had no notice of until the appeal on her own complaint against Azemi.

132.    Defendants improperly and unlawfully treated Azemi's complaint against Plaintiff as a formal complaint and terminated her without any lawful basis or finding of fault.

133.    By failing to comply with the UMES policy on discrimination and harassment and USM policies, Defendants violated rights, entitlements, and protections afforded to the Plaintiff under the Fourteenth Amendment to the United States Constitution.

134.    By maliciously and willfully violating the Title IX and UMES policy provisions including those relating to: 1. complaint intake, 2. witness selection, 3. recording statements, 4. impartial and neutral investigation, 5. gathering of evidence, 6. excluding irrelevant evidence; 7. provision of sufficient notice; 8. opportunity to examine evidence; 9. investigation of new allegations, 10. falsification of allegations/facts, 11. interim supportive measures, 12. deadlines for fair investigation and complaint resolution, individual defendants violated Plaintiff's constitutional and legal rights.

135.    By maliciously, deceptively, and willfully conducting the investigation and abusing processes to achieve an erroneous predetermined outcome against Plaintiff, the individual defendants violated Plaintiff's constitutional and legal rights.

136.    By imposing a sanction of termination without any adverse finding against Plaintiff, Defendants violated her constitutional and legal rights.

137.    As a direct and proximate result of the above conduct, Plaintiff Cui Fang sustained serious damages, including, without limitation, for unlawful termination, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future economic losses.

138.    As a result of the Defendants' malicious and unlawful actions, Plaintiff is entitled to a judgment against UMES and USM Defendants and each of the individual Defendants 1-6, an injunction and order reinstating her to her previous position, and damages in an amount to be determined at trial, plus prejudgment interest, fees, expenses, costs and disbursements.

**COUNT 2: Violation of Title IX and Retaliatory Termination**

139.    Plaintiff realleges and incorporates all allegations in paragraphs above as if fully set forth herein.

140.    Title IX provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

141.    Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendants UMES and USM.

142.    Title IX prohibits any covered entity from discriminating "in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time" "on the basis of sex." 34 C.F.R. § 106.51(a)(1).

143.    Title IX requires a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. §106.8(b)

144.    Defendant UMES discriminated against Plaintiff Reid because of her sex by applying an unfair, unreliable, biased, and inapplicable process in resolving her complaints against Azemi and Azemi's supposed complaints against her.

145.    The outcome in this case was erroneous because Plaintiff was innocent, did not violate Defendant UMES's policies, and was a victim of discrimination engaging in protected activity.

146.    The University Defendants' investigation and procedures were fundamentally flawed, and deprived Plaintiff of the protections she was entitled to under the United States and Maryland Constitutions.

147.    By willfully and maliciously violating Title IX's mandate for a fair and impartial investigation and flouting specific provisions including those relating to 1. complaint intake,

25

2. witness selection, 3. recording statements, 4. impartial and neutral investigation, 5. gathering of evidence, 6. excluding irrelevant evidence; 7. provision of sufficient notice; 8. opportunity to examine evidence; 9. investigation of new allegations, 10. falsification of allegations/facts, 11. interim supportive measures, 12. deadlines for fair investigation and complaint resolution, defendants violated Plaintiff's constitutional and legal rights.

148.    Plaintiff was subjected to retaliation by Defendants who had an ulterior motive to cover up discrimination, harassment, and fraud because they feared the consequences of exposure, liability, and personal accountability. Defendants were already under investigation, had been sanctioned by the Department of Education and wanted to eliminate Plaintiff's valid complaint. Plaintiff's termination was pretextual retribution for exercising her legal rights.

149.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, damages for unlawful termination, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future economic losses.

150.    Plaintiff is entitled to an injunction and order to reinstate her to her previous role and damages in an amount to be determined at trial, plus prejudgment interest, fees, expenses, costs and disbursements.

**COUNT 3: Violation of Due Process under the Fourteenth Amendment to the US Constitution.**

113.    Plaintiff incorporates by reference the allegations above herein as if fully set forth.

114.    Defendants engaged in deprivation of the Plaintiff's constitutionally protected property right in her job in several ways including but not limited to denying the existence of Plaintiff's property right in her role at UMES, denying Plaintiff the right to a procedures mandated by

UMES and USM policies and rules governing the removal of tenured academic staff, not providing any rationale for the deprivation of her property right in employment with sufficient specificity as to allow a meaningful response.

115.    Each of the Defendants knew that their actions were unlawful, that there was no legal basis to fire an academic instructor, and that they were violating UMES and USM policies protecting academic faculty. A reasonable person would have known that their egregious actions were illegal, but the Defendants engaged in their unlawful actions anyway for malicious purposes to violate Plaintiff's constitutionally protected rights. Defendants are not entitled to qualified immunity because they knew their actions were unlawful and had every opportunity to comply with their legal obligations. Defendants had training in the law but chose to violate legal provisions and adopt interpretations that they knew were specious.

116.    Defendants' actions have caused economic and non-economic damages and compensable damages as Plaintiff continues to suffer harm.

117.    Defendants' actions were an intentional and malicious violation of 42 U.S.C. § 1983.

**COUNT 4: Violation of Title VI**

118.    Plaintiff realleges and incorporates allegations in paragraphs above as if fully set forth herein.

119.    Title VI, 42 USC §2000d provides "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

120.    UMES and USM are public institutions receiving federal financial assistance. Plaintiff is a "person in the United States."

121.   Defendants discriminated against Plaintiff in numerous ways as outlined above including but not restricted to subjecting her to unequal and discriminatory workload allocation, differential pay, not crediting her complaints but giving unequal credence to Azemi's statements, discrimination in witness selection, not providing supportive measures, and unlawfully terminating her for participating in protected activity.

122.   Defendants were aware of their Title VI obligations and were trained in anti-discrimination laws. They acted with reckless disregard for Plaintiff's legal rights with ulterior motives because they wanted to punish Plaintiff for exposing discrimination and fraud and are not entitled to qualified immunity.

123.   Plaintiff suffered serious and continuing harm from Defendants' malicious and willful violation of 42 USC §2000d.

**COUNT 5: Civil Conspiracy Under 42 U.S.C. § 1985.**

124.   Plaintiff incorporates and restates the allegations above.

125.   Defendants undertook and actively engaged in a conspiracy to violate Plaintiff's civil rights under the color of law. They are not entitled to qualified immunity.

126.   Defendants knew that Plaintiff had raised complaints about unlawful practices at UMES and formed an intention to terminate her employment because she was seen as a problem for their schemes.

127.   Defendants Heidi Anderson, Rondall Allen, Jason Casares, Jay Perman, Asad Azemi, Matthew Taylor and Alexandra Ginta Martin conspired to deprive Plaintiff of her constitutionally protected property right to academic employment without due process by firing her unlawfully. Each of the Defendants knew that the termination was unlawful and that it was done in retaliation for Plaintiff's participation in protected legal activity. Defendants

actively engaged in the conspiracy and took actions in furtherance including meetings, preparing fake allegations, falsification of documents, notes, abuses of processes, and concealment of fraud to deprive Plaintiff of her constitutionally protected rights without due process of law. Defendants engaged in said activities knowing that their actions were unlawful or with reckless disregard.

128.    Each of the Defendants knew that USM and UMES mandated stringent due process protections prior to any adverse employment actions against academic faculty.

129.    Each of the Defendants knew the provisions of the Higher Education Act related to attendance requirements, financial aid obligations, grading standards, regular and substantive interaction requirements for students, class hour requirements for courses, credit requirements, administrative drop obligations for students not attending classes, rules for counting enrollment of students, obligations to honestly report enrollment numbers to the federal government and accreditation agencies, the statutory mandate for honest and good faith compliance.

130.    Each of the individual defendants engaged in fraud and retaliated against Plaintiff because she reported their fraud via the USM Fraud Hotline, by email to the USM Board of Regents, to the Department of Education Office of Inspector General, and to the Department of Justice.

131.    Defendants retaliated against Plaintiff as part of their conspiratorial scheme to conceal and cover-up fraud and deceive the US Department of Education, the USM Board of Regents, and the State of Maryland.'

132.    Defendants Anderson, Allen, Perman, Azemi, Taylor, Casares, and Martin manufactured fake statements, concocted lies, deceived and coerced Plaintiff, and abused processes in furtherance of the conspiracy. They imposed a sanction of termination although they knew they had no authority to impose such a sanction and that applicable rules gave them no such authority.

133.    Defendant Heidi Anderson promoted Casares and Martin and bribed them with grossly excessive pay in exchange for their participation in conspiracies to violate Plaintiff's rights. Taylor willfully provided false legal opinions and advice, knowingly abused processes against those who challenged Anderson's schemes in furtherance of the conspiracy including in the fake complaints and investigation against Plaintiff.

134.    Defendant Allen who is responsible for all academic faculty and compliance, acted in furtherance of the conspiracy to terminate Plaintiff's employment despite her stellar performance with an ulterior motive to defraud the Department of Education and accreditors.

135.    Each action of each conspirator in furtherance of the conspiracy is imputed to all members of the conspiracy.

136.    As a result of Defendants' unlawful actions, Plaintiff has suffered serious economic and non-economic harm and compensable damages.

**COUNT 6: Breach of Contract**

137.    Plaintiff realleges and incorporates allegations in paragraphs above as if fully set forth herein.

138.    A contract of continuing, indefinite employment existed between UMES and Plaintiff.

139.    A term of that contract was that Plaintiff would not be disciplined or terminated absent proven violations of stated policies of UMES following fair and impartial processes.

140.    Another term of that contract was that Plaintiff would have academic freedom to teach, that UMES would follow the laws, she would not be disparaged and her future employment opportunities in her field be eliminated based on false pretenses or unfair procedures.

141.    UMES breached that contract by disregarding its own stated policies, the law, and the agreement between it and Plaintiff by unlawfully terminating her.

142.    Plaintiff suffered and continues to suffer foreseeable damages from this breach.

143.    As a direct and proximate result of UMES's breach, Plaintiff sustained damages, including, without limitation, for termination, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future economic losses. Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT 7: Promissory estoppel**

144.    Plaintiff realleges and incorporates allegations in paragraphs above as if they are fully set forth herein.

145.    Defendants made a promise of continued employment when Plaintiff was hired, reiterated that promise numerous times, including during the meeting on March 21, 2025.

146.    Plaintiff was assured that she would remain employed at UMES with the same salary and benefits as recently as March 2025. That promise was live and unchanged until the abrupt and unlawful termination letter issued by Heidi Anderson on August 20, 2025.

147.    Defendants knew that Plaintiff would rely on that promise as she needed employment for supporting her family, had strong connections to UMES as an alumnus, and had expressed a strong desire to continue working for UMES. Defendants knew that the standard practice at UMES was for lecturers to continue in their roles for decades unless removed for cause based on a legally valid process.

148.    Plaintiff relied upon that promise and forbore from other professional opportunities. Plaintiff did not look for other jobs because of Defendants' promise of continued employment. Continued employment was the norm at UMES and it was reasonable for Defendants to expect her to rely and for Plaintiff to rely on that promise.

149.    Defendants' malicious termination of Plaintiff's continued employment expectations and reliance upon their promises has caused her serious economic and non-economic harm.

31

## COUNT 8: Negligent Hiring, Supervision, and Training

142.    Plaintiff incorporates by reference the allegations in paragraphs herein above again as if fully restated for this count.

143.    Defendants were negligent in hiring, supervision, and training of individual Defendants 1-7 and any reasonable person could have foreseen that the individual defendants' prior work records and actual work performance at UMES and USM made it highly likely that they would engage in unlawful actions including fraud, and discrimination based on race and gender.

144.    Defendants 1-7 had well-established records of problematic behavior and complaints about unlawful conduct that were not properly investigated. The numerous whistleblower complaints, lawsuits, and other complaints had brought to UMES and USM's attention serious illegal activities by the individual defendants. Defendants 8 and 9 were reckless or negligent in disciplining, training, and supervising their work to ensure compliance with the laws. Jay Perman's conflict of interest in relation to Heidi Anderson, and Heidi Anderson's close connections to the other members of her gang should have alerted UMES and USM to the need to exercise due diligence and oversight as the likelihood of illegal activity was foreseeable and very high.

145.    Defendant 6 was reckless in his failure to supervise Defendants 1-5 and 7 although he had cause to ensure they did not engage in unlawful activities because he was on notice from prior complaints, their employment records, and active investigations at UMES/USM. He ought to have foreseen the consequences of his recklessness and neglect of his duties and known that harm to the Plaintiff was likely. He is not entitled to qualified immunity.

146.    Defendant 9 was on notice about Defendants 1-7 actively concealing and covering up fraud. They were notified by Plaintiff and other UMES faculty but ignored the clear and convincing evidence of an illegal cover up and a sabotaging of the USM Fraud Hotline.

147.   Plaintiff suffered harm due to Defendants' negligent failure to hire properly and supervise adequately because it resulted in unlawful acts against her causing serious economic and non-economic harm.

### Count 9: Tortious Interference with Contract

148.   The allegations in paragraphs hereinabove are incorporated again by reference.

149.   Individual Defendants 1-7 knew that Plaintiff had a continuing contract of employment with the USM and UMES. They were aware that the tenure protections made it very difficult to terminate her employment contract.

150.   Individual Defendants tortiously interfered to terminate Plaintiff's contract. The fraudulent "findings", erroneous outcomes, intimidation, defamation, discrimination, and harassment were created by them to get Defendants 8 and 9 to terminate Plaintiff's contract. They knew their actions were unlawful and are not entitled to qualified immunity.

151.   The Plaintiff suffered enormous damages as a result of the involuntary termination of her contract particularly as she had relied on tenure protections guaranteed by the state to make financial plans for her future. Plaintiff had no intention of ending her employment and was harmed by the tortious termination of her contract by the actions of the Defendants.

### COUNT 10: Defamation

152.   Plaintiff realleges and incorporates allegations in paragraphs above herein as if fully set forth again.

153.   Defendants made false statements that Plaintiff is not qualified for her job, falsely accused her of not doing her job competently, and terminated her employment unlawfully on these false premises.

154.    Defendants' denigration of Plaintiff's qualifications and performance and communication of termination expose Plaintiff to severe reputational harm and ridicule.

155.    Defendants' actions were malicious and willful and with reckless disregard for Plaintiff's rights, reputation, or the truth because they knew that Plaintiff was an exceptional teacher and had received an award and students loved her.

156.    Defendants' defamation has harmed Plaintiff's career and future job prospects because prospective employers will see Plaintiff in a false light.

157.    Plaintiff has suffered reputational, emotional, psychological, health, and economic harm due to the Defendants' negligent and reckless actions.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests a jury trial and that the Court enter judgment against Defendants and provide the Plaintiff with the following relief:

1.  An injunction ordering Defendants to rehire Plaintiff at UMES with pay and benefits commensurate with her qualifications and experience;

2.  An order rescinding her termination from employment as null and void;

3.  A declaratory judgment that Defendants' actions violated the Plaintiff's constitutionally protected rights;

4.  A declaratory judgment that the individual Defendants engaged in a conspiracy to violate Plaintiff's rights;

5.  An order of compensatory and punitive damages from the individual Defendants in their personal capacities in an amount not less than $1 million;

6.  An order compelling the University System of Maryland to commence disciplinary proceedings against the individual Defendants;

7. Compensatory and punitive damages in an amount to be determined at trial but not less than $1 million from UMES and USM for the egregious violations;

8. Fees and costs associated with litigation and any other relief that the court deems appropriate.

### JURY DEMAND

Plaintiff hereby demands trial by jury for all issues triable by jury.

### Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. A.

I agree to provide the Clerk's Office with any changes to my address where case- related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: 8/22/2025

Signature of Plaintiff _____

Printed Name of Plaintiff: Cui Fang

Address: 1204 Emerson Ave, Salisbury, MD 21801.

Tel: 202-352-4792

Email: catherinefangcui@gmail.com

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **CUI FANG**<br>**Plaintiff**<br><br>v.<br><br>**HEIDI M. ANDERSON**<br>**RONDALL ALLEN**<br>**ASAD AZEMI**<br>**JASON CASARES**<br>**ALEXANDRA GINTA MARTIN**<br>**JAY A. PERMAN**<br>**MATTHEW A. TAYLOR**<br>**UNIVERSITY OF MARYLAND EASTERN SHORE**<br>**UNIVERSITY SYSTEM OF MARYLAND**　·<br><br>11868 College Backbone Rd<br>Princess Anne, MD 21853<br><br>**Defendants** | **COMPLAINT FOR**<br>**DECLARATORY AND**<br>**INJUNCTIVE RELIEF**<br>**AND**<br>**JURY DEMAND**<br><br>**Case No.** |

---

## VERIFICATION OF PLAINTIFF

**CUI FANG**, being duly sworn, deposes and says:

I am the Plaintiff named in this matter. I have read the annexed complaint and Exhibits, know the contents thereof, and affirm that the factual allegations contained in paragraphs 1-157 of the Complaint and the Exhibits are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

Signed under the pains and penalties of perjury, on this 22nd day of August 2025.

CUI FANG

36