# Exhibit 10

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

Whistleblower Complaint

**Rosalie I. Hornbuckle**



**Title: Director of Human Resources, Chief Human Resources Officer**
**Respondent Agency; University of Maryland Eastern Shore**

<u>**Persons Against whom the Complaint is Made**</u>

Dr. Heidi Anderson – President

Mr. Lester Primus – VP Admin and Finance

Dr. Robert Mock – Chief of Staff to President

Matthew Taylor – Legal Counsel for UMES

<u>**Underlying Facts**</u>

**1) Pre-Employment –**

  a) Interviewed for the Associate VP Position HR, at the request of President Heidi Anderson–
  b) Title switched to Interim Director of HR
  c) Function and Responsibilities all aligned with VP HR-
  d) @ final interview with President, Heidi Anderson, she explained that the position was going to be interim due to the climate on campus not trusting HR.
  e) President Anderson stated the position would be a part of the President's Cabinet, immediately and that the position would be transitioned to VP on July 1, 2019.  She stated that the interim was meant for the title and not the job.
  f) Dr Anderson, then asked what $ amount would get me there?  I stated that my salary was $160k and that I was in three searches, VP of HR Ithaca College, approximately 200; West Chester University, 175K and Frederick Community College $165k.
  g) President Anderson stated that she couldn't afford 200K; and could pay 135k and move the salary to $165k on July 1, along with the title of Vice President of HR, reporting directly to her.  She indicated that all the other cabinet members had to accept less due to the University's fiscal situation.

**2) Employment Offer**

  a) I was hired by the University of Maryland Eastern Shore on February 18, 2019, As the Interim Director of Human Resources, reporting to Mr. Primus, as a member of the President's Cabinet
  b) I am an African American Female, born on July 16, 1961 (age 58)
  c) I did an excellent Job.  Amongst my accomplishments was, remedying unfair labor practices, streamlining the recruitment process, cleaning up the payroll/salary budgeting system, and investigation of fraud and theft of resources and money in the Henson Center, and identifying payroll waste of University funds in the payment to individuals who were placed in fictitious jobs; and identifying abuse

1

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

of restricted funds to pay employees with federal government grants (i.e. Tittle iv); amongst other abuse of power for which the President sent me an e-mail commending my work on March 17, 2019.

3) Reporting Relationship –

a) Sometime in January of 2019, after the President had encouraged me to "to bring my talents back to an HBCU", and I had accepted the position and( I had withdrawn from the search for VP of HR for Ithaca College; CHRO for Frederick Community College; And Associate VP of West Chester University all of which I had an excellent chance of getting) on a housing trip to the area, President Anderson invited my husband and I to dinner;

b) She informed me that the position (HR) always reported into Finance and that they hired a new VP of Administration and Finance, who would be starting on Feb 4, 2019, and that the position of Associate VP would be a Director Position and would continue to report to Finance on paper.

c) She informed me that she had alerted Mr. Primus to the fact that my position would be on Cabinet and that it would be unofficially reporting to her. I expressed my displeasure with that, due to the lack of transparency; the fact that I had already withdrawn from numerous searches based on our relationship/her word; and the fact that HR needed independence from the control of Finance due to the historical relationship of both departments and the impact on the rest of the campus. She stated that she would discuss that with Dr. Mock her Chief of Staff. I once again expressed my concern.

d) Sometime at the end of January I received an email from Mr. Primus requesting a conference call, prior to the start of my employ. I discussed the tone of the e-mail with the President (I found it to be very authoritative, considering I wasn't yet employed with the University). I shared the email with President Anderson who agreed with me and stated that she would speak with Mr. Primus. I asked if she had discussed my role and the transition (reporting to her). She stated that she had. President Anderson said that she would call and speak with Mr. Primus, she apologized for his behavior and expressed that he was new to the scope of the role coming from a two (2) year community college. I asked her to hold off until Mr. Primus and I had talked since at times it was difficult to establish tone in e-mail and I would let her know how the conversation went.

e) On or around January 29, 1019 I received a call from Mr. Primus, sometime after 3pm. He started the conversation by reprimanding me ("we had an appointment for 3pm and I don't like a lack of punctuality). I greeted him and explained that my conference call with a client (Swarthmore College) ran late. During the conversation he expressed his views of HR and dictated how our working relationship would work. After, he spoke I highlighted for him my experience in Higher Ed, and gave him my philosophy on HR. After highlighting my experience, he toned down and the conversation ended on a better note from which it started.

f) I sent a text message to President Anderson, stating that the conversation was good. During a follow-up phone conversation with President Anderson, I described him as, chauvinistic, in-experienced and questioned if he was the right choice for the University considering the history of the finance area since he lacked management and interpersonal skills.

g) President Anderson said that the search committee loved him, and it was the only time that the committee was unanimous. She stated that he only had two-year experience and that together we would be able to groom him.

h) Sometime after, February 18, 2019, I found out that much of the search committee did not want Mr. Primus; that the members of the Administration and Finance area were all aligned welcoming his candidacy and the remainder of the search committee felt that he was known to Finance. Many felt that

2

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

there was a better qualified candidate with better credentials and University experience who had been verbally attacked by members of the finance team on the search committee, and treated so badly that he raised the treatment to HR.

i)   On February 18, 2019, my first day of work I was summoned to Mr. Primus's office.  During that meeting he gave me a folder full of reclassifications that he had approved and told me to finish processing them. He reiterated his philosophy on HR – "HR was to have independence, and that meant of complaints. HR was to keep out of financial matters, and we would get along".  I responded by letting Mr. Primus know that I appreciated his perspective and that I only knew how to do HR one way, based on my training and 30 years of experience.  And that I was sure we would get along because we all had a fiduciary responsibility to the organization.

j)   I met with the President that evening and discussed the conversation. President Anderson stated that she needed me to work with Mr. Primus while Dr. Mock worked with the new VP of Student Affairs, Mr. Hans Cooper.

k)   President Anderson also discussed with me the History and perception of the HR Department.  She made note to share a dated consultant's report on the department via email.  After reading the report it was clear that President Anderson had not read the report, because the report highlighted the deficiencies of the Finance Area, and the impact it had on HR fulfilling their obligations.  I found the consultants report to be relevant in terms of the strangle hold on HR by Finance.

l)   On Monday, February 25 I was in my office (a small room 8*8) meeting with my HR Manager, Mary Ames, when Mr. Primus barged in unannounced.

m)   Ms. Ames got up and had to brush around him, his posture was aggressive and belligerent.  My office was an 8*8 closet, with a broken phone and a computer that crashed every 20 minutes running windows 2007.  This was the former HR AVP's office.  I was sitting at my desk and Mr. Primus standing, towering over me while he slammed the door shut, literally on Mary Ames.  Patricia Mann, our HR office Assistant was at the front desk. Mr. Primus was upset over the following:

   a.   Me questioning his team; On explaining the policy to me, I asked the question because I was unfamiliar with that type of policy and wanted to make sure it was defendable.

   b.   My processing of reclassifications and processing of prior approved replacement positions; I explained that he had signed all the reclassifications and after reviewing the stack, I only processed the ones, that the Union MOU required us to process.  That the searches currently running were all approved prior to my starting.

Not processing or Denying other reclassifications primarily for Supervisory employees. I asked why the exempt supervisory employees making a higher salary should be processed if he was concerned about the budget?

   c.   He yelled, used language such as "what's wrong with you?  I know you are HR but let me explain to you what a budget is? He explained that we have to balance the budget by June 30th 2019. And that meant not processing re-classifications, and to stop hiring people. I was not to process any searches or any further contracts. We could hire who ever we wanted after July 1, 2019; I asked what was special about July 1, 2019?  How would we be able to afford positions then?

   d.   The fact that I had begun work to review and audit payroll and was questioning the lack of budget codes and item numbers associated with payroll angered him.  I questioned why he would be so upset about this since we would be helping him in his budget process

3

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

n) I held my composer although I was visibly upset and told Primus that I did not appreciate his approach. I stated that I was uncomfortable in the manner her was speaking to me.

o) After Mr. Primus left my office. I asked my staff, many of whom had gathered in the outer office, concerned for my safety, to write down what they had heard and observed, privately in their own work area and not to discuss it with each other or anyone else.

p) I went to seek out the President and found Dr. Mock (COS), I explained to him what had just happened, and he voiced very similar concerns to the ones Mr. Primus brought up and never once expressed concern over Mr. Primus's behavior. Much of the language that Dr. Mock used was very similar to Mr. Primus's. Internally I was alarmed, externally I tried not to make my emotions show. I asked Dr. Mock, why am I here if it weren't to help clean up the situation, we all found ourselves in? I stated that I withdrew from several searches in order to come here and support "Heidi", President Anderson, and in doing so my first obligation is to the organization, not to anyone earch.

q) Dr. Mock stated, "you proceed at your own peril". I asked what that meant? I got no reply. I felt threatened and was shocked.

r) I spoke to President Anderson later that evening and told her that I planned on meeting with Mr. Primus the next day try and square things up. I asked her once again if Mr. Primus knew that I would not be reporting to him? Because in my estimation he didn't act like it, and that I was physically afraid of him. She stated that she had spoken to Mr. Primus and that he knew I was unofficially reporting to her.

s) I described my conversation with Dr. Mock and questioned why a former President at Johnson and Wales would take a position as Chief of Staff? She stated that he was unofficially her Executive Vice President.

t) I further asked, why no one else on the Cabinet had not found or brought to her the issues that I was finding in my first few days. A question that I would continue to ask throughout my short tenure.

u) On or around February 25, 2019, I went to Mr. Primus's Office and spoke to him. I told him that his conversation with me was very aggressive. That I was uncomfortable around him regarding his behavior. I provided examples of his e-mail before either of us had started at UMES, and continued to provide him with examples of demeaning phrases and tone of voice. He stated that he acted that way because I was unprofessional. I asked him to describe the behavior that I exhibited that he labeled unprofessional. He stated, that I got mad when he was telling me what not to do and that I didn't follow his orders, so that's why he was yelling. Mr. Primus stated, "If you're unprofessional or question me, your boss, then I'm goanna give it right back to you!".

v) I asked Mr. Primus if the President had discussed with him my reporting order? He stated that your reporting order is on your contract.

w) I was shocked by his belligerent behavior; his responses and I had no reply.

x) On or around the evening of February 25 I spoke to President Anderson about my conversation with Mr. Primus. I described his belligerent behavior towards me; and that other females had outside of his office had reported similar behavior and interactions. I described his lack of emotional intelligence; management acumen, lack of technological skills and concern for the lack of his finance and administration experience.

y) President Anderson informed me that she was changing my reporting order immediately and that I would be named Vice President and she would make the announcement to campus. She sent me an email later that evening saying that Mr. Primus, she, Dr. Mock and I would meet at 9am, the next morning.

4

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

z) On or around February 26 at 9am, Dr. Mock, Mr. Primus, President Anderson and I met.  President Anderson verbally made the change in reporting order.

aa) I was shocked when during the meeting Dr. Mock stated that I was difficult to get along with and described me as not a team player.

bb) At the Cabinet meeting right afterwards, Dr. Mock would praise communication between The VP of Student Affairs and Mr. Primus by stopping the meeting and stating, "great teamwork guys", "that's commendable teamwork! Right there between Mr. Primus and Hans".  He would then pointedly look at me and state "that's how you handle teamwork".  I noticed that whenever I made comments or suggestions they were ignored.  At one point, Mr. Hans Cooper repeated verbatim one of my suggestions, to which Dr. Mock then praised him and said, "let's go with that"!

cc) I felt humiliated, marginalized, demeaned and felt hostility directed towards me by a male dominated environment.  I was shocked that President Anderson allowed that behavior to continue.

dd) It became apparent to everyone in the room that Dr. Mock was running the show.  Often telling the President, "no we're not going to do that", "let's move on" when President Anderson mentioned that the Governor wanted us to hire former Senator Matthias.

   a. In subsequent cabinet meetings Mr. Primus began ridiculing me in public.  I remember at a meeting during which President Anderson was asking for volunteers and Mr. Primus, volunteering for something and then stating, "We'll just have Ms. Hornbuckle handle the finances all by herself".  To which he and Dr. Mock laughed.  These comments came at a time when, I informed Mr. Primus that the budget which Ms. Michelle Martin and Ms. Beatrice Wright was responsible for, had not been updated with the system in 5 years.  That in HR, I was having the payroll Manager (who reported to HR) work with the system to help update the budget by including budget codes and item numbers for each employee.  That these efforts would only provide a current budget and that there was no way we could develop a balanced budget for the next Fiscal Year, because we would not meet the May deadline this late.

ee) At the Cabinet meeting the President made the announcement regarding my change in reporting order, at which time I commented "since HR no longer reported to Finance and now reported directly to the President, that I would be working with Mr. Primus to ensure that all Administrative HR and Payroll processes and approvals would be moved from Finance.  Thus, ensuring that we begin to streamline processes, move more quickly on recruitment requests etc."  I further stated that HR would continue to help Mr. Primus by cleaning up the payroll/salary budget him the budgetary codes and item numbers for each employee on payroll and providing it to the System.  Mr. Primus and the President thanked me.  The President then asked Mr. Primus to include me on the agenda for his next direct reports meeting to make the announcement to the Finance team.  He agreed but failed to invite me to the meeting.

ff) Dr. Mock was concerned that we would be giving the system too much information and didn't think that was a good idea.

gg) After the cabinet meeting I meet with President Anderson and asked her about the announce informing campus of my reporting order and new title, and the raise?

hh) She stated that Dr. Mock didn't think we should make the announcement public or that it was a good time to change my status.  I also asked why Dr. Mock had concerns, to which she indicated that it would water down his authority as Executive Vice President.

ii) President Anderson went on to tell me that the prior President, who she said she was friends with, had an Executive Vice President in the prior administration, a Ms. Kimberly Dumpson, and the Chancellor did

5

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

not want another EVP, because of what had happened.  So, Dr. Mock's role would have to be under the table.

## 4) Compensation Equity

a) **Hiring Senator Mathias –** President Anderson spoke to me in late February, she indicated that she was under pressure from the Regents, Chancellor and the Governor to provide Senator Mathias a position with the University.

b) She indicated that cabinet members (Dr. Robert Mock, Mr. Matt Taylor and Mr. Mr. Primus) did not want to do this.  She stated that in discussion with Dr. Mock, she was told to offer Senator Matthias a salary of $40,000 so that the salary would discourage him from accepting the offer.

c) She stated that in discussion with Dr. Mock and Mr. Primus, she had made the Senator an offer of $32k, because Dr. Mock wanted him to go away.  That Dr. Mock indicated that they didn't need a former Senator around meddling in the University's affairs.

d) I advised President Anderson that there was an approved open position that the University had not filled in several years, that it was still posted along with numerous other unfilled positions (That Ms. Martin buried positions, upgrades and searches that she did not want processed, often blaming the former Assoc VP of HR, Ms. Marie Billie for the lack of follow through) and that treating Senator Matthias in such a way could be a liability to the University as it related to reverse race discrimination and on compensation equity grounds.   President Anderson replied that she would only have $40k left after paying the new Provost.

e) I proposed that we hire senator Matthias, bring him in at the bottom of the scale with a base salary of $61,000 and 10% bonus when he hit measurable targets identified by her and the VP of Advancement.  I told her that Senator Mathias could be worth his weight in gold.  I processed the paperwork got her signoff and sent the form onto Mr. Primus.  Mr. Primus contacted my manager and stated that the position was only budgeted for part-time.  I spoke with the President who advised me to post the position and get the Senator on-board.

f) Mr. Primus and Robert Mock each came to see me individually to let me know that I was overstepping my bounds.  During a conversation with Dr. Mock he asked me "why do you think you're here"? Shocked, I didn't respond.  I felt threatened, by his tone and physical presence.

g) At the last cabinet meeting I attended it was announced that Senator Mathias had closed a deal of $1,000,000 donation to UMES; and had $1,500,000 pending.  President Anderson commended me on my judgment to encourage his hire.

h) **Hiring Nancy Niemi, Provost -** The President asked me to handle the hiring and the offer to Dr. Niemi, the finalist for Provost from Yale.

i) President Anderson indicated that I was to process a salary of $175,000. I questioned the dollar amount because that was the same salary that she indicated that I would make beginning July 1, 2019. I stated that as Provost she should be the second highest paid in the organization. I asked her to remember that we had Gender Equity to be aware of and that historically women didn't negotiate.

j) President Anderson "I did and so did Mr. Primus, VP Administration and Finance, and Hans Copper, VP Student Affairs.  Mr. Primus got $200k and Hans Cooper got $190k, and free University housing".

k) Mr. Primus is an African American Male

l) Mr. Cooper is an African American Male under 40

6

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

    m) I was shocked, (based, on our discussions regarding my salary) and stated that the Provost needed to be paid in the low 200K, President Anderson said that Dr. Mock suggested $185k to keep the salary low.

    n) I asked how could we pay the Provost below the VP of Finance? President Anderson stated because she doesn't know budgets. I replied that neither did the VP of Finance. I reminded her that I was cleaning up the budget and that Mr. Primus was completely lost. And conversely Mr. Primus didn't know how to be Provost

    o) The President agreed to provide Dr. Niemi 3% more than the VP of Administration and Finance for a total compensation of $206,000.

    p) Dr. Mock and Mr. Primus both expressed their fury towards me; and Mr. Primus went so far as to send the President an e-mail to the President requesting that the three of us meet to discuss salary offers and the impact to the budget.

    q) During a meeting with President Anderson she asked me if there were any positions that we could evaluate for savings?

    r) I informed the President that due to the decrease in student enrollment the organization was top heavy. I asked her about Ms. Alissa Carr's role in the organization.

    s) Ms. Carr had recently been promoted to AVP/Director of Marketing, placed on Cabinet with no demonstrable work assigned or being completed. And the faculty on campus were disgruntled with the lack of service and responsiveness from the office.

    t) President Anderson stated that she liked Ms. Carr and had promoted her with an increase in pay and placed her on the cabinet so she could break up the testosterone. And that Ms. Carr was responsible for reviewing her speeches, because there was no budget for marketing and branding.

    u) Ms. Carr is a white female.

### 5) Employee, Labor & Faculty Relations Issues and Policy Infractions – On my first day at work and after it became known that I reported directly to the President and not to Finance my schedule became overwhelming, with employees, Faculty and Union Representatives requesting to meet with me.

    a) **Labor Relations Quiana Tillman** – The union brought me 5 out of 10 cases on my first day of employment.

    b) Ms. Tillman, a Resident Hall Advisor in student affairs, while on Maternity Leave and under FMLA protection she was provided a letter of termination, written by her manager, Ms. Shannon Warren, which was delivered to her in a pizza parlor.

    c) Sometime later, after bringing this to the attention of the Union Steward, Joe Hartman, the letter was rescinded, and a grievance ensued. The Grievance was heard by Matt Taylor, legal Counsel, and Mr. Jason Casares, Equity, Title IX and Compliance officer.

    d) The grievance was denied, and a termination letter was then prepared by Mr. Taylor, providing 6 months' notice, with pay.

    e) Ms. Tillman and her newborn were confined to her University housing. A review of the documentation stated that she was terminated based on her "At-Will" status (Union Employee) due to her Performance.

    f) A review of her Human Resources file revealed good performance reviews, and no prior disciplines in her file.

    g) I spoke to Manager Ms. Shannon Warren, she informed me that she hadn't provided any performance feedback and further conversations indicated that there were personal feelings surrounding the

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

termination.  Ms. Warren also stated that she had spoken to Dr. Mock about all of this, and he, Dr. Mock, had approved. She also stated that she had already decided to promote someone else into Ms. Tillman's role.

h) I spoke with Mr. Matt Taylor, Mr. Jason Casares, Mr. Robert Mock, and Mr. Hans Cooper (VP of Student Affairs) asking what the grounds for the termination were?  They could provide no substantial reasons that violated policy, procedures, or performance.  During my meeting it was relayed that she was well respected by and responsive to students.

i) I contacted the President and informed her of the liability to the organization; the strength of the union's case for appeal and my shock that Mr. Matt Taylor, as legal counsel would write a letter to terminate that was devoid facts.  The President thanked me for "keeping us safe". Later I found out the following:

   a. Quiana Tillman had testified before the Regents on the loss of her job which resulted in a change to the AT Will employment policy.  I was commended for my actions at an HR system's meeting, on April 4, 2019, for doing the right thing, returning Ms. Tillman to work;

   b. Ms. Tillman had met with the President and informed her of her situation.  According to Ms. Tillman, the President hugged her and promised her support to ensure that she kept her job.

   c. That the President (who had stated to me that she had no knowledge of the issue) had full knowledge that Dr. Mock and Mr. Taylor were going to fire Ms. Tillman;

   d. The President right before my termination stated that I kept overstepping my bounds and that people were upset with me for reversing Ms. Tillman's situation.  That I had overturned a decision that others had weighed heavily and took weeks to make decisions on, for reasons not known to me. And that Dr. Mock was not pleased.

   e. That Dr. Mock had moved an employee into a defunct department in order to save her position; and took advantage of the Tillman situation to have her terminated in order to save the other young lady he was hiding, so that it would be budget neutral.

   f. The person, an admin employee was assigned to a department without a supervisor, no other employees and no work assignment.  This individual was paid for months until Mr. Cooper discovered her after I asked the Cabinet to do a physical census of their departments and update their organization chart.

   g. In the Cabinet meeting on or around March 27, 2019, Mr. Hans Cooper praised the work that Ms. Tillman was doing on the Spring Fling for students and discussed how much the Students loved and appreciated her. He also commended Ms. Tillman for her attention to detail, initiative and work ethics.

J). Mr. Tree Mills was an employee, in the finance area, pulled over by the Princess Anne police who had a large amount of Marijuana packaged for sale and eatables, with a UMES student in the car.  I first heard about the situation from President Anderson, regarding the large number of employees placed on paid Administrative leave pending investigations, back in early December 2018.

a) Again, this was a case handled by Mr. Matt Taylor and Mr. Jason Casares.  In this situation Mr. Primus, interjected himself by working with Ms. Mary Ames, HR Manager, to resolve the situation.  He interviewed the employee to hear his side of the story and recommended to Ms. Ames that we provide the employee with severance, rather than just terminate him.

b) I spoke to Mr. Taylor and asked why the paid leave vs. termination?  He stated that the University had no way of knowing if the employee had sold drugs to students.

8

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

c) I spoke to Mr. Primus and asked why he wanted to provide a severance for this employee? He repeated the same thing as Mr. Matt Taylor, that we had no way of knowing if Mr. Mills was selling drugs to students.

d) I discovered that Mr. Mills was the nephew of the Budget Director, Ms. Beatrice Wright. Over time I came to realize a pattern of behavior by Mr. Taylor to find ways of circumventing University Policy, creating confusion with the President for people in the university community who were favored; and falsifying documentation for those who were not in favor or those perceived to be a threat. Ms. Wright, Budget Director, had failed to complete the budget for the last five (5) years and was provided a 50k increase and promoted to Budget Director from an executive administration position. And lacked the competencies for the position.

e) A review of the police report and the Drug policy showed that Mr. Mills who had confessed to the possession of illegal substance had violated policy and could be terminated.

f) I met with Mr. Hartman, Union steward and Mr. Mills and terminated him for violation of the University's drug policy, and possession of an illegal substance, that he had pled guilty to.

g) Mr. Taylor, Mr. Casares, Mr. Primus, Ms. Martin and Mr. Mock all expressed disapproval to the President over this. In a meeting with the President, she informed me, "that while they were all upset with me. I had done the right thing and that she wanted to know If I had reviewed the Dr. Whitehead situation and the situation with Ms. Martin, both of whom has been insubordinate to me and that she wanted terminated". During this meeting she also complained about Ms. Wright and felt that she should be terminated as well.

K) Mr. Belton – was the head of the Physical Plant and was placed on Paid Leave at some point in the latter half of 2018. He was out on leave for approximately 6 months. The investigation was conducted by Mr. Jason Casares (Title IX, compliance officer) with oversight by Mr. Matt Taylor. Many of the allegations included fraud, quid pro quo sexual harassment, physical confrontations, and aggressive bullying. From the debrief provided to me by Mr. Jason Casares, the investigation at its embryo stage provided concrete evidence of violation of system policy, state and federal violations, and allegations of theft of university property. All initially, providing strong grounds for termination for cause.

a) I was shocked to hear from Mr. Casares that there was no write up of investigative notes and I questioned why it took so long to remove him from the university? Mr. Casares speculated that Mr. Bolton was a close friend of Ms. Michelle Martin, who had been the Interim VP of Administration and Finance and under her protection.

b) After questioning the President and Mr. Matt Taylor why we were paying so many people out on Paid Leave to do nothing when we were having budgetary crisis. I was told, by the President, to speak with Mr. Casares and get a handle on it. I was told by Mr. Taylor that they were protected from termination by the Termination Policy.

c) Prior to discussing with Mr. Casares, I became aware that Mr. Matt Taylor and Mr. Primus were planning on terminating Mr. Belton, without HR involvement, a violation of the system policy. I spoke to the President and she agreed that the termination should be handled by HR. I laid out a plan to contact Mr. Belton and terminate him via certified letter. I decided on Certified Letter and not to have him come to campus because of a violent physical incident that Mr. Belton had engaged in while he was Director of Physical Plant.

d) I was shocked when Mr. Taylor, and Mr. Primus became concerned about the potential of me meeting with Mr. Belton.

9

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

e) What I discovered was that Mr. Belton had given instructions to the Lock Smith, to make a duplicate Key to the former Title IX Director's office and to provide the Key to Mr. Matt Taylor and Mr. Jason Casares. The lock smith who is the son of the Union President, reported the order to his father who told him not to do it. Weeks after the order was given, the former Title IX office was broken into.

f) Mr. Jason Casares and Mr. Matt Taylor alerted the President of the lack of effectiveness and other issues with the former Title IX officer, the result was that Mr. Jason Casares took over the duties when the former Title IX officer, utilizing paperwork from the Office after the break-in.

g) I strongly believe the reason to originally exclude Me, HR from the process to terminate Mr. Belton was to ensure that Mr. Belton did not have any opportunity to bring up any compromising information against Mr. Jason Casares, or Mr. Matt Taylor.

L) Leigh Anne Vreeland – Administrative Assistant in the department of Human Ecology, Prior employment if Sociology. Came to my office to report concerns about Mr. Jason Casares and stated that she, "felt retaliated against for bringing forth a complaint against her former boss Dr. Boyd".

a) In 2018 Ms. Vreeland went to Mr. Jason Casares and complained that her Department Chair (Dr. Boyd) had removed her from her office after she presented him (Dr. Boyd) with pictures of used condoms found in her office. Her concern was that someone had access to her office which held student information and a potential violation of FERPA.

b) Ms. Vreeland had e-mails from Dr. Boyd instructing her to academically advise students in the program, (Department of Sociology), a violation of Accreditation standards and FERPA;

c) Ms. Vreeland had been employed in the department for over 10 years and enjoyed the respect of the faculty and the students in the program and according to her was successful at advising what she deemed as "her students". Her Student Advisees were successful and had a higher than average graduation rate, going on to graduate school and in several cases graduating earlier than anticipated.

d) Ms. Vreeland's goal in contacting Mr. Jason Casares was to get back her office after being placed at the front receptionist desk, in order to continue counseling student's academically in private, pursuant to Dr. Boyd's directive.

e) During the meeting, Ms. Vreeland informed Mr. Casares that she had ADD and that regardless of advising students she needed the Office as an accommodation which provided her the ability to focus without the major distractions at the front desk.

f) At some point in October (possibly October 9, 2018) Ms. Vreeland was given notice that she was being switched with the Admin in Human Ecology Ms. Theresa Shockley (who had worked in the Human Ecology dept for over 20 yrs) in order to help her ADD.

g) Directly after the switch of the two Admins, which caused disruptions to both departments, students and faculty; and resulted in Ms. Shockley suffering a stress related attack that landed her in the hospital.

h) Mr. Jason Casares was then given two (2) adjunct faculty assignments by Dr. Boyd, one class Mondays in the evening, and the other MWF during the workday, in violation of system and university policy. Dr. Boyd left the University one week later to attend to personal family issues.

i) Mr. Caasares, adjunct faculty assignment did not go through the appropriate approval process for payment and conflicted with primary job.

M) Dr. Prince Attoh, Director of the ORLD program – At some point in December 2018 Dr. Attoh was removed from campus, placed on Paid Administrative Leave based on a complaint of sexual harassment.

10

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

a) I took the opportunity to speak with Mr. Jason Casares, after the President asked me to check into the large number of cases of the University employees out on paid leave, when he stopped by my office regarding a write up of a union grievance handled by he an Matt Taylor for failure to pay a union member for work performed for a year.

b) Mr. Casares stated that he had placed Dr. Attoh on paid leave 6 months ago. That he had interviewed over 50 students and had about 15 more students to interview over the course of the next few weeks.

c) He stated that he had no written complaints and did not take notes on the matter

d) When asked what the allegations against Dr. Attoh were, he said it varied, he became very defensive and evasive. I asked if it was quid pro Quo, he said no and stated it was creating a hostile environment. Giving harder grades to white females on tests.

e) I asked Jason if he had met with or interviewed Dr. Attoh about the investigation. He said that he had not. I asked when the last time was anyone had communication with Dr. Attoh, Mr. Casares stated its been over six months.

f) I asked if he had applied the course rubric to the test grades in question? Mr. Casares replied that he doubted if the course had a Rubric.

g) I replied we must have a Rubric if the program was accredited. And if we don't have one, did we consider getting one of the other two professors in the program re-grade the test and see how it differs.

h) Jason then informed me that I report to the President and not to you.

i) I stated that it would probably be beneficial to him if he reported directly to Student Affairs, since you are now assuming the duties of the Student Disabilities Officer in addition to your other duties; or report to the Provost Office, because the President doesn't have the time to provide the oversight needed.

j) It's my belief that no investigation had taken place in over 6 months.

N) Quid Pro Quo sexual Harassment Claims –

a) According to the President, Mr. Robert Mock, Mr. Jason Casares and Mr. Matt Taylor had received complaints regarding an Assistant Manager, Mr. Kenny Evans in physical plant. According to reports Mr. Evans who oversaw housekeeping would hire young female housekeepers into a Contingent 1 category, in order to move to a more permanent status of Contingent 2, they would be approached by Mr. Evans to have sexual intercourse with him. If they refused, they were threatened with the loss of their jobs and terminated.

b) None of the above cabinet members and Mr. Casares saw the urgency in investigating these allegations. Mr. Casares stated that Mr. Evan's could not be investigate, because "the ones who complained have all been fired and are no longer here"; And that Mr. Kenny Evans was under the protection of Ms. Michelle Martin.

c) Mr. Casares stated that he believed that Mr. Evans was the father of Ms. Martin's child. He shared that all employment matters related to Mr. Evans was protected by Ms. Martin and that his employment file was maintained by Ms. Martin in Finance. Mr. Casares stated that I was causing problems because all HR issues were typically handled by Finance. He stated that certain people in the University were hands off.

d) To prove his point Mr. Casares then provided me with a disciplinary action that had been removed from Ms. Martin's file, it was a confidential last chance agreement by the former title IX officer Mr. Rudasill that had been buried in Ms. Martin's office; and

11

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

e) a series of confidential e-mails between Ms. Marie Billie (former Assoc. VP of HR) and Ms. Martin. In the e-mails Ms. Martin forbade Ms. Billie to attend grievance meetings in support of an employee had filed complaints against Mr. Evans.

f) I asked how Mr. Casares had obtained the emails and the report. He stated that Mr. Matt Taylor provided him access to all Ms. Billie's (former AVP of HR) e-mails and that of the former Title IX officers file.

g) At some point at the end of April Mr. Evans was rewarded with a substantial increase in pay and was appointed second in charge of the physical plant, while he continued to oversee housekeeping.

h) To defray liability to the university, I worked with the acting director of physical plant and set up an interdisciplinary team to hire housekeepers and process promotions of contingent 1 and 2s with HR oversight working with the Union.

i) Sometime towards the end of February, I asked for the email files of the former HR AVP and was denied access due to the confidential nature, by Mr. Taylor and the President.

j) I was shocked that Mr. Casares had access to all HR files.

M) Jason Casares File Review – after my conversation with Mr. Casares, I reported my findings to the President and Mr. Matt Taylor and expressed my concerns. I suggested that Mr. Casares needed closer supervision in order to limit liabilities to the organization. I suggested that Mr. Casares reporting order change to either Student Affairs, the Provost Office or as a last resort hire a director over Mr. Casares to provide more direction, development and supervision of his work.

a) The lack of concern from both President Anderson and Mr. Taylor bothered me, and I pulled Mr. Casares employment file and reviewed his application, resume and credentials background check. findings were:

b) Falsified application, claimed a PHD (ABD) in Philosophy – He had a Master of Science in Student Affairs;

c) Falsified his resume, - claimed that he was the Director of Multi-cultural affairs at Ball State University – He was a student worker doing filing and copying and after graduation was a coach mgr. for less than a year.

d) Googling his name revealed allegations of Sexual Misconduct. In discussion with the HR team, Ms. Mary Ames (HR Manager) and Ms. Gertrude Hairston (payroll mgr.) I was informed that his hiring created an outcry from parents and alumni that was ignored by Mr. Matt Taylor who hired him. That HR's role in the hiring process was relegated to processing the paperwork.

e) According to Ms. Mary Ames, HR Manager, Mr. Matt Taylor's response to this lack of due diligence was to add a question to reference checks going forward "Do you know of any embarrassing personal information why we shouldn't hire this person?" Ms. Ames stated that she didn't use the question because she felt that it could be construed wrongly and could potentially be illegal.

f) Sometime at the end of March I discussed; my findings with the President regarding Mr. Casares, my conversation with Mr. Mock after the cabinet meeting on March 27th, my concerns about Mr. Taylor refusal to hold Ms. Martin accountable; Mr. Primus's lack of ability in managing the finance area and the fact that I believed that she was not being provided truthful and full detail by these individuals and that Mr. Casares was Utilizing his position for personal gain.

g) Her response shocked me. She became angry and stated that:

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

    a. Dr. Mock was not happy with my "continual interference in business that did not concern me"; she said that she was inclined to agree with Dr. Mock that I was "just an angry black woman".

    b. That Mr. Mock, Mr. Taylor and Mr. Primus were upset because I had fired Ms. Lafabian Marshall (executive director of Henson Center) for theft and there was no one to handle summer camps.

    c. That Mr. Primus had the right to be upset "because of your investigations Ms. Michelle Martin was on leave and she was the only one who knew how to "handle the books"

    d. That there would not be any restructure of the organization

    e. That Mr. Casares had his own way of doing investigations that were unique and that he had kept her abreast of all investigations; and she was familiar with investigations taking longer than 6 months.

    f. That Mr. Casares reported to her and would continue to report to her and that she had regular updates from Mr. Casares and she had approved all his work.

h) In closing Dr. Anderson asked for the falsified documents from Mr. Casares (employment application, employment check from prior employees that I had completed) which was provided to her.

i) As I was leaving, she asked whether I thought Ms. Beatrice Wright (Director of Budgets), could be terminated. Surprised at this after our conversation, I stated that Mr. Primus felt he could train her (Ms. Wright).

5) Budgetary and Fiscal Mismanagement

    a. Most of the employees under Student Affairs are being paid by Title IV funding – including the Registrar's Office, highly unusual and probably a violation of Federal statutes.

b) UMES is a NCAA Division I school. Women Basketball, Bowling, & Golf teams are nationally ranked. They also have a Division I Men's basketball team

c) NCAA provides funding to support academic scholarship, tutoring and academic support. In 2017/18 FY the University received in excess of $200,000 From NCAA for restricted use. Most of the funding is unaccounted for.

d) The Athletic fees paid by students to support free admissions to the games etc. are not allocated to athletics

e) At some point in March of 2019, Assoc. VP Admin & Finance, Michelle Martin and Current VP Mr. Primus instituted a policy on campus restricting any other form of tender other than Hawk Card or Cash. The policy change was not communicated to anyone on campus and was implemented without notice, having an adverse impact on the student population.

f) Karen Harmon, an Auxiliary Internal Audit Accountant, was approached by the Manager campus bookstore for the remainder of the balance that could not be processed on Student's Hawk Cards, since the university refused to allow purchases on credit cards or debit cards.

    a. Book purchase of $380;

    b. Student tries to use a form of tender other than Cash (0.00) or Hawk Card (balance $190.);

    c. Bookstore runs total sale for $190 on Hawk Card;

    d. Bookstore is told by Ms. Martin & Mr. Primus that balance of $190 will be placed on Students Account with the Bursar's office and the payment transferred to the bookstore from the students account with the Bursar.

13

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

g) Ms. Karen Harmon advises the Bookstore that she cannot place balances on student accounts when they have already run purchases as a total sale on the Hawk card.

h) Ms. Harmon refused to process the balance onto students accounts without substantiation that the balance was owed. Ms. Martin then contacts Ms. Harmon and threatens to fire her if she does not comply. Ms. Martin tells Ms. Harmon "to get with Mr. Billie, University Bursar, and add the remainder of the lost sale to each student's account and to pay the Book Store and reminds Ms. Harmon that they both work for her"

i) Mr. Norman Billie, Bursar, refused to put charges on Students' Accounts citing the illegality of the process, and after some badgering from Ms. Martin, Mr. Billie conveys Ms. Martin that he will only comply if Ms. Martin or Mr. Primus documents the specific request in writing.

j) In a meeting with Mr. Primus he advised me that it was normal accounting procedures to charge balances to student accounts without their knowledge

k) Henson Center is a revenue generating INN, with non-revenue generating office, classroom and ballroom lab space and kitchen for the degreed hospitality program.   The Inn was run by a General Manager Lafabian Marshall, close friend to the Associate VP of Administration and Finance, Michelle Martin.

6) Financial Misconduct; Subjecting Students and UMES Community to potential Harm; and Abuse of Authority
A) At some point in March of 2019, Ms. Harmon made me aware that Ms. Marshall (GM Henson) was holding events on campus and not logging the events into the system.  And that Ms. Martin had instructed the Registrar to provide Ms. Marshall with access to book the non-revenue generating classroom and lab space in the Henson Center.  The registrar Ms. Duffy complies with the request despite a State Audit's report finding. This violation of policy and procedure resulted in:

    a. Several false bookings, parties that were held in the Henson Center that the University was not aware of and therefore not able to track monetary transactions.

    b. In October of 2018 an event was held for a Biker Gang and listed as an employee appreciation event in a non-revenue generating room in the Henson Center.  Ms. Marshall notified Security that they would not be needed for the event.

    c. Petty Cash was used to purchase the alcohol for the event at a local liquor store.  Only Ms. Marshall and her assistant would run the bar for these types of events and the Assistant General Manager sent home, from his regular over night shift.  No bar receipts were ever turned in.

    d. The Biker event in October of 2018, turned into a brawl sometime in the early hours of the morning.  Princess Anne Police notified the campus police that they had received a call from campus that there was a fight on campus.

    e. Both Campus police and Princess Anne police responded and broke up a brawl that involved the bikers with mace and batons.  The Biker gang left campus and continued the fight at their headquarters in Virginia, where the fight resulted in one of the bikers being shot and killed by another biker, investigated by State police.

B) In October of 2018 a second event was scheduled in a non-revenue generating space in the Henson Center as an anniversary celebration.  Either the State Police or the FBI, who had started surveillance into gang activities in the area, intercepted a series of flyers produced by the biker gang of a party that was to be held

14

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

at the Henson Center. The Authorities contacted the Interim head of Campus Police and notified him. The Interim head of campus police cancels the event citing false bookings with Ms. Marshall and her direct supervisor Ms. Martin.

C) Ms. Karen Harmon (accountant), began to detail a series of cash handling accounting procedural violations with which Ms. Martin was excusing Ms. Marshall on.

   a. continued failure to put revenue event transactions into the hotel booking system;
   b. Utilizing the facilities and other University resources for personal monetary gain, Several Superbowl parties with cash bars, where members of the campus community attended, including Ms. Martin, Mr. Evans, Mr. Boyle. For one party a review of Ms. Martin's work cell phone showed text messages to Ms. Marshall's cell phone requesting her (Ms. Martin's) preferred choice of wines, that she wanted Ms. Marshall to purchase at the local liquor store.
   c. Theft of University resources targeted for student's educational program; Each year in the spring the University Hospitality program host a series of luncheons that the program markets to the immediate community with ticket sales. The event is very popular within the Salisbury and Princess Anne Communities. The event provides the students in the program with hands on experience of planning menus and exemplary customer service experience. The ticket sales are used to defray the cost of the event, outlaid by the department. Ticket sales are collected by the Auxiliary and never returned to the program. Chef Wallingford, lecturer in the Program stated that he has asked Ms. Martin for the proceeds to be credited back to the program a request that has been denied.
   d. Housekeepers assigned to the Henson Center, have reported that during the "under the table events", that they are sent home by Mr. Kenny Evans and docked hours because they don't want housekeeping around.
   e. One of the main purposes of the Henson was to provide training for the students in the Hospitality program. Prior to Ms. Martin and Ms. Marshall taking over the running of the Henson center, many of the students who worked in the Henson Center were students from the program. In fact, the Assistant General manager, Kevin O'Dell was a graduate of the program. By February of 2018 no students of the Hospitality program worked for the center. Because of the way Ms. Marshall treated people.
        a. Mr. O'Dell had met with Mr. Mathew Taylor, after he had resigned his position as Assistant GM, due to the stress that it was causing in his personal life. He detailed for Mr. Taylor the issues including accounting procedures, lack of proper cash handling and the verbal abuse that students were subjected to. Mr. O'Dell came to speak with me in mid to late March and provided for me an example of the treatment and verbal abuse students experienced. There was an e-mail sent to Ms. Martin from an Alum who had witnessed a verbal attack on a student by Ms. Marshall while staying in the Henson.
        b. Ms. Martin had never responded to the email and the student quit the work study job in Henson.
   f. I notified the President of the issues in the Henson Center along with the issues regarding the student accounts and other concerns brought to me by Ms. Harmon. The President asked me if Ms. Harmon was the same individual who had spoken to Dr. Mock? I indicated that she was, surprised to be aware that the President knew that this had all been brought to Dr. Mock's attention and he had done nothing. I told the President that the accounting

15

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

irregularities were such that we should bring in the State to do an Audit of Auxiliary. After speaking with Dr. Mock and Mr. Taylor the President advised me that she had been convinced to bring in the System Auditors because the State had done an Audit several years ago and found so many findings that she felt it was better for the system.

g. The President was leaving to attend a trip in Argentina and stated that Mr. Taylor would handle the Audit. Mr. Taylor then informed me that only the President could recommend an audit.

h. Ms. Marshall was terminated. When I recommended Ms. Martin's termination Mr. Taylor intervened and persuaded the President to place her on paid leave. It is my understanding that Ms. Martin has been returned to work.

7) Failure to fill critical vacancies – The campus for the most part is being run by interim appointees and in many cases have unfilled crucial vacancies, in order to have an appearance of a balanced operating budget.

a. The Director of IT is retired from Salisbury University and collecting his pension from the system. in order to get around the System rules regarding hiring retirees, he has been given a contract by Ms. Michelle Martin.

b. The head of Security is an interim position, he was refused the permanent position because Ms. Martin did not want to "hire a white man for a job at a black university"

c. The Director of Auxiliary had been posted for 3 years and not filled, because Ms. Martin assumed the position of Director of Auxiliary; Ms. Martin was also the Direct Supervisor of the Bursar, Internal audit functions; and indirectly Grant Accounting. In any other institution this would pose a concern with checks and balances.

d. Facilities Director position was vacant, and the University was refusing to fill it. There was no one qualified or who had the competencies to do the position.

   a. In April of 2019, the university was going through the process of building a Pharmacy building (despite the lack of enrollment in Pharmacy programs throughout the country and the lack of enrollment at UMES overall) in an effort to get the plans approved for the building they were using the Electrical Supervisor as an Electrical Engineer to design the electrical system of the new building; and the HVAC Supervisor functioning as an Engineer. Both of whom were spending all their time in Facilities and no coverage for Physical Plant.

e. Physical Plant – Has an Interim Assistant Director, a female (whose salary was less than other male counterparts with less responsibilities and education).

f. The Fleet Coordinator position, was not replaced and the Interim AD was required by Mr. Primus to assume the duties, manning a desk in the back of the plant for 8 hours a day, unable to function as the Interim Director of Physical plant.

g. Many Housekeepers, Maintenance Personnel, Grounds Keepers were laid off without the System's knowledge and not replaced.

h. Overtime in physical plant, grounds and housekeeping are high as a result of staffing shortage; employees are often not paid overtime because the supervisors who report directly into Finance are afraid, to process the hours because OT is not allowed, a violation of DOL, FLSA.

i. Faculty Promotional increases (Assistant to Associate etc.) have not been paid since 2009 (possibly since 2005)

16

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

j.  Adjunct Faculty and Coaches go for numerous months without payment for work done. Their contracts are held up for months in Finance with the VP and Associate VP of Administration and Finance, in order to balance the budget.

k.  The "Friends of", Assoc. VP of Admin and Finance are routinely rewarded with salaries outside the scope of their responsibilities, with Mr. Matt Taylor finding a way to make it happen. For example:

    a. Dr. Whitehead, former Assistant Provost, $138,000;

    b. Promoted to Interim Provost, $180,000;

    c. Removed as Interim Provost, for cause, had a position created for her as an administrative coordinator in the International Program, @ $138,000. Top of the scale for Admin Coordinator is $61,000; after Mr. Taylor convinced the President that she was subject to notice under the termination policy.

    d. The President, Heidi Anderson, with advice of Matt Taylor, legal counsel, secretly provides free housing to VP of Student Affairs (Hans Cooper), in violation of State audit recommendations. There is no documentation in his offer letter of the arrangement and the value of his housing is not being taxed.

        i. On April 3, 2019 I sent an e-mail to the President informing her that the VP of Student Affairs, Mr. Hans Cooper was caught twice breaking into the Provost Office late in the evening (around 7pm) by the Associate Provost Dr. Wade.

l.  **Gross Budgetary Mismanagement**

m.  As discussed earlier, Ms. Michelle Martin and Ms. Beatrice Wright budget officer are responsible for maintaining the budget system with the system office. A review of the system (conversations with Monica West) found that the University budgets had not been updated in 5 years.

n.  I strongly suspect, that this is intentional. It makes it easier to hide from the system the cash flow management; accurate headcounts; misappropriation of funds involving Title 4, NCAA restricted funds (restricted funds such as NCAA dollars were being swept into general funds to help balance the budget, thus creating supposed shortfalls in the Athletic programs)and gross mismanagement occurring at the University.

o.  As I began the update to the payroll system, having my then Payroll Manager work with Ms. Monica West at the system office, to assign budget codes and item numbers to each employee; and building a position control management database, I was continually told that I was overstepping my bounds.

p.  Suspicious, Fleet – The majority of the university fleet is leased, what is remarkable is that much of the fleet is aged. I brought this to the attention of President Anderson in early March 2019, who stated that she would have Dr. Mock look into it.

**8) OSHA Violations & Safety Concerns**

a.  There was an OSHA recordable incident that occurred approximately one or two weeks prior to April 5, 2019. In short when transferring oil from boiler 1 to boiler 2 over 100k gallons of oil was contaminated with water. In addition to the waste of resources, the President, Mr. Taylor, Mr. primus and Dr. Mock were not concerned. I continued to express my concern, as I pointed out the lack of Mr. Primus's competency and the fact that he was way over his head and the lack of safety for our employees. During my meeting on March 27, with Dr. Mock as I tried to explain the potential risk/liability, he waved me off and said "yeah you keep saying that".

17

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

b.  Since no one was concerned, I reported to the physical plant to investigate the incident the following morning at 8am, as required by OSHA and submitted a report to Mr. Primus on the findings:

  a.  I discovered:
  b.  A lack of safety procedures, failure to tag and lock out each step of the two-day process required to switch from one boiler to another;
  c.  Supervisors not qualified to lead or having knowledge of OSHA procedures;
  d.  HVAC Supervisor, working outside of his License, functioning as an Engineer working primarily in Facilities leading the efforts of the building of the new Pharmacy;
  e.  Electrician Supervisor, working outside of his License, functioning as an Engineer working on electrical plans for the new building;
  f.  Critical understaffing –boiler house staff reduced to two operators
  g.  For 1000 acres of campus the staff had been reduced from 17 to 7 grounds keepers
  h.  No Safety Trainings for any personnel
  i.  And a lack of proper PPE equipment

9) Retaliatory Disciplinary Actions:

  a.  My employment with the University was terminated on April 5, 2019, after the discovery, reports and meetings detailed above.
  b.  On March 17, 2019 the President sent me an email commending my performance;
  c.  On March 27, 2019 I met with Dr. Mock, as the President requested, when I was verbally attacked and put in my place for informing about Mr. Jason Casares, to Mr. Taylor and the President; Dr. Mock was also upset at me for my role in removing Dr. Whitehead from campus, which should have been done by Mr. Matt Taylor initially when she was removed from acting Provost. Mr. Mock in this conversation and others berated me for the suspension of Ms. Martin and Ms. Marshall who he continued to state should have been handled by Mr. Primus.
  d.  On March 28, 2019, I wrote Dr. Mock about his sexist treatment of me during the meeting on the 27th. Having made similar reports of Mr. Primus's behavior towards to the President in the past. In fact, it was this type of sexist and belligerent behavior that initially moved the President to change my direct reporting order.
  e.  On April 1, 2019, I met with the President who stated, "Rosalie I like having you here, I hope you like being here. I am not changing Mr. Primus's portfolio. And Jason is going to continue to report to me."
  f.  On April 3, 2019, I sent an e-mail to the President and Mr. Matt Taylor formally documenting the issues concerning Mr. Casares, his falsification of documents (employment application, resume degree and his experience); Mr. Cassare's utilization of his position for his own personal gain, obtaining adjunct positions while investigating a chair and then moving the employee out of the way.
  g.  The April 3, 2019, email also documented Mr. Matt Taylor's involvement in trying to get a key made to the former Title IX office and his inability to supervise investigations. And documentation showing that the reason UMES Affirmative Action Plan had not been completed was because it was assigned to Mr. Taylor, with specific instructions given to the consultant to no longer communicate with Ms. Gertrude Hairston in HR, who had previously provided the information to the consultant and had successfully completed the reports until it was taken over by Mr. Taylor.
  h.  In a separate e-mail, On April 3, 2019, sent only to the President, I made her aware of the fact that Mr. Hans Cooper had been caught breaking into the Provost's Office On two consecutive nights and

18

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

had been caught by Associate Provost Dr. Wade. Behavior very similar to the break-in to the former Title IX officer's office.

i. On April 4, 2019, I attended the System HR Meeting at University Park. I notified Ms. Carolyn Skolnick at the end of the meeting that there were issues that I was concerned with at the University. I gave her the Jason Casares issues as example, my findings regarding non-payment for faculty promotions, and the lack of budget updates from the University in the last 5 years. I also told Carolyn that Mr. Matt Taylor was complicit. She stated that I should speak with her boss. I stated that I had sent the President the e-mail the evening before and asked for time to let President Anderson respond. We left it that if President Anderson did not respond that I would reach out and set up a meeting with her boss.

j. On April 5, 2019 I was terminated for cause. I was not provided any notice, pursuant to the policy on termination. My termination letter erroneously indicated that I was in my probationary period. A fact that Mr. Taylor and Dr. Mock would have known, since they had requested a copy of my offer letter from Ms. Mary Ames in HR on April 4, 2019.

k. The termination meeting included President Anderson, Dr. Rondell Allen (Interim Provost), and Myself. I read the letter aloud and for each item I asked for an example of the behavior or actions that constituted the vague points in the termination letter. For each one President Anderson stated, "I have examples, I'm just not going to tell you!" I would then turn to Dr. Allen and asked if he had any. Dr. Allen stated that he had none and was just there as a witness and that he felt that I had done a lot to promote the cause of the faculty in the short time I was there.

l. President Anderson then told me to hurry up and to read in silent. I stated I wanted to read the letter out loud so that I could ensure that Dr. Allen understood. When I read the last point President Anderson stated, ok that's it she got up from her desk to show me out. I got up surprised that she had not asked me to sign the letter and left the Provost Office.

m. I was escorted from the Provost Office by an African American male campus Police Officer. The Officer was extremely cordial and asked if I needed help packing up my office. I replied that I did not have any personal belongings in the office except for my pocketbook and car keys. He asked for my University badge and Office Key. I explained to him that I had attended a System meeting in Maryland yesterday (April 4, 2019) and that I had forgot my keys and badge in the briefcase that I had taken to the meeting.

n. Ms. Mary Ames (who I had often carpooled with), approached the officer and I at that point. I explained what was happening and Ms. Ames volunteered to pick up the badge and key at 5pm that evening and bring it to the security office. She further explained that she was in interviews all day and could not get it before. With the matter of the key settled the officer then walked me to my car to escort me off campus.

o. When I got home, I informed my husband of the events, and upset I went upstairs to my bedroom to try and sleep. I informed my husband that Mary Ames was expected at 5pm to get the office key and my ID. I placed the key and Badge on my nightstand where my husband would be able to find it.

p. I received a text from Ms. Gertrude Hairston, *"Dr. Mock stated that you would be returning your keys, photo identification, etc. They would like to have these by 3p.m. today. Mary will not be leaving work until 5 p.m. and they want the items by 3p.m."* I replied, *"Sorry I'm not coming back to campus. I'll give to Mary. Best"*

q. I then fell asleep out of pure emotional exhaustion. When my husband woke me and asked for the key and badge, I assumed it was 5pm. My husband returned upstairs and I noticed it was around

19

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

2pm. My husband informed me that a White Police Officer in an unmarked police car wearing his UMES uniform and gun had come to the house. The Officer instructed my husband that I had failed to sign a letter and that I needed to sign it. My husband a African American male, told the White officer that I think you're here for her keys and ID badge. He came inside to get it and then provided them to Ms. Ames who was with the Officer. The Officer again stated, that I needed to sign the letter, and my husband told the officer, "its my understanding that she no longer works for you. You're entitled to your property and that's it. I'm not asking her to sign anything". With that the Officer returned to the car and left the property. It should be noted that the Officer was respectful.

r.   It was obvious that the Keys and the badge were a ploy in order to scare me into signing the false termination letter, that President Anderson had failed to request. And illegally sending a white Armed Police Officer, to my home in Salisbury outside of his jurisdiction, UMES Campus of Princess Anne, was a racist terroristic threatening act towards me orchestrated by senior cabinet members of the organization.

10. *Post Termination retaliation and Harm:*

a)   I worked for the University of Maryland Eastern Shore (UMES) from February 18, 2019 to April 5, 2019, therefore I was not eligible for unemployment from the state of MD through UMES. I therefore applied for unemployment in the State of Pa, which would impact my last employer The City of Philadelphia, where I served as the Chief Human Resources Officer for the Philadelphia International Airport and Deputy Director of HR for the City of Philadelphia.

b)   UMES under the guidance of Mr. Matt Taylor and Dr. Mock contested my unemployment making false allegations against and causing harm to my reputation. At one point after I had appealed, they held up my claim by refusing to comply with the adjudicators time frame in order to submit evidence supporting their claim of fraud against me. It wasn't enough that they had conspired to support members of the UMES community who continued to violate the public trust; participate in fraudulent behavior; commit gross mismanagement and create situations that were Grossly unsafe to human life and the environment; by terminating me for following the whistleblower procedures and bringing to light the issues to them and the system; they also filed false documentation to a Federal process, (unemployment) that is administered by the state.

a.   I eventually received my unemployment after the adjudicator found that their claims against me were false, because "they were unable to substantiate that I was involved in the fraudulent behavior" that they either concocted or tried to blame on me.

c)   Benefits – As you may be aware the University of Maryland System, at the time of my hire was having problems getting individuals enrolled on benefits in a timely manner. I was not enrolled into the benefit plan until late March 2019. At the time of my termination on April 5, 2019, I had not received any insurance cards. By the time I received my insurance cards my benefits had expired at the end of April. I never received COBRA information in order to continue benefits. Therefore, my contributions towards benefits for my husband and myself were wasted.

a.   I am the bread winner of my family, my husband and I moved to Salisbury to take this job and we utilized all our savings towards the purchase of a home in Salisbury. We had and have no income at this time. My husband who is a diabetic could not afford his medication and his health was failing. His sugar level shot up to over 500 in July almost placing him in a diabetic coma. He was hospitalized for close to two weeks and received intravenous IVs with a home nurse for 6 weeks after the release from the hospital. While in the hospital he had to have his right big toe

20

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

amputated.  He could not attend any of the wedding activities in Princeton of our eldest son, we lost money that we had pre-paid to our family re-union in Tennessee, that occurred in August 2019, while he attended the funeral of a beloved brother, he was not able to say his goodbye during the last days of his life; or run, an activity that my husband, has done since grade school and continued after his ALL American college career as a stress reliever.

b. Had we been provided Unemployment benefits in a timely manner, or the four (4) week notice pursuant the System Termination policy my husband would not have had to suffer or lose his toe, because we would have been able to pay for his life enabling medication.

Count I – Retaliation

Paragraphs 1- 10 are incorporated as though set forth fully herein

1) I was subjected to taunts; aggressive behavior and a hostile environment in meetings with Mr. Lester Primus and Dr. Robert Mock for the termination of Ms. Lafabian Marshall, the recommendation to terminate Ms. Michelle Martin for cause and Ms. Martin's suspension;

2) I was terminated on April 5, 2019 for bringing in the System to Audit the Henson Center;

3) I was terminated on April 5, 2019 for reporting an OSHA violation in physical Plant involving the boiler house;

4) I was terminated on April 5, 2019 for Overturning the illegal termination of an employee in good standing, who was terminated on protected leave under The Family and Medical Leave Act of 1993 (FMLA).

5) I was terminated on April 5, 2019 for terminating Mr. Mills, the nephew of the Budget Director, removing him from paid leave status and not granting him severance for violation of the University of Maryland System Drug Policy, and violation of State and Federal law for which he had pled guilty in a court of law.

6) I was terminated for advocating for employees who were subjected to false allegations; unfair treatment by Mr. Matt Taylor, Dr. Mock and Mr. Jason Casares; and denied fair and timely due diligence in investigations.

7) I was terminated on April 5, 2019 for informing the President that Mr. Casares had falsified his State employment application; falsifying his experience and education; and utilizing his position for personal gain.

8) I was terminated on April 5, 2019 for informing the President that Mr. Matt Taylor had failed to do his due diligence in the recruitment of Mr. Casares; failing to check previous employment or review Mr. Casares's resume appropriately, after they had removed HR from the process.

9) I was terminated on April 5, 2019 for addressing Dr. Mock's sexist and aggressiveness towards me in a meeting on March 27, 2019. And complaining about the continued hostile sexist environments that I was subjected to by Dr. Mock and Mr. Lester Primus.

10) I was terminated on April 5, 2019 for telling the President that the free housing that she was providing to Mr. Hans Cooper was a violation of state audit findings and federal and State Tax Codes.

11) I was subjected to Racist Terroristic Threats by members of the Cabinet on April 5, 2019, who conspired to intimidate me when they illegally sent an armed UMES police Officer to my home.

12) I was denied due process, when they failed to provide notice to me during the termination process a violation of USM, Policy on Separation for Regular Exempt Staff Employees.  Employees who plead guilty to drug violations and  violate policies, steal from the university, create safety violations and other gross

21

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

> misconduct; are provided notice and do not have their jobs taken away from them for no reason; or are
> placed on paid leave pending an investigation and do not have their jobs taken away for no reason.

13) In May of 2019, they slandered my reputation, lied to cover up their retaliatory action by lying to the
Pennsylvania Unemployment commission. Employees who are terminated for gross violations do not have
their unemployment denied and do not have their jobs taken away for no reason.

### Count II – Gender Pay Equity

Paragraphs 1- 10 are incorporated as though set forth fully herein

1) See Paragraph 4
2) On April 5, 2019 I was terminated.  Caucasian White females, and Males are paid appropriately for their
responsibilities and do not have their jobs taken away for no reason.
3) On April 5, 2019 I was terminated. Caucasian White Females and Males are placed in the position with the
appropriate title and Pay immediately and not delayed till the budget is fixed and do not have their jobs
taken away for no reason.
4) On April 5, 2019 I was terminated. Males are provided free campus housing in violation of State and IRS
guidelines and do not have their jobs taken away for no reason.

### Count III – Gender Discrimination

1) See Paragraph 4, H through S
2) On April 5, 2019 I was terminated.  Consideration are given to Males who move their family to the area
and purchase a home, regardless of their capability to perform the work and do not have their jobs
taken away for no reason.

### Count IV – Racial Discrimination

1) See Paragraph 4, H Through S
2) White females are provided increase in pay and title to sit on Cabinet and break up the testosterone;
without any additional responsibilities and do not have their jobs taken away for no reason.

### Count V – Age Discrimination

1) See Paragraph 4, H Through S
2) Younger cabinet members employees are provided pay consistent with experience and function and do
not have their jobs taken away from them for no reason.

### CONCLUSION

Based on the above, I allege that the Respondents violated Section 5-309 of the Maryland State Code, Pers. &
Pens.;

And that the Respondents Violated

By retaliating against me for informing of Gross violations of Management, Life Safety, Environmental Safety;
Failing the public trust and Fraud of public resources; And

By discriminating against me based on Race, Gender and Age; As well as violating Gender Pay Equity.

22

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

DUAL FILING

This complaint has been dually filed with the Equal Employment Opportunity Commission (EEOC)

REMEDY

Pursuant to the allegations herein, I request that Respondents be required to provide all remedies available to me under Section 5-309 of the Maryland State Code, Pers. & Pens.; any other applicable State and Federal statues, and Title VII of the Civil Rights Act of 1964 of the United States of America code;

VERIFICATION

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information and belief.  I understand that false statements herein are made subject to the penalties of State and Federal Statutes, relating to unsworn falsification to authorities.

_____              _____

*Date*                             *Rosalie I. Hornbuckle*

23