

**OFFICE OF INSTITUTIONAL EQUITY AND COMPLIANCE**

# EXHIBIT 16

## REPORT OF INVESTIGATION

**COMPLAINANT:** Cui Fang, Lecturer, Department of Computer Science and Engineering Technology
**RESPONDENT:** Asad Azemi, PhD, Professor & Chair, Department of Computer Science and Engineering Technology
**DATE OF PRELIMINARY REPORT OF INVESTIGATION:** July 28, 2025
**PREPARED BY:** The Office of Institutional Equity and Compliance

### SUMMARY OF THE COMPLAINTS[1]

The UMES Office of Institutional Equity and Compliance (OIE) has received a complaint brought forth by Ms. Cui Fang ("Ms. Fang" or "Complainant"), Lecturer, alleging that Dr. Asad Azemi ("Dr. Azemi" or "Respondent") Professor and Chair, has engaged in unequal treatment of the Complainant based on her gender (woman). The Complainant alleges that, as a result of the Respondent's conduct, she suffered an adverse impact with respect to her job assignment, job benefits, and working conditions, which created a hostile work environment for the Complainant.

It was specifically alleged that:

1. On or about Fall 2023 semester, Dr. Azemi allegedly discriminated against Ms. Fang by asking her to upload her teaching materials she developed for courses (CSDP 221 and CSDP 222) she was teaching. Subsequently, Dr. Azemi took over Ms. Fang's teaching duties without prior notice or discussion, which she viewed as deliberately humiliating.
2. On or about Winter 2024 semester, Dr. Azemi allegedly discriminated against Ms. Fang by requiring her to collaborate with graduate students on the online course design for CSDP 221/222, for which she developed the syllabi, quizzes, and exams, and was not compensated.
3. On or about Spring 2024, Dr. Azemi allegedly discriminated against Ms. Fang when he cancelled her section of course CSDP 221 and relegated the Complainant to a support role under his section. Dr. Azemi required Ms. Fang to follow his material and grading structure, regardless of discrepancies and student confusion.
4. Dr. Azemi allegedly discriminated against Ms. Fang when he required her to submit her lecture content and assignments (from C++ to Python courses) for his review and approval. Additionally, Dr. Azemi allegedly bullied Ms. Fang when he scrutinized her teaching materials during weekly meetings and excessively micromanaged her.
5. Dr. Azemi allegedly discriminated against Ms. Fang when he directed her to "learn" from a male graduate student, who had previously served as a Teaching Assistant for Ms. Fang's

---

[1] The above allegations have been extracted from a complaint narrative submitted by Ms. Fang to the OIE. The narrative included seven (7) categories of themes, each containing multiple individual allegations. Following an assessment of the information provided by the Complainant, the OIE is pursuing the ones that have reasonably met the threshold to fall under the jurisdiction of the UMES Policy Prohibiting Discrimination and/or the UMES Policy Prohibiting Workplace Bullying.

courses (CSDP 221 and CSDP 222). According to the Complainant, this contributed to professional humiliation and fostered a hostile work environment.

6. Dr. Azemi allegedly discriminated against Ms. Fang when he required her to complete and upload all lecture content for CSDP 120 by end of Spring 2024, and for CSDP 150 by end of Summer 2024, despite these courses being assigned to her and knowing she would be outside the U.S. during the summer.

7. During Ms. Fang's parental leave (December 2024 – March 2025), Dr. Azemi allegedly discriminated against Ms. Fang when he began reassigning her responsibilities and, without discussion or consent, removed her from teaching duties. This allegedly occurred despite Ms. Fang's continued attempts to clarify work expectations and prepare for her return. Dr. Azemi also allegedly contacted Ms. Fang during her parental leave and gave her assignments.

8. On or about March 21, 2025, Dr. Azemi allegedly discriminated against Ms. Fang when he informed her that her Fall 2025 teaching assignments had been removed, and she was offered only non-instructional tasks, despite the department scheduling over 30 courses. Dr. Azemi allegedly offered Ms. Fang three options moving forward: (1) continue in a full-time position with primarily staff like, non-teaching duties, (2) a part-time adjunct role, or (3) no renewal of contract.

## SUMMARY OF COUNTERCOMPLAINT

In addition to filing a complaint against Dr. Azemi with the OIE, Ms. Fang proceeded to escalate the matter with the University System of Maryland Board of Regents. This prompted the notification of Dr. Azemi, who, in turn filed a counter complaint of bullying against Ms. Fang[2].

Dr. Azemi believes that Ms. Fang "strategically and maliciously leveraged knowingly false accusations, coupled with aggressive public escalation, not to genuinely seek protection or resolution but specifically to coerce [Azemi] into reversing legitimate management actions [discussed at the March 21, 2025 meeting]." Dr. Azemi also noted that Ms. Fang had almost two academic years (Fall 2023 through Spring 2025) "to express formal concerns through appropriate departmental and institutional channels."

Dr. Azemi questioned the timing and motivation of Ms. Fang's complaint, the fact that Ms. Fang alleged discrimination on the basis of her gender identity in her complaint to the OIE, and subsequently also alleging discrimination on the basis of national origin in her complaint to the Board of Regents. He further noted that he viewed these as "deliberately designed to create maximum reputational damage and intimidate both [Azemi] personally and the university leadership."

The OIE will not render a determination on whether or not Ms. Fang's complaint against Dr. Azemi was made in bad faith; however, it should be noted that the USM Board of Regents is not a

---

[2] Following an assessment of the information contained in Dr. Azemi's countercomplaint under the UMES Policy Prohibiting Discrimination, corresponding definitions, and/or appropriate/permissible resolution paths, it was determined that it would not be pursued separately as a stand-alone complaint against Ms. Fang. However, the information has been reviewed and referenced, as appropriate.

complaint resolution mechanism for faculty-related matters involving grievances, reports of discrimination, and/or workplace bullying.

## OIE PRELIMINARY ASSESSMENT AND DETERMINATION
Following an extended preliminary and subsequent assessment of Ms. Fang's original complaint brought forth and the allegations that fall under the purview of the OIE, it has been determined that the matter will be resolved through a formal investigative process.

## APPLICABLE POLICY AND PROCEDURES
The governing policies are the University of Maryland Eastern Shore Policy Prohibiting Discrimination and the UMES Policy and Procedures Prohibiting Workplace Bullying. The standard of evidence used in this investigation is the preponderance of the evidence standard. The scope of the investigation proceedings is to determine whether Dr. Azemi engaged in any actions and/or behaviors, which would constitute violations of the aforementioned policies.

## THE INVESTIGATION
The OIE has conducted interviews with and/or received information from the following individuals[3] as part of the investigation process (listed alphabetically):

- Asad Azemi, PhD – Professor & Chair, Department of Computer Science and Engineering Technology
- Lizhou Cao, PhD – Assistant Professor, Department of Computer Science and Engineering Technology
- Muna Elobaid, MS – Computer Science Lab Specialist, Department of Computer Science and Engineering Technology
- Cui Fang, MS – Lecturer, Department of Computer Science and Engineering Technology
- Gertrude Hairston – Director, Office of Human Resources Management
- Rakesh Sharma, PhD – Lecturer, Department of Computer Science and Engineering Technology
- Joel Tomlinson, MS – Lecturer and Lab Manager, Department of Computer Science and Engineering Technology
- SM Zobaed, PhD – Assistant Professor, Department of Computer Science and Engineering Technology

---

[3] In her response to the Preliminary Investigative Report, Ms. Fang stated that "The selection of witnesses and the portrayal of their statements appear selective and at times inconsistent with what was actually said."

As it standard in any investigation, both Ms. Fang as the Complainant and Dr. Azemi as the Respondent were provided with the opportunity to submit the names of any witnesses deemed to have relevant and germane information pertaining to the allegations. In her Fair Practices Complaint Form, Ms. Fang identified one witness, who was interviewed by the OIE for the purpose of the investigation. In a subsequent email communication, Ms. Fang identified two additional witnesses who were contacted by the OIE who did not respond, declined, or were unable to participate appropriately. Other witnesses were identified by other witnesses and/or selected independently to serve as comparators in the current analysis.

The following witnesses were contacted as part of the investigation, but did not respond, declined, or were unable to participate appropriately:

- Joshua Ajayi – UMES student
- Victory Naboya – UMES student
- Moses Nwakwuo – UMES student
- Abuobida Osman, MS – Lecturer, Department of Computer Science and Engineering Technology
- Weiwei Stone, PhD – Associate Professor, Department of Computer Science and Engineering Technology
- Jun Zhang, PhD[4] – Professor, Department of Computer Science and Engineering Technology

As part of the investigation, the OIE has also reviewed the following documents and written materials:

- Supporting documentation submitted by the Respondent.
- Supporting documentation submitted by Witnesses.
- Email correspondence submitted and retrieved through University email accounts.
- Response to the Preliminary Investigation Report submitted by the Complainant[5].
- Response to the Preliminary Investigative Report submitted by the Complainant.


## BACKGROUND

The Respondent is the Chair of the Department of Computer Science and Engineering Technology

---

[4] Dr. Zhang (employed on an annual nine-month contract) indicated in his response to the OIE email invite that he was on vacation abroad and he would not be able to attend a meeting in the U.S.

[5] In her response to the Preliminary Investigative Report, Ms. Fang noted that she was not provided "with a meaningful opportunity to review and respond" to the Preliminary Investigation Report, as she was not provided with an electronic copy of the report.

Upon receiving the request, the OIE informed Ms. Fang on July 7, 2025, July 17, 2025, and July 18, 2025, that
  *"We [OIE] do not distribute the Preliminary Investigative Report, as it contains preliminary findings and contested information, to which you and the other Party can provide a response. Therefore, we accommodate the report review in our office, during which you can take notes in order to prepare a response. The Final Investigative Report will be distributed to you and the other Party electronically.*

The UMES Policy Prohibiting Discrimination states that "OIE shall complete a draft written report of its Investigation. The report should include a summary of the allegations, evidence reviewed, and witness statements; findings of material facts and an analysis of those facts; and a finding whether a Policy violation occurred. OIE will then notify the parties and give them an opportunity to review it. The office will then issue a notice of findings to both parties and to appropriate University administrators." The Policy distinguishes between *providing parties with an opportunity to review* it (referring to the Preliminary Investigative Report) and *issuing a notice of findings* (referring to the Final Investigation Report). It has been the OIE's well established and documented practice since the Policy has been in existence (March 2019) to conduct the review of the Preliminary Investigation Report in-person, with ample opportunities for the Parties to review and respond.

Ms. Fang was provided with the option to select any preferred time interval on five different days anytime during business hours to ensure flexibility. Ms. Fang was also informed that she could request additional review time after her report first review, when she did not utilize all the time she was allocated.

as of Summer 2023. The Complainant identifies as a woman. She was originally hired as a Visiting Lecturer in 2021 and as a full-time Lecturer in the Department of Computer Science and Engineering Technology in Spring 2022, on a nine-month contract renewed on an annual basis. Per the Complainant, the Respondent has engaged "in a pattern of bullying, retaliation, discriminatory behavior, and potential academic misconduct[6]," following her parental leave (December 2024 – March 2025).

## FINDINGS OF FACT
The following details are noted as findings of fact:

1. **On or about Fall 2023 semester, Dr. Azemi allegedly discriminated against Ms. Fang by asking her to upload her teaching materials she developed for courses (CSDP 221 and CSDP 222) she was teaching. Subsequently, Dr. Azemi took over Ms. Fang's teaching duties without prior notice or discussion, which she viewed as deliberately humiliating.**

Ms. Fang submitted an initial narrative as part of her complaint against Dr. Azemi, in which she listed concerns related to the Respondent's alleged discriminatory and bullying actions, which had an adverse impact on her, as well as concerns related to academic matters. Ms. Fang shared, for context, that when she was hired in the Department, there was a different Chair and that Dr. Azemi came later in that role. She described their working relationship as hostile from the beginning, because of her gender and race[7].

The Complainant indicated that she had reported some concerns to Ms. Gertrude Hairston, Director of the Office of Human Resources Management, at some point during the Spring 2024 semester, but that she backed out because she was afraid of retaliation from Dr. Azemi if he found out; therefore, she did not want any action taken at that time. To Ms. Fang's knowledge, Ms. Hairston did not share her (Fang's) concerns with Dr. Azemi at the time she made the report.

Ms. Fang advised she is one of two women (faculty) in the Department, the other being a full Professor. She is also the youngest of the four Lecturers and the other three are males. Ms. Fang stated that she did not know what the ethnic and racial demographic composition of the Department was. The Complainant advised that she believed Dr. Azemi's actions against her were discriminatory and hostile, and in retaliation for making a report to Ms. Hairston[8].

During the meetings with the OIE, Ms. Fang consistently referred to her original narrative (from which the allegations at hand have been extracted) in support of her complaint of discrimination;

---

[6] The concerns reported by Ms. Fang that have been deemed to fall under the category of "academic misconduct" do not fall under the purview of the OIE and will be referred to the Division of Academic Affairs for review and redress, as appropriate.

[7] During the intake meeting with the OIE, Ms. Fang stated feeling she was discriminated on the basis of her gender and race. In the Fair Practices form she submitted subsequently as part of her complaint documentation, Ms. Fang only selected "Gender Identity" as a protected category as the basis of her complaint. At the time of completion of the current report, the Complainant did not amend the form in question to select other protected categories.

[8] Ms. Hairston confirmed that she did not share Ms. Fang's concerns with Dr. Azemi at any point. In the absence of any knowledge of a previous report from Ms. Fang, Dr. Azemi could not have retaliated against her for making such a report. Therefore, the current process has not pursued Ms. Fang's allegation of retaliation by Dr. Azemi.

yet she advised that she did not know how others in the Department were being treated, as it was "hard to tell, because not everyone talks." The Complainant also indicated she did not know if Dr. Azemi engaged in any type of favoritism of other faculty members in the Department.

When asked about Dr. Azemi's manifestations of hostility towards her, or times when she felt threatened or intimidated, Ms. Fang did not provide any illustrating examples; however, she indicated she was "afraid the Respondent might yell at her, because he had already retaliated against her." Specifically, she was afraid that Dr. Azemi would "go to her office and retaliate." Ms. Fang advised she did not know how to answer whether there were precedents of Dr. Azemi going to her office and displaying any type of hostility towards her.

The Complainant advised that she "avoided those types of interactions because she was afraid that he [Azemi] would yell at her" and noted "there have been very few opportunities where it has just been the two of them [Fang and Azemi] where he could have yelled at her because there was usually someone else present." Ms. Fang advised that she did not know if Dr. Azemi had ever yelled at anyone because his office was on the other side [of the hallway] from hers.

The Complainant's description of "[Dr. Azemi] behaves extremely rudely" was the Respondent's action of requesting her teaching materials, reviewing her lectures, and taking over her class without any notification, which, per Ms. Fang, the Respondent did not do with the other instructors in the Department. Therefore, Ms. Fang viewed these actions as discriminatory and hostile towards her.

Ms. Fang explained that in the beginning of the Fall 2023 semester, Dr. Azemi was initially giving her suggestions regarding her classes. However, one day when she got to class, he was already there engaging with the students. The Complainant noted that there was no prior notification from Dr. Azemi or discussion with her, and no explanation provided to the students. Seeing that Dr. Azemi was already there, Ms. Fang advised she just went to the back of the classroom, which she regarded as deliberately humiliating.

The Complainant added that she went to talk to Dr. Azemi a few days after, and that he did not clarify much for her. Also, that the Respondent stated to her that he did not have time to teach her class daily but did not tell her why. Subsequently, Dr. Azemi went back to Ms. Fang's class, and on or about October or November, he asked her for her teaching materials. Ms. Fang viewed that as an appropriation of her intellectual property by Dr. Azemi, without her consent, which created a hostile environment for her when she tried to teach her course.

In his response to the allegations[9], Dr. Azemi stated that he categorically denied that any of his supervisory actions directed at Ms. Fang were "motivated by her sex, pregnancy, or any other protected status." He added that "each action was taken in good faith fulfillment of his duties as Department Chair to maintain course quality."

---

[9] Dr. Azemi submitted a written response to the Notice of Allegations on or about May 19, 2025, and a supplemental response on or about June 8, 2025. Relevant information from both submissions has been included in the current report as it relates to each set of allegations.

Dr. Azemi explained, for context, that the introductory programming courses CSDP 221 and CSDP 222 (in the old catalog) and CSDP 101, CSDP 120, and CSDP 150 (in the new catalog) are the "gateway sequence" courses for every major in the Computer Science and Engineering Technology (CSET) Department at UMES. He noted that historical retention data supports that "the largest share of student attrition occurs in the first three semesters, typically after an unsuccessful attempt in one of these courses."

The Respondent further added that comprehensive data analysis (consisting of five years of student progression patterns and retention statistics) was conducted during departmental assessment meetings in Spring and Summer 2023. Dr. Azemi indicated that, based on "an alarming pattern"[10] that was identified, the Department, under his direction, "implemented a comprehensive quality-assurance framework: common learning outcomes, syllabus standardization, uniform assessment rubrics, and scheduled peer observations," which were communicated to all instructional staff, including Ms. Fang.

Dr. Azemi also explained that Ms. Fang was hired in Spring 2022 to teach the above-mentioned "gateway courses," without any prior college-level teaching experience in Computer Science, based on her personnel file, or any documented "structured onboarding or pedagogical training plan at the appointment time." The Respondent noted that student dissatisfaction with Ms. Fang's classes surfaced shortly after and resulted in multiple student complaints[11] that he (Azemi) had to manage his first semester as Chair (Fall 2023) and into the present."

Dr. Azemi recalled that the first documented student complaint regarding Ms. Fang's class dated back to on or about September 12, 2023[12]. At that time, multiple students reported various concerns related to slide outlines, omissions of code examples subsequently used in quizzes and exams, etc. The Respondent stated that, consequently, he undertook a series of "pedagogically driven, legally permissible interventions to address serious deficiencies in Ms. Fang's instructional approach: requesting full course materials, demonstrating effective lecture methods through joint instructional sessions, convening weekly coaching meetings, and, for Spring 2024, co-teaching a course section from day one to facilitate real-time mentoring."

---

[10] According to Dr. Azemi, the findings revealed a critical 52% attrition rate directly linked to these gateway courses and were formally presented to the entire department during the August 2023 faculty retreat meeting and subsequently reinforced in monthly departmental meetings throughout the 2023-24 academic year.
[11] According to Dr. Azemi, the student complaints regarding Ms. Fang's class came through various channels (direct communications, formal retention surveys, and class evaluations) and included:
    (i)    lecture slides posted without accompanying code samples;
    (ii)   examinations covering material never made available on Canvas;
    (iii)  an exclusive reliance on reading aloud from PowerPoint with no in-class coding practice; and
    (iv)  the absence of required readings in the LMS.
These practices directly undermined course-accessibility expectations articulated in University guidance that all instructional resources evaluated for credit must be made available to students through the learning-management system.
[12] Reviewed email correspondence submitted by the Respondent, verified that Dr. Azemi received a complaint from a student regarding Ms. Fang's class on or about September 8, 2023, to which Dr. Azemi responded on or about September 10, 2023. The Respondent also received a complaint in connection to Ms. Fang from a different student on or about September 11, 2023, to which he responded on September 12, 2023. A third student complaint was received via email on September 4, 2024.

On or about September 29, 2023, and October 6, 2023, Dr. Azemi conducted observations of Ms. Fang's CSDP 221 class[13]. He specified that during the two sessions, he proceeded to co-teach "substantial portions of both classes to demonstrate research-supported active-learning techniques that are particularly effective in programming courses," and he provided examples. The Respondent described his approach as "a constructive, supportive measure to model best practices rather than merely critiquing existing methods."

In his supplemental response to the allegations, Dr. Azemi advised that he delivered "short, live-coding demonstrations (approximately 15-20 minutes each) to model active learning techniques requested by the students and previously discussed with Ms. Fang." The Respondent explained that the demonstrations were "part of a documented mentoring plan aimed at improving course accessibility after multiple student complaints related to missing code examples and insufficient hands-on practice."

Dr. Azemi stated that such modeling sessions do not constitute a course "takeover," as department chairs nationwide routinely proceeded in this manner. Moreover, he added that the UMES Faculty Handbook authorizes chairs "to observe classes and provide pedagogical guidance" where instructional quality concerns arise. Dr. Azemi clarified, however, that he did not assume the responsibility for the day-to-day conduct of the course and Ms. Fang resumed primary instruction.

Dr. Azemi further noted that after his class observations he engaged Ms. Fang in what he described as "detailed oral conversations about specific instructional moments […]" as well as uploaded the complete lecture materials in Canvas (learning-management system), so they would be available to students in preparing for subsequent assessments. In his supplemental response to the allegations, Dr. Azemi clarified that Ms. Fang remained solely responsible for entering or modifying grades, as well as due dates for assignments, quiz availability windows, and rubric edits, while he had read-only access consistent with his supervisory role, and he did not override grades or adjusted scores.

During a meeting on or about late October 2023, attended by Dr. Azemi, Ms. Fang, and the course Teaching Assistant, the Respondent gave the Complainant an oral directive to post the full slide decks, sample code, lab instructions, and required readings to Canvas before each class. He noted that he did not provide Ms. Fang with written instructions at the time; however, he restated the departmental guidelines, "which require that all instructional resources evaluated for credit must be made available to students through the learning-management system." On a related note, Dr. Azemi shared that Ms. Fang pushed back and claimed intellectual property rights over the lecture materials she used in her courses, which are "copied from here and there." He went on to explain that the materials are a "joint deal" between the instructor and the institution, and that intellectual property rights can only be claimed on original content.

The Respondent advised that Ms. Fang displayed resistance to his efforts and insisted she did not require assistance, refusing to adjust her teaching methods. Dr. Azemi noted that Ms. Fang placed the blame for poor performance on the students and regularly claimed widespread cheating without substantiation. He further stated that, in the absence of any changes, students continued to struggle

---

[13] This information is based on the Respondent's contemporaneous calendar, meeting invites, and observation notes.

academically in Ms. Fang's classes[14], driving some to consider changing their majors entirely. This was confirmed by a witness who advised being approached directly by students on multiple occasions over the year, stating they wanted to change their major because of their experience in Ms. Fang's class. Others that had passed Ms. Fang's class shared with the witness they had to use YouTube tutorials and request the assistance of family members who were senior programmers.

Dr. Azemi noted that since the investigation into the current matter started[15], Ms. Fang also displayed more overt aggression and took his feedback and comments (that she was not supposed to be working from home) as extremely personally, which was reflected in a very long reply email from the Complainant. A witness also noted a similar personal reaction from the Complainant when she approached Ms. Fang cordially after receiving a complaint from a student. According to the witness, Ms. Fang refused to engage and proceeded to collect her belongings off her desk, stating that she had to go and that the witness did not have a right to question her.

In her response to the Preliminary Investigative Report, Ms. Fang stated that "the report contains statements falsely attributed to [her] or taken out of context." Ms. Fang did not provide any specific examples of statements that needed to be amended or further clarified. Additionally, she advised that the report "also omits substantial incidents of discriminatory and retaliatory behavior by Dr. Azemi," which "raise serious concerns about the fairness and integrity of this process." Ms. Fang did not provide any specific examples of omission or any supplemental information. Moreover, the Complainant did not submit any supporting documentation in connection with her allegations, as part of her response.

Regarding the matter at hand, a witness advised that Ms. Fang shared that she was having some issues with Dr. Azemi; he described it as "some strife between the two of them [Fang and Azemi]." He recalled that Ms. Fang shared the concerns approximately a year ago that there was "some blame shifted around grades being low," and the witness recommended that she document it. The witness also noted that Ms. Fang has not had much control over the courses she was teaching throughout the years and surmised the likely reasons was the turnover in department chairs, which impacted teaching assignments and course allocations. He also confirmed that Dr. Azemi was heavily focused on the introductory courses on the Computer Science side.

Another faculty member in the Department noted that Ms. Fang had recently shared some frustrations with him (approximately two-three weeks before his interview with the OIE) regarding herself and Dr. Azemi. The Complainant described to him that, when she went to her class, she found Dr. Azemi already there, for which he did not give her or the students any prior notification; hence causing her frustration.

---

[14] Dr. Azemi remarked that, despite his interventions, the DFW rates (totaling the number of students who received a D grade, an F grade, or withdrew from the course) in Ms. Fang's courses rose to 48%. The Respondent explained that these rates were well above the departmental benchmark. He advised, at the time, that he was primarily interested in looking at the rates for the "retention courses."
The Respondent also provided a semester-by-semester breakdown of DFW rates for Ms. Fang's classes starting with Fall 2021 through Fall 2024. A summary review of the percentages reveals that the highest rate 71.43% was recorded for CSDP 222 in Spring 2022, while other semesters had rates ranging from 12.5% to 69.23%.
[15] This is in connection to an email Dr. Azemi sent Ms. Fang on or about May 21, 2025, and her reply.

A faculty witness stated that Ms. Fang did not share much about her experience at UMES other than general topics, such as students, teaching/pedagogy, student engagement and interest, etc. A different witness reported that Ms. Fang did not share anything with him directly related to any concerns involving Dr. Azemi. However, the witness shared he had knowledge of students reporting concerns about Ms. Fang's teaching style and approachability, as they were having a hard time grasping the content.

Comparably, another witness noted being approached by Ms. Fang's whole class one semester with concerns about her courses prior to Dr. Azemi's chairship. After a few times when this happened, the witness approached the interim Department Chair at the time, who advised he could not review Ms. Fang's materials because she did not upload any on Blackboard (learning management system in use at that time). According to the witness, this was also confirmed by the staff of the Center for Instructional Technology & Online Learning.

When Dr. Azemi came into the Chair role and the student complaints continued, the witness advised approaching him to relay the complaints and concerns from students about Ms. Fang's classes as they were coming in. Subsequently, the witness recalled learning that Ms. Fang was not willing to share any of her teaching materials for review, claiming they were her intellectual property. Shortly after, the solution was that Dr. Azemi was going to observe Ms. Fang's class, which subsequently led to the decision to co-teach (covered in Segment 3 of the current report).

A similarly situated witness to Ms. Fang in terms of position (but with more instructional experience than Ms. Fang) confirmed that Dr. Azemi had also requested his teaching materials for review. Unlike Dr. Azemi and Ms. Fang, the witness and the Respondent have never co-taught, because the Engineering program is more established and has a more solid curriculum than the Computer Science side, where Dr. Azemi is more hands-on.

A senior Lecturer in the Department shared that Dr. Azemi has been involved in his pedagogy and the Respondent provided feedback on his materials, which he (the witness) found helpful. He also advised that Dr. Azemi dropped in during his class time and that he (the witness) also invited Dr. Azemi to observe one of his classes. In that context, the witness spoke about Department-wide discussions led by Dr. Azemi to organize things better, have a synchronized syllabus, etc., as part of the ABET[16] compliance efforts.

The investigation verified that Dr. Azemi asked Ms. Fang to upload the teaching materials for her Fall 2023 courses. Additionally, it was corroborated that Dr. Azemi made at least two unannounced drop-in visits to Ms. Fang's courses and had instructional contributions to her class on both occasions. Moreover, the rationale presented by the Respondent for proceeding as he did is supported by available documentation confirming the existence of student complaints, falling retention rates, etc., that required redress. Two comparably positioned witnesses (male Lecturers) confirmed that Dr. Azemi reviewed their course materials and provided feedback, while one of the two confirmed that Dr. Azemi made at least one drop-in visit to his class. The information available at this time does not support a determination that Dr. Azemi discriminated against Ms. Fang on

---

[16] ABET accreditation provides assurance that a college or university program meets the quality standards of the profession for which that program prepares graduates. It is a nonprofit, non-governmental agency that accredits programs in applied and natural science, computing, engineering and engineering technology.

the basis of her gender in connection to this set of allegations, hence there was no violation of the UMES Policy Prohibiting Discrimination.

2. **On or about Winter 2024 semester, Dr. Azemi allegedly discriminated against Ms. Fang by requiring her to collaborate with graduate students on the online course design for CSDP 221/222, for which she developed the syllabi, quizzes, and exams, and was not compensated.**

Ms. Fang indicated that another discriminatory action that Dr. Azemi took against her was to require her to collaborate with graduate students to develop the online course design for CSDP 221/222 (the Complainant's classes). She advised that when Dr. Azemi asked her to complete the task, he did not share any information about compensation, which led her to believe that Dr. Azemi did not want her teaching Winter courses. Subsequently, she clarified that she was paid $1500 for Winter course instruction; however, she clarified she was not compensated for the course development. Ms. Fang advised that she did not know if other colleagues were compensated for course development.

In his response to the allegations, Dr. Azemi stated that the Department created accelerated-term repeat sections of CSDP 221 and CSDP 222 in direct response to sustained student complaints (noted in Segment 1 of the current report) related to Ms. Fang's classes. The Respondent clarified that the sections were available to students who had failed the classes prior or who withdrew late in the Fall 2023 semester, so they could progress to the next course in the sequence and remain on schedule for graduation.

Dr. Azemi explained that he led the course redesign, the assessment alignment, and scheduling logistics for the sections in question, while Ms. Fang was included in the planning group. The Respondent shared the three reasons behind his decision to purposely include Ms. Fang, namely "to prevent any appearance of exclusion or discrimination; to solicit her insights on the course content; and to give her a structured opportunity to observe effective active-learning strategies and thereby enhance her own teaching practice."

Dr. Azemi further clarified that a very limited number of materials from Ms. Fang's previous sections were incorporated in the redesigned Winter courses, due to reviews from faculty according to which many of Ms. Fang's existing materials were "not sufficiently effective or appropriate for addressing the identified learning challenges." He added that the quizzes and exams were also "substantially redesigned …. [to incorporate] elements that had been lacking in the original course iterations and that contributed to the high DFW rates." The Respondent approximated that he used anywhere between 5% to 10% of the information Ms. Fang developed.

The Respondent advised that Ms. Fang was compensated for the Winter 2024 courses with a $1500 overload payment, for which he provided supporting documentation. He clarified that there was no compensation for the course development itself, but Ms. Fang did receive compensation for her contribution to instruction. In his response to the Preliminary Investigation Report, Dr. Azemi clarified that Ms. Fang was, in fact, the only one who was compensated. Regarding the staffing of the Winter 2024 courses, Dr. Azemi indicated that they were taught by "senior tenure-track faculty

supported by graduate assistants, ensuring that complete lecture notes, sample code, and laboratory exercises were posted to Canvas before each class meeting."

One of the witnesses advised that instructors should receive compensation for course development, because technically that is external to their job responsibilities. To his knowledge, new course development had come with compensation in the past; however, if it is an existing course that needs restructuring, there is no additional compensation, as that is part of the instructor's job duties. He also pointed out that compensation would also depend on the University's availability of funds for such purposes. A different witness indicated that instructors could expect compensation if they develop a brand-new course; but keeping things updated and refreshing materials is part of an instructor's job.

Based on the totality of the information available at this time, it was corroborated that Ms. Fang was not compensated for the course development (conversion/redesign of existing course), however she was compensated for her contribution to the instruction of Winter 2024 courses. A determination could not be made that this constituted a discriminatory act against Ms. Fang on the basis of her gender, as the recognized practice is to provide compensation for new courses, as opposed to redesigned courses, or that others have received compensation in comparable circumstances. Consequently, Dr. Azemi's actions do not support a determination of a violation of the UMES Policy Prohibiting Discrimination.

3. **On or about Spring 2024, Dr. Azemi allegedly discriminated against Ms. Fang when he cancelled her section of course CSDP 221 and relegated the Complainant to a support role under his section. Dr. Azemi required Ms. Fang to follow his material and grading structure, regardless of discrepancies and student confusion.**

Ms. Fang stated that Dr. Azemi's action of cancelling her Spring 2024 section of CSDP 221 was discriminatory towards her and it resulted in Ms. Fang being reduced to an instructional support role. She described as hostile treatment Dr. Azemi's requirement that she follow his materials and grading structure. The Complainant added that she was required to do so regardless of the discrepancies that came up or student confusion[17].

In his written response to the allegations, Dr. Azemi stated that in his role as Department Chair, he has "the explicit authority and responsibility to make all course staffing decisions, including instructor assignments, section configurations, and teaching modalities." He added that "Course assignments are not entitlements but are made based on departmental needs, curricular requirements, and instructor effectiveness."

The Respondent went on to note the benefits and pervasiveness of team teaching in academia and his particular experience implementing it during his tenure at Pennsylvania State University, where he also published peer-reviewed research on the structure and effectiveness of team teaching in technical disciplines[18]. He regarded the practice as standard in academic leadership rather than

---

[17] Ms. Fang did not elaborate on or provide supporting documentation in connection to the alleged student confusion.
[18] i.e.: Azemi, A., & D'Imperio, N. (2009, June), *New Approach To Teaching An Introductory Computer Science Course* Paper presented at 2009 Annual Conference & Exposition, Austin, Texas. 10.18260/1-2--5730

discrimination, which he clarified it [team teaching] would have been implemented for any instructor, irrespective of protected characteristics, if they displayed "similar performance deficiencies and resistance to improvement."

On a related note, Dr. Azemi advised that, despite his efforts during Fall 2023, Ms. Fang's Spring 2024 course preparations "showed little substantive change." He observed "persistent gaps in posted materials and a continued lecture-only approach," which "threatened to negate [the Department's] retention-improvement initiative." The Respondent recalled that he met with Ms. Fang in his office on the week prior to the start of the Spring 2024 semester. Dr. Azemi advised that he outlined his co-teaching plan according to which he would serve as faculty lead in Canvas and Ms. Fang did not voice any objections at the time.

In his original response to the allegations, Dr. Azemi stated that his goals were to provide direct, practical training and to safeguard student learning outcomes, when he converted Ms. Fang's Spring 2024 section of CSDP 221 into a joint-taught course under his lead. Subsequently, he clarified that Ms. Fang's original section of CSDP 221 was not canceled and remained active for the duration of the semester, without being rolled back or deleted in the Registrar's Office records. Dr. Azemi proceeded with a label change for the "lead faculty" label as himself in Canvas, so that he could post complete lecture decks, sample codes, and auto-graded practice quizzes without any delay. At the same time, Ms. Fang retained full permission to access Canvas, along with the corresponding salary benefits.

The Respondent also illustrated with examples what his involvement was (designed the lesson plans, prepared the lecture slides, and delivered most classes) during the first ten weeks. Dr. Azemi highlighted that this allowed Ms. Fang to focus on lesson-delivery skills and interactions with students. The Respondent clarified that Ms. Fang "assumed primary delivery for the final portion of the semester (staring with week 11) so that she could apply the active-learning techniques modelled and receive formative feedback."

Dr. Azemi contested the claim that students were confused by the joint teaching arrangement and advised that it was not supported by documentary evidence (emails, grievances, or course-evaluation comments). Conversely, he noted that student feedback collected in November 2024, as part of the Retention Survey[19], criticized Ms. Fang's "pacing, clarity, and use of examples," without any mention of confusion about multiple instructors or inconsistent grading structures.

In her response to the Preliminary Investigative Report, Ms. Fang commented that "Patterns of behavior that should clearly indicate retaliation and hostile work environment have been overlooked [from the report], while questionable practices are presented as routine or justified." The Complainant further noted that "there is no indication that other department chairs at UMES

---

[19] The survey was conducted on or about October 29, 2024, by a staff member in the Department for CSDP 101 and CSDP 120. The purpose of the survey session was "to understand why the students are not passing these courses in the midterm exams and to assist the department in improving the course structure." For Ms. Fang's class there were 13 answers/themes provided by the students (15 present). These included stated dissatisfaction with Ms. Fang's pedagogy, communication and language proficiency, her strictness about providing assistance during tutoring sessions and class times, marking absences instead of tardies, leaving questions unanswered, late availability of materials for quizzes, class time duration, etc. In contrast, there was 1 answer/theme identified for the other instructor. The results were communicated to Dr. Azemi via email on or about November 1, 2024.

follow the same procedures cited by Dr. Azemi as "standard academic practice." The tone and content of his remarks throughout this process reflect, in [Ms. Fang's] view, a dismissive and coercive leadership style that should have warranted closer scrutiny." Ms. Fang did not provide any specific examples or any supplemental information in support of her statement. For clarification, the OIE will not render a determination regarding Dr. Azemi's general leadership style, as it falls outside the scope of the investigation.

Upon review and consideration of pertinent information, the investigation established that Dr. Azemi did not technically cancel Ms. Fang's CSDP 221 section. He did co-teach that course with Ms. Fang during the Spring 2024 semester, assuming the lead instructor role for the first ten weeks of classes, while Ms. Fang resumed full instruction starting week 11. Comparably to Segment 1 of the current report, the Respondent's rationale is supported by available documentation confirming the existence of student complaints, falling retention rates, etc., that required redress. On that account, Dr. Azemi's actions were not deemed to be discriminatory on the basis of Ms. Fang's gender, therefore not in violation of the UMES Policy Prohibiting Discrimination.

4. **Dr. Azemi allegedly discriminated against Ms. Fang when he required her to submit her lecture content and assignments (from C++ to Python courses) for his review and approval. Additionally, Dr. Azemi allegedly bullied Ms. Fang when he scrutinized her teaching materials during weekly meetings and excessively micromanaged her.**

As part of her allegations of "History of Discrimination and Hostile Treatment," Ms. Fang advised that Dr. Azemi consistently required her to submit her lecture content and assignments for his review and approval. The Complainant explained that Dr. Azemi required her to meet on a weekly basis, when he scrutinized her teaching materials to ensure they meet his personal standards.

Ms. Fang described that Dr. Azemi would tell her to add "xyz," or change "xyz" in her presentations, or tell her that they needed to add more examples. Additionally, Dr. Azemi would ask Ms. Fang how many students have a grade that was lower than 70%, whenever she told him that some students were struggling in class. The Complainant stated that she viewed Dr. Azemi's actions as problematic because he did not require the same things of other instructors. Ms. Fang also indicated that Dr. Azemi's continuous oversight and excessive micromanagement "did not serve a clear academic or lawful purpose."

In his written response to the allegations, Dr. Azemi explained that starting with the Fall 2024 semester, the Department adopted Python rather than C++ as the primary instructional language for first-year programming. This was described as a change that aligned with the Department's retention strategies, industry practice, as well as other institutions in order to facilitate student transfer processes.

Specifically, regarding Ms. Fang's expertise, the Respondent advised that she had no formal background in Python and relied on self-studying. Dr. Azemi went on to note that the materials Ms. Fang submitted initially for Python instruction revealed what he described as having "significant quality concerns" and he provided examples. Therefore, Ms. Fang's materials required substantial revisions "to align with the Department's established quality standards and to support

retention goals." The Respondent clarified that "the same standards and review processes were applied uniformly to other instructors teaching gateway courses," as part of the Department's retention framework.

Dr. Azemi contested Ms. Fang's allegation that she was "excessively micromanaged," and he stated that the oversight he provided was "directly proportional to the serious deficiencies in her materials," being implemented in the same manner for all instructors teaching these retention-critical courses. Dr. Azemi viewed the meetings[20] as a "direct exercise" of his "responsibility to ensure that every section delivered the Department's approved outcomes and that the students received coherent, accessible instruction, particularly critical in gateway courses where attrition is highest."

He clarified that he scheduled weekly half-hour sessions on Fridays, during which they "reviewed upcoming modules, walked through canonical Python examples, and standardized learning outcomes across all instructors," with "detailed agendas, annotated code samples, and Canvas-ready labs provided on a weekly basis." According to the Respondent, they stemmed from "pedagogical necessity," without any relation to Ms. Fang's protected characteristics and were conducted professionally, without any humiliating or abusive language.

The investigation concluded that Dr. Azemi requested Ms. Fang's lecture content and assignments when the switch to Python occurred. This action is reasonably supported by the fact that Ms. Fang did not have previous experience with Python and was relying on self-study. The Parties do not dispute that they had weekly meetings during which Dr. Azemi had specific objectives as outlined above. They can reasonably be viewed as providing routine coaching and counseling, including feedback about and correction of work performance or conduct, which fall under supervisory prerogative. There is no information to support that Dr. Azemi employed any abusive language, angry outbursts, or insults. Based on a preponderance of the evidence, Dr. Azemi's actions were not discriminatory or bullying towards Ms. Fang on the basis of her gender, therefore they were not deemed a violation of the UMES Policy Prohibiting Discrimination or the UMES Policy Prohibiting Workplace Bullying.

5. **Dr. Azemi allegedly discriminated against Ms. Fang when he directed her to "learn" from a male graduate student, who had previously served as a Teaching Assistant for Ms. Fang's courses (CSDP 221 and CSDP 222). According to the Complainant, this contributed to professional humiliation and fostered a hostile work environment.**

As part of her allegations of "Misuse of Authority and Discrimination," Ms. Fang indicated that Dr. Azemi instructed her to "begin preparing lectures, homework, and projects for the newly planned Python courses, including CSDP 120 and CSDP 150." The Complainant further noted that, at the same time, the Respondent instructed her to "learn" from a male graduate student, who had previously served as a Teaching Assistant in her courses.

---

[20] Dr. Azemi advised that standing "programming meetings" have been implemented as of Spring 2025 and include all faculty that teach CSDP 101, CSDP 121, and CSDP 150. They will remain in place continue until retention metrics reach the department's target benchmarks.

Ms. Fang described that the context was that the student was doing his graduate project on Python and Dr. Azemi asked her to learn with him. She subsequently added that Dr. Azemi was trying to change the C++ to Python language and Dr. Azemi asked her to learn from the graduate student, when she emailed Dr. Azemi to let him know that she was doing Python study by herself. Ms. Fang advised that there was no one else present at the time Dr. Azemi made the comment in her office. Ms. Fang stated that, "This directive lacked academic or professional justification and was both inappropriate and dismissive of [Fang's] qualifications and position as a faculty member. It contributed to a sense of professional humiliation and fostered a hostile working environment."

In his written response to the allegations, Dr. Azemi stated that Ms. Fang's allegation contained an incomplete description and lacked context. He explained that on or about mid-February 2024, following a lab session, several students had commented on the clarity of a grading rubric created by the Teaching Assistant. During a subsequent course team meeting, Dr. Azemi invited Ms. Fang to examine the rubric as a model of best practice. The Respondent added that highlighting the successful approach, i.e., the grading rubric was consistent with "UMES' collaborative teaching culture and the obligation to adopt proven methods." On a related note, the Respondent advised that faculty members routinely share rubrics assignments and grading strategies.

The Respondent characterized the suggestion as "purely instructional, as an example of continuous improvement and knowledge-sharing among instructional staff." He advised that the exchange was collegial and there was no humiliating, abusive, or gender-related language used or implied. Dr. Azemi concluded that "Directing lecturers to review exemplary teaching artifacts is an ordinary supervisory function within the chair's responsibilities. It maintains instructional quality and alignment across sections without discriminatory intent or effect."

In his supplemental response to the allegations, Dr. Azemi noted that Ms. Fang did not quote his alleged words, nor did she provide the exact language from supporting documentation or context, which he requested. He further noted that upon a re-examination of his notes, he did not find a record or any kind to match the quotation attributed to him. He also contested that the statement alone or juxtaposed to other conducts meet the threshold to be deemed severe and pervasive to create a hostile work environment based on a protected characteristic.

The information collected throughout the investigation and available at this time reveals the Parties dispute the details, context, and potential existence of the alleged statement that constitutes the basis of the current set of allegations. A determination could not be made based on a preponderance of the evidence that the statement was made and that it had a gendered animus. Moreover, there is no information to support that there were other comparable statements made by the Respondent that were severe or pervasive to create and maintain a hostile work environment for the Complainant. Consequently, a determination was made that Dr. Azemi did not violate the UMES Policy Prohibiting Discrimination.

6. **Dr. Azemi allegedly discriminated against Ms. Fang when he required her to complete and upload all lecture content for CSDP 120 by end of Spring 2024, and for CSDP 150**

**by end of Summer 2024[21], despite these courses being assigned to her and knowing she would be outside the U.S. during the summer.**

Ms. Fang included as part of her allegations pertaining to what she labeled as "Misuse of Authority and Discrimination" Dr. Azemi's requirement for her to complete and update all lecture content for the above-mentioned courses by the end of the Spring 2025 semester. She noted that this was problematic because these courses were not even assigned to her, and that she was going to be abroad for the duration of the summer, as her nine-month contract expired at the end of May 2025. Ms. Fang described the deadline as very tight.

In his written response to the allegations, Dr. Azemi stated that Ms. Fang was not instructed to prepare any materials for CSDP 120 or CSDP 150 by the end of the Summer 2024, as they were not offered until the Fall 2024 semester. He noted that after Ms. Fang's return from parental leave, she was invited to develop the 10-week Summer 2025 course for CSDP 120 and asked to assist with content preparation for CSDP 150. Dr. Azemi added that the content development work for CSDP 150 was subsequently assigned to a different faculty member due to Ms. Fang's limited progress with CSDP 150 by the first deadline. He further stated that the tasks were assigned for completion in accordance with her nine-month contract, after her return from parental leave, therefore, there were no violations of her terms of leave.

Dr. Azemi added that following her parental leave, attendance logs showed that Ms. Fang was on campus for the monthly department meeting and the weekly programming meeting, despite not having any authorization from him or the Office of Human Resources Management for continued remote work. On a related note, Dr. Azemi also remarked that the work volume Ms. Fang had produced in two months after her return from parental leave could have been achieved in anywhere between 20- and 40-hours total.

The investigation revealed that Ms. Fang's allegation referred to the tasks she was assigned after her return from parental leave, when she did not have any teaching duties, as opposed to initially assessed as having occurred in 2024 when Ms. Fang was actively teaching. With consideration that there is no comparator or comparable circumstances, the OIE will not render a determination as to whether it constituted a reasonable task with reasonable deadlines; it was verified, however, that Ms. Fang was not expected to work beyond the expiration date of her nine-month contract. Hence, a determination could not be made that Dr. Azemi engaged in unequal treatment of Ms. Fang to support a violation of the UMES Policy Prohibiting Discrimination.

7. **During Ms. Fang's parental leave (December 2024 – March 2025), Dr. Azemi allegedly discriminated against Ms. Fang when he began reassigning her responsibilities and, without discussion or consent, removed her from teaching duties. This allegedly occurred despite Ms. Fang's continued attempts to clarify work expectations and prepare for her return. Dr. Azemi also allegedly contacted Ms. Fang during her parental leave and gave her assignments.**

---

[21] Correction: The allegation should read, *"Dr. Azemi allegedly discriminated against Ms. Fang when he required her to complete and upload all lecture content for CSDP 120 by end of Spring 2025, and for CSDP 150 by end of Summer 2025 [...]"* The information was extracted from Ms. Fang's narrative, which indicated the year as 2024.

Ms. Fang stated that she took a legally approved 12-week parental leave in early 2025. She added that during this period, Dr. Azemi began reassigning her responsibilities and, without discussion or consent, he removed her from teaching duties. Ms. Fang advised that this occurred despite her continued attempts to clarify work expectations and prepare for her return. The Complainant advised that she viewed Dr. Azemi's action as discriminatory and "retaliation following parental leave." Ms. Fang also raised concerns with the fact that Dr. Azemi contacted her while she was on parental leave.

In his written response to the allegations, Dr. Azemi clarified that the Spring 2025 schedule was finalized in October 2024, consistent with UMES practice, and communicated to all faculty. Therefore, Ms. Fang was informed that she would not be assigned any courses for the respective term, before the start of her parental leave (December 2024).

On or about January 17, 2025, Dr. Azemi emailed[22] Ms. Fang a detailed return plan (post parental leave), which listed the tasks on which Ms. Fang was expected to work upon her return. The email noted she was not assigned any teaching duties until May 22, 2025 (end of her nine-month contract for AY 2024-2025). In the same email communication, Dr. Azemi also encouraged Ms. Fang to express any questions or related concerns. He reiterated that, except for the aforementioned administrative email, there was no "excessive communication", nor any work requests for the duration of Ms. Fang's parental leave[23]. Dr. Azemi concluded that "establishing future schedules and clarifying post-leave responsibilities fall squarely within a Department Chair's duties and were executed in accordance with UMES policy and federal FMLA requirements."

Email correspondence reviewed for the purpose of the investigation verifies that Dr. Azemi sent an email on January 17, 2025, in which he outlined tasks for Ms. Fang to complete upon her return. The Complainant responded on January 22, 2025, and followed up again on February 24, 2025. Dr. Azemi replied on February 27, 2025, with answers to Ms. Fang's inquiries. The email exchange does not indicate an expectation or a request from Dr. Azemi for Ms. Fang to complete any tasks during her leave, or that Ms. Fang's understanding was that she was expected to complete the tasks during her leave. The Complainant's email dated February 24, 2025, reads: *"I wanted to follow up on my previous email regarding the assignment after returning from my parental leave, as I have not yet received a response."*

In Ms. Fang's email from February 24, 2025, she mentions that she would prioritize the tasks Dr. Azemi assigned and would appreciate his guidance on the priority for the three courses' lecture preparations. The Complainant noted her willingness to resume teaching by stating, *"For Fall 2025, I want to express my respect for and willingness to accept the courses and job assignments assigned by the department. However, if possible, I would prefer to continue teaching programming courses, as that aligns best with my expertise."* The exchange does not contain any inquiries from Ms. Fang about resuming teaching mid-Spring 2025 semester upon her return from parental leave or any objection in this regard.

---

[22] Dr. Azemi also included the Dean of the School of Business, Engineering, Applied Sciences, Technology, and Tourism Management on the email communication, which has been reviewed for accuracy.
[23] It should be noted there is no explicit provision prohibiting that an employee be contacted for information-sharing purposes during approved leave.

The investigation verified that there was a modicum of communication between the Parties for the duration of the Complainant's parental leave. However, it was not deemed excessive, nor did it contain any requests of tasks to be completed by Ms. Fang, while on parental leave. Prior to that, there is no clear evidence to confirm that the Parties had an explicit conversation as to whether Ms. Fang would return directly to her teaching duties mid-Spring 2025 semester post parental leave.

The Spring 2025 schedule posted in Fall 2024 did not have Ms. Fang listed as the course instructor, which did not elicit any objections at the time from the Complainant. Similarly, the email communications referenced above do not record any objections from Ms. Fang regarding her Spring 2025 teaching duties, which albeit non-instructional in nature did not come with a reduction in compensation or benefits. With consideration to the information available at this time and based on a preponderance of the evidence, it was not determined that Dr. Azemi's actions constituted discrimination on the basis of the Complainant's gender, hence not a violation of the UMES Policy Prohibiting Discrimination.

8. **On or about March 21, 2025, Dr. Azemi allegedly discriminated against Ms. Fang when he informed her that her Fall 2025 teaching assignments had been removed, and she was offered only non-instructional tasks, despite the department scheduling over 30 courses. Dr. Azemi allegedly offered Ms. Fang three options moving forward: (1) continue in a full-time position with primarily staff like, non-teaching duties, (2) a part-time adjunct role, or (3) no renewal of contract.**

Ms. Fang stated that upon her return from parental leave, she learned that all her Fall 2025 teaching assignments had been removed, and she was offered only non-instructional tasks, despite the department scheduling over 30 courses. Ms. Fang advised that the three options (detailed below on page 19) she was offered, constitute a "change in direction, made without performance-based justification, directly contradicts [Fang's] contract as a Lecturer, which defines [Fang's] role as teaching-focused." The Complainant stated that this action follows a "history of unlawful activities by Dr. Azemi and seems to turn [Fang] into some sort of secretary rather than an academic."

Regarding the meeting on March 21, 2025, Ms. Fang explained that she had requested it "to clarify Spring [2025] teaching assignments." The Complainant recalled that, "to her complete surprise," Ms. Hairston was present in the conference room, information which was not shared with Ms. Fang in advance. Ms. Fang described that the meeting "took a confrontational tone" and focused on the removal of her teaching responsibilities. She also noted that Dr. Azemi's "harsh manner" caused her to break down in tears.

In his written response to the allegations, Dr. Azemi noted, for context, that starting with the Academic Year 2024, two new-tenure track faculty members "with demonstrated expertise in introductory pedagogy had joined the department," and another one is lined up to start in Fall 2025. Additional recruiting efforts for three additional tenure-track faculty members (required to have relevant college-level teaching experience) were also conducted in parallel.

Dr. Azemi explained that these staffing changes resulted in a significantly diminished need for Ms. Fang to teach a full-course load, which he advised was communicated formally to Dr. Derrek Dunn, Dean of the School of Business, Engineering, Applied Sciences, Technology, and Tourism Management. In the memo at hand (undated) submitted for review by the Respondent, he was seeking Dr. Dunn's "input on ongoing concerns regarding Ms. Fang's performance."

Dr. Azemi went on to note in the memo that, since assuming the Chair role, he had received consistent negative feedback from students, primarily related to Ms. Fang's "ineffective teaching methods," and provided illustrating examples. Dr. Azemi pointed out "concerns about the overall quality of the instruction and their impact on student engagement and learning outcomes." The Respondent stated he addressed the issues directly with Ms. Fang, resulting in little change to her approach, which supported his decision to take on the co-instructor role in one of her classes. Dr. Azemi also listed other actions he had taken (creating an introductory course, establishing regular meetings with programming instructors). He made note of the Retention Survey results, which "revealed an overwhelming discontent with Ms. Fang's courses," compared to another section of the same course taught by a different instructor, performing significantly better.

Dr. Azemi also referenced Ms. Fang's academic background and credentials, as well as the lack of teaching experience prior to being hired at UMES. Subsequently, he outlined the option he was considering moving forward at that time – reassigning Ms. Fang to content creation for programming courses and developing templates for online courses. The Respondent advised that if Ms. Fang was unwilling or unable to take on the responsibilities, he would search for a replacement. Additionally, even with the new duties, Dr. Azemi advised that he did not anticipate needing Ms. Fang's services beyond a year.

Around the same time (on or about November – December 2024), following Dr. Dunn's recommendation, Dr. Azemi advised he initiated consultations with the Office of Human Resources Management and the General Counsel regarding Ms. Fang's subsequent contract and role within the Department. Email correspondence dated December 4 through December 5, 2024, verifies the Respondent's inquiry and guidance he requested regarding Ms. Fang. Consequently, the decision was that Ms. Fang was going to be provided with "an opportunity to remain with the department in a role that aligned with [their] strategic retention efforts and addressed [their] critical needs for support in online course development." Dr. Azemi clarified that Ms. Fang's new role "was designed to utilize her skills beneficially without loss of salary or benefits."

On March 21, 2025, after Ms. Fang's return from parental leave, Dr. Azemi scheduled a meeting with Ms. Fang in the presence of Ms. Gertrude Hairston, Director of the Office of Human Resources Management, "to ensure transparency and accurate documentation." The Respondent clarified that the meeting was initiated at Ms. Fang's request. He noted that Ms. Fang asked to meet "to clarify [her] future teaching assignments," after receiving the Spring 2025 schedule.
Dr. Azemi advised that, at the meeting, he offered Ms. Fang three alternative paths in compliance with USM Policy II-1.00 and the 90-day notice requirement, as confirmed by Ms. Hairston:
1. Full-time reassignment (no loss of salary or benefits) focused on departmental retention initiatives and online-course development, including at most one 3-credit section to maintain teaching continuity.

2. Part-time adjunct appointment capped at two introductory courses per semester, pro-rated compensation, no service obligations.

3. Non-renewal after the current nine-month contract (May 22, 2025), with the statutory notice period honored.

Dr. Azemi stated that the three options emerged from legitimate academic planning considerations, which included the "arrival of new qualified faculty, ongoing accreditation-driven retention goals, and Ms. Fang's documented resistance to pedagogical improvement." The Respondent emphasized that "the same framework would apply to any lecturer in analogous circumstances," without any considerations on the basis of sex, pregnancy, or any other protected activity.

Dr. Azemi described that upon sharing this information and the supporting rationale, Ms. Fang's "initial reaction was focused solely on personal convenience rather than the department's or its students' interests." Dr. Azemi viewed Ms. Fang's inquiries as to whether she was going to be staff and if she needed to work 9 to 5 every day as "clear disinterest in contributing positively to the department's mission and goals." Dr. Azemi added that Ms. Fang's clear preference would be to teach her classes and go home. At the conclusion of the meeting, Ms. Fang did not commit to any of the options presented to her.

Contemporaneous notes provided by Ms. Hairston in connection to the March 21, 2025, meeting recorded the rationale Dr. Azemi shared with Ms. Fang in support of the decision for her not to teach as of Fall 2025, which included the three new tenure-track hires with strong backgrounds in the subjects the Department was offering. Ms. Hairston advised that the three options presented to Ms. Fang were also documented, previously discussed with herself and the General Counsel, and subsequently deemed in accordance with existing guidance.

According to the notes, "there were no instances [Ms. Hairston] noted of anyone being upset and disrespectful," Ms. Fang asked questions and took notes, while Dr. Azemi answered the questions. Ms. Hairston did not describe Dr. Azemi's manner as harsh and did not confirm that Ms. Fang broke down in tears as she had stated. The witness noted observing that Ms. Fang was "sniffling" at some point, and shortly after, she got up and went to the bathroom. Ms. Hairston clarified that she did not see Ms. Fang crying.

After the meeting, Dr. Azemi recalled that on or about March 24, 2025, Ms. Fang emailed him seeking clarification on the proposed "new contract responsibilities," to which he replied on the same day, indicating that he would provide full details upon his return. In the same email communication, Dr. Azemi emphasized to Ms. Fang that her job was not remote, and that she was hired for face-to-face interactions.

On a more general note, regarding documenting Ms. Fang's deficiencies, Dr. Azemi advised that he had completed only one evaluation for her, in which he explained he did not include information about how much improvement she needed, because he feels that "evaluations are not being used for a good reason." He stated, "If you don't give [someone] a meritorious [evaluation] that shows that there is something wrong with your department and people start to look into what could be wrong". Dr. Azemi also remarked that he was "not trying to go after anyone" and that he prefers to "have a private conversation instead about the changes that should occur." However, in Ms.

Fang's case, that did not yield the results and progress the Respondent was looking for in terms of student learning outcomes and retention goals.

In her response to the Preliminary Investigation Report, Ms. Fang stated that the report did not sufficiently address her concerns regarding pregnancy-related retaliation (Segments 7 and 8). She noted the timing and nature of Dr. Azemi's decisions made during and after her leave, which she viewed as having a retaliatory intent. Ms. Fang did not provide any specific examples of what was not given sufficient considerations or submit any supplemental information and/or documentation in support of her statement.

The investigation verified that upon Ms. Fang's return from parental leave, Dr. Azemi presented her with three options for consideration to effectively replace her previous teaching duties. Moreover, it was corroborated that Dr. Azemi created the options under his supervisory prerogative based on reasonably objective and bona fide criteria, with robust supporting documentation related to Ms. Fang's performance going back to 2023. He also engaged in consultations with and sought guidance from the Dean of the School of Business, Engineering, Applied Sciences, Technology, and Tourism, the Office of Human Resources Management, and the General Counsel. Hence, a determination of discrimination on the basis of the Complainant's gender is not supported as a violation of the UMES Policy Prohibiting Discrimination.

## SUMMARY OF PRELIMINARY FINDINGS AND FACTUAL ANALYSIS

The OIE has conducted an extensive review and subsequent analysis of the allegations of discrimination, bullying, and hostile work environment on the basis of gender brought forth under the applicable policies by Ms. Fang against Dr. Azemi.

The investigation revealed that there is a disputed history between the Parties going back to the Fall 2023 semester, with heavily contested attributions of the Parties' reciprocal actions. There is also a documented history of student complaints regarding Ms. Fang's pedagogy prior to and starting early into Dr. Azemi's chairship. The reported concerns have been viewed as being linked to suboptimal student learning outcomes, high DFW rates, with a negative impact on student retention.

Consequently, Dr. Azemi viewed it as obligation to address and redress it, by taking a set of actions in connection to Ms. Fang's classes and role, as outlined throughout the current report. On the other hand, Ms. Fang, regarded Dr. Azemi's actions as a form of discrimination and hostile treatment due to her being the youngest of the four Lecturers and the only female.

Regarding the allegations at hand, the OIE's investigation of facts established that Dr. Azemi:

- Requested that Ms. Fang upload the teaching materials she developed for her Fall 2023 classes (CSDP 221 and CSDP 222) and made at least two drop-in visits to her classes, during which he had an instructional contribution.
- Requested that Ms. Fang work on the online course design for CSDP 221/222, for which she was not compensated (the course preparation aspect), however she was compensated for the instructional aspect/teaching of the course.

- Assumed the role of "lead faculty" in for CSDP 221 during the Spring 2024 semester and co-taught with Ms. Fang for the first 10 weeks of the course, while Ms. Fang assumed instruction for the remainder of the semester.
- Requested that Ms. Fang to submit lecture content and assignments (from C++ to Python courses) for his review and approval and met with Ms. Fang on a weekly basis to discuss and review materials.
- Requested that Ms. Fang complete and upload all lecture content for CSDP 120 and for CSDP 150 by end of Spring 2025 (end of the Complainant's nine-month contract).
- Did not assign Ms. Fang (who was on parental leave until March 19) teaching duties for Spring 2025.
- Presented Ms. Fang with three options for consideration starting with the Fall 2025 semester, as opposed to assigning the same classes she had been typically teaching.

These above referenced constitute findings of facts that have been analyzed individually to determine whether or not they constitute violations of the UMES Policy Prohibiting Discrimination and the UMES Policy Prohibiting Workplace Bullying. Based on a preponderance of the evidence, it is more likely than not that the Respondent's actions and interventions were connected to the Complainant's performance. Therefore, at this time, the foregoing established facts with the corresponding corroborating details and supporting rationale included throughout each report segment, support the determinations that Dr. Azemi did not violate the applicable policies in connection to the eight (8) sets of allegations at hand.

**SANCTIONS**
The sanctions should be reasonably calculated to end the course of conduct, action, and/or behavior of the Respondent and any adverse impact on the Complainant, as well as prevent reoccurrence. With consideration to the fact that there were no findings or policy violations, the OIE will not recommend and will not implement any sanctions.

