# EXHIBIT 20

## Appeal against OIE Final Report into Complaints of Bullying by Asad Azemi
## Ms. Cui Fang

The Final Report issued by Mr. Jason Casares and Ms. Alexandra Martin of OIE is biased, deceptive, and violative of due process protections in addition to the letter and spirit of UMES and USM policies.

I wish to note that from the outset, Ms. Martin acted in a biased and deceitful manner to protect Dr. Asad Azemi. It was apparent that she and Mr. Casares were friendly with Dr. Azemi and had some connection with him for ulterior purposes. The whole slant of the investigation was designed to subvert the process, hide the truth, and manufacture lies to help Dr. Azemi escape the consequences of his bullying.

Mr. Casares and Ms. Martin did not interview the witnesses provided by Ms. Cui Fang despite the ability and the witnesses' willingness to meet by Zoom. OIE interviewed extraneous and irrelevant witnesses who had no direct knowledge of any relevant facts in an attempt to assist Dr. Azemi. *Doe v. TCU* 601 F. Supp. 3d. 78 (2022); *Vengalattore v. Cornell University*, 2nd Cir. NY (2024).

Mr. Casares and Ms. Martin gave credence to unsupported and unsubstantiated claims made by Dr. Azemi but dismissed claims made by Ms. Cui Fang. This is both a violation of due process and an act of gender based discrimination violating Title VI and Title IX. See, *Doe v. Quinnipiac University*, 404 F.Supp.3d 643. (2019).

Mr. Casares and Ms. Martin's biased investigation breached UMES's promise to not discriminate against Ms. Cui Fang based on gender enshrined in its promise to apply Title IX to the US Department of Education. This promise is cascaded to all employees and students by way of contracts and official UMES documents.

Mr. Casares and Ms. Martin's biased investigation violated UMES contractual promises of good faith and fair dealing contained in the employment contract with Ms. Cui Fang.

The paragraphs below will focus on some of these aspects. It is hoped that the UMES leadership has the courage and integrity to do their duty and process this appeal in the correct manner.

- **Bias in witness selection**

[3] In her response to the Preliminary Investigative Report. Ms. Fang stated that "The selection of witnesses and the portrayal of their statements appear selective and at times inconsistent with what was actually said."

As it standard in any investigation, both Ms. Fang as the Complainant and Dr. Azemi as the Respondent were provided with the opportunity to submit the names of any witnesses deemed to have relevant and germane information pertaining to the allegations. In her Fair Practices Complaint Form, Ms. Fang identified one witness, who was interviewed by the OIE for the purpose of the investigation. In a subsequent email communication, Ms. Fang identified two additional witnesses who were contacted by the OIE who did not respond, declined, or were unable to participate appropriately. Other witnesses were identified by other witnesses and/or selected independently to serve as comparators in the current analysis.

An impartial investigation relies upon witnesses who have direct knowledge of the facts and who can testify truthfully. Ms. Martin and Mr. Casares intentionally did not interview witnesses who had direct knowledge about Dr. Azemi's bullying and violation of UMES policies. Ms. Cui Fang provided a list of witnesses who had knowledge of the facts but Ms. Martin and Mr. Casares made every effort to not learn the truth from them. They made perfunctory contact with these witnesses and did not offer them proper opportunities to testify. The witnesses wanted to ensure that the truth was recorded and wished to speak with a recording device because of their knowledge about Ms. Martin's deceptive tactics. Ms. Martin is known to make up statements or distort what people say in an attempt to help her allies. Ms. Martin knew that Ms. Cui Fang's witnesses would provide highly damaging information about Dr. Azemi's bullying and therefore did not want them to speak. OIE has provided no evidence that Ms. Cui Fang's witnesses refused to speak to them.

Instead, Ms. Martin used highly suspicious and deceptive tactics to select other witnesses who had no direct knowledge of any relevant facts in an effort to protect Dr. Azemi. The investigation claims that "other witnesses were identified by other witnesses and/or selected independently to serve as comparators." OIE is not in any position to "independently" select – that is not their role and they are biased. There is no provision in the rules to select witnesses as "comparators." What are "comparators?" The selection process for student witnesses demonstrates clear bias and a lack of impartiality. Of the three students selected for interviews:

- Two had poor academic performance in Ms. Cui Fang's class, which may have affected their perspectives and introduced negative bias.
    - One of them had an attendance rate of less than 50%, which significantly limits his exposure to the course content and teaching methodology.
    - The other withdrew from the CSDP 222 course more than one month after the semester began and therefore did not complete the class.
- The third student had never officially enrolled in any of Ms. Cui Fang's courses at all and, as such, cannot meaningfully evaluate Ms. Cui Fang's instruction.

This selection process raises serious concerns. This is an investigation about bullying and toxic workplace created by Dr. Azemi. It is not an investigation about Ms. Cui Fang's teaching quality. Ms. Martin and Mr. Casares have no qualifications to assess teaching quality and that is not their role at the university.

If a qualified person in academic leadership and teaching excellence at UMES intended to evaluate Ms. Cui Fang's teaching performance fairly, they would have had to take a random sample or a representative range of students from all performance levels and attendance rates. In addition, as is standard practice in higher education, an assessment of teaching quality would have required an objective viewing of teaching in the classroom by an expert in that discipline.

Ms. Martin and Mr. Casares do not meet these requirements and have no intellectual or technical competence to assess teaching quality in a university.

Instead, they engaged in a fishing expedition beyond their jurisdiction and competence to help Dr. Azemi by interviewing individuals with low performance, minimal engagement, or no actual experience in my class. These individuals had no connection with the subject matter of the investigation – Ms. Cui Fang's allegations of bullying by Dr. Azemi.

Moreover, despite Ms. Cui Fang's explicit mention of my graduate teaching assistant (TA) during meetings with OIE—someone who directly observed my instruction and student interactions—the TA was never contacted or interviewed.

This **omission was deliberate and biased**. It reflects a troubling disregard for relevant, first-hand perspectives that could have provided a more balanced and accurate assessment of my teaching. The selective use of biased or unqualified witnesses severely undermines the credibility and fairness of the investigation's conclusions and must be thrown out by the appeal authority.

---

[4] Dr. Zhang (employed on an annual nine-month contract) indicated in his response to the OIE email invite that he was on vacation abroad and he would not be able to attend a meeting in the U.S.

[5] In her response to the Preliminary Investigative Report, Ms. Fang noted that she was not provided "with a meaningful opportunity to review and respond" to the Preliminary Investigation Report, as she was not provided with an electronic copy of the report.

Upon receiving the request, the OIE informed Ms. Fang on July 7, 2025, July 17, 2025, and July 18, 2025, that
> "We [OIE] do not distribute the Preliminary Investigative Report, as it contains preliminary findings and contested information, to which you and the other Party can provide a response. Therefore, we accommodate the report review in our office, during which you can take notes in order to prepare a response. The Final Investigative Report will be distributed to you and the other Party electronically.

The UMES Policy Prohibiting Discrimination states that "OIE shall complete a draft written report of its Investigation. The report should include a summary of the allegations, evidence reviewed, and witness statements; findings of material facts and an analysis of those facts; and a finding whether a Policy violation occurred. OIE will then notify the parties and give them an opportunity to review it. The office will then issue a notice of findings to both parties and to appropriate University administrators." The Policy distinguishes between *providing parties with an opportunity to review* it (referring to the Preliminary Investigative Report) and *issuing a notice of findings* (referring to the Final Investigation Report). It has been the OIE's well established and documented practice since the Policy has been in existence (March 2019) to conduct the review of the Preliminary Investigation Report in-person, with ample opportunities for the Parties to review and respond.

Ms. Fang was provided with the option to select any preferred time interval on five different days anytime during business hours to ensure flexibility. Ms. Fang was also informed that she could request additional review time after her report first review, when she did not utilize all the time she was allocated.

- **Bias in retaliation because of complaint to USM Board of Regents**

Early in the process, Ms. Cui Fang brought her complaint to the attention of the USM Board of Regents because the reputation of OIE is very bad on the UMES campus. This was done in anticipation of bias and retaliation. And that is exactly what transpired. The OIE's report itself references the complaint to USM Board of Regents and the whole slant of the investigation was tainted by a retaliatory animus.

- **Bias in Failure to investigate complaint competently**

OIE conducted this investigation in an incompetent manner applying different yardsticks to achieve their previously determined outcome favoring Dr. Azemi. When they know that Dr. Azemi will be found guilty because the evidence is conclusive, they change the goalposts and claim that the matter is outside their jurisdiction whereas on similar matters that can help Dr. Azemi they are happy to make unsupported conclusions. For example,

---

[6] The concerns reported by Ms. Fang that have been deemed to fall under the category of "academic misconduct" do not fall under the purview of the OIE and will be referred to the Division of Academic Affairs for review and redress, as appropriate.

[7] During the intake meeting with the OIE, Ms. Fang stated feeling she was discriminated on the basis of her gender and race. In the Fair Practices form she submitted subsequently as part of her complaint documentation, Ms. Fang only selected "Gender Identity" as a protected category as the basis of her complaint. At the time of completion of the current report, the Complainant did not amend the form in question to select other protected categories.

[8] Ms. Hairston confirmed that she did not share Ms. Fang's concerns with Dr. Azemi at any point. In the absence of any knowledge of a previous report from Ms. Fang, Dr. Azemi could not have retaliated against her for making such a report. Therefore, the current process has not pursued Ms. Fang's allegation of retaliation by Dr. Azemi.

---

The OIE's claim that Ms. Cui Fang's concerns fall under "academic misconduct" and thus outside their purview is a clear error. Dr. Azemi repeatedly justified his retaliatory actions and reassignment decisions by attacking Ms. Cui Fang's academic qualifications and teaching performance — not through a fair or documented process, but through unilateral and punitive measures. His performance and qualifications are worse than mine.

His conduct, under the pretext of "academic standards," involved a pattern of public shaming, stripping Ms. Cui Fang of teaching responsibilities, and forcing Ms. Cui Fang into a non-teaching role immediately upon return from maternity leave — all without any prior warnings, performance evaluations, or opportunity for remediation.

This is textbook retaliation, not an academic review process. There are processes for academic evaluations that require the input of academic experts in particular disciplines specified by UMES academic policies. Dr. Azemi did not follow these policies but arbitrarily made up his claims for retaliatory purposes.

Academic criticism does not grant a supervisor the right to circumvent due process, target a returning mother, and unilaterally redefine her job functions. The Human Resources office has defined policies for such matters and Dr. Azemi did not follow any process for redefining my role because he had no such authority and I did not consent.

The attempt to reframe his retaliatory conduct as academic concern is a manipulation of process to escape accountability.

Dr. Azemi's actions — including the abrupt cancellation of Ms. Cui Fang's evaluation meeting immediately after he was officially notified of Ms. Cui Fang's complaint — clearly indicate retaliatory behavior. They are temporally proximate and there is no other reasonable explanation for his abrupt change. His own email correspondence shows awareness of Ms. Cui Fang's report. The idea that he acted without knowledge is not credible.

Lastly, if the OIE disregards retaliatory actions simply because the form checked "gender identity" rather than "retaliation". This is an absolute lie because they have not followed their own policies repeatedly. For instance, they provided no notice that they were assessing my teaching as required by the policy and conducted a fishing expedition with weak students to defame me.

> yet she advised that she did not know how others in the Department were being treated, as it was "hard to tell, because not everyone talks." The Complainant also indicated she did not know if Dr. Azemi engaged in any type of favoritism of other faculty members in the Department.

During Ms. Cui Fang's initial intake meeting with the OIE, she made it clear that her formal complaint focused solely on her personal experience. At that point, Ms. Cui Fang expressed that "it's hard to tell" the extent of discriminatory or unfair treatment experienced by other faculty members, as she could not speak on their behalf without more evidence.

However, in subsequent emails to the OIE, Ms. Cui Fang explicitly stated that she had come to learn that other faculty members in the department had also experienced varying degrees of discriminatory and unfair treatment under Dr. Azemi's leadership. Despite this, Ms. Cui Fang was told by the OIE that she could not include concerns regarding other faculty members because she do not represent them.

This is complete nonsense and shows that OIE is lying because they did not follow this principle with Dr. Azemi. They took his word about students and contacted them to defame me.

In addition, the fact that multiple individuals report similar patterns of mistreatment by the same supervisor are highly relevant by the university and USM's own policies and practices. They show there is a pattern and that the environment is hostile and toxic. For example, Dr. Azemi has used extremely disparaging and racially tinged language to describe UMES students analogizing them to "dogs." He has publicly claimed UMES students are not smart enough to study math and computer science. This created a toxic work environment for the whole department.

OIE lied to claim that "you cannot represent others". Ms. Cui Fang did not need to represent others. Ms. Cui Fang's statement should have prompted a proper investigation into the experience of others in the department. Ms. Cui Fang believe Ms. Martin and Mr. Casares are concealing known facts about bullying by Dr. Azemi using manipulative tactics.

[11] According to Dr. Azemi, the student complaints regarding Ms. Fang's class came through various channels (direct communications, formal retention surveys, and class evaluations) and included:
   (i)   lecture slides posted without accompanying code samples;
   (ii)  examinations covering material never made available on Canvas;
   (iii) an exclusive reliance on reading aloud from PowerPoint with no in-class coding practice; and
   (iv)  the absence of required readings in the LMS.
These practices directly undermined course-accessibility expectations articulated in University guidance that all instructional resources evaluated for credit must be made available to students through the learning-management system.

[12] Reviewed email correspondence submitted by the Respondent, verified that Dr. Azemi received a complaint from a student regarding Ms. Fang's class on or about September 8, 2023, to which Dr. Azemi responded on or about September 10, 2023. The Respondent also received a complaint in connection to Ms. Fang from a different student on or about September 11, 2023, to which he responded on September 12, 2023. A third student complaint was received via email on September 4, 2024.

Dr. Azemi never contacted Ms. Cui Fang to verify or clarify any of the allegations before acting upon them. Instead, starting in October, he requested her teaching slides for "review" and began appearing unannounced in her classroom to use her materials and teach her students on at least three separate occasions—without providing any explanation to her or her students.

This raises several fatal inconsistencies that require the appeal authority to throw out the OIE's final report:

- **No Findings from His "Classroom Reviews"**
  If Dr. Azemi was genuinely concerned about instructional quality based on the student complaints, why did he not observe or raise any of these issues during his own multiple in-person visits? He had direct access to Ms. Cui Fang's materials and classroom setting but never addressed any of the alleged issues during or after his appearances.

- **Assessment Preparation Was Communicated Clearly**
  Contrary to the allegations, Ms. Cui Fang always communicated the exam and quiz topics verbally in class, often by writing them on the board and encouraging students to take notes or photos. She also responded to individual emails from students who inquired about assessment content. There has never been a departmental or university requirement that exam topics or reviews must be posted on Canvas. The report's claim that her exam practices violate "course-accessibility expectations" is therefore unfounded and not based on any actual policy.

- **Academic cheating and fraud encouraged by Dr. Azemi**
  One of the witnesses Dr. Azemi provided, Ms. Muna, is a staff member who has never taught any computer science courses. She once came to Ms. Cui Fang's office demanding that Ms. Cui Fang include exact exam questions in the review materials she gave students. This suggestion is cheating and academic fraud. It directly conflicts with academic accreditation and fair assessment practices. If this expectation reflects a new departmental or university retention strategy, why was it never communicated to faculty formally? Such standards—if real—should have been disclosed clearly and uniformly.

Taken together, this pattern suggests that the student complaints were selectively used by Dr. Azemi not to improve instruction, but to justify retaliatory oversight of my teaching.

On or about September 29, 2023, and October 6, 2023, Dr. Azemi conducted observations of Ms. Fang's CSDP 221 class[13]. He specified that during the two sessions, he proceeded to co-teach "substantial portions of both classes to demonstrate research-supported active-learning techniques that are particularly effective in programming courses," and he provided examples. The Respondent described his approach as "a constructive, supportive measure to model best practices rather than merely critiquing existing methods."

From Fall 2023 to Spring 2024, Ms. Cui Fang co-instructed the capstone course CSDP 490 with Dr. Azemi. During that time, several senior students expressed frustration that they had not achieved the expected learning outcomes in earlier required courses—stating openly that they felt unprepared or had "learned nothing." This is unsurprising since Dr. Azemi has dubious competence and was violating academic standards.

Despite these concerns clearly pointing to issues with instruction in other courses taught by different faculty members, Dr. Azemi did not conduct any classroom observations, slide reviews, or unsolicited in-person teaching for those instructors. He made no attempt to verify the quality of instruction or course delivery in those cases.

By contrast, he repeatedly subjected Ms. Cui Fang alone to intrusive oversight—including demanding her teaching materials without guidance, unexpectedly entering her classroom to lecture using her slides, and never offering an explanation to Ms. Cui Fang or her students.

This selective application of oversight raises serious concerns of unequal treatment. If instructional quality and student outcomes were the genuine concern, such reviews should have been applied uniformly across all faculty involved. The fact that only Ms. Cui Fang was singled out for this level of scrutiny suggests targeted monitoring rather than fair academic administration.

be made available to students through the learning-management system." On a related note, Dr. Azemi shared that Ms. Fang pushed back and claimed intellectual property rights over the lecture materials she used in her courses, which are "copied from here and there." He went on to explain that the materials are a "joint deal" between the instructor and the institution, and that intellectual property rights can only be claimed on original content.

Since Fall 2023, I have consistently uploaded all lecture slides in PDF format to Canvas on the same day of instruction for all the courses I taught. Additionally, I explicitly permitted students to take photos of live-coded examples or impromptu board notes during class, to ensure instructional accessibility and transparency.

However, in Spring 2025—immediately following Ms. Cui Fang's return from maternity leave—Dr. Azemi instructed her to develop slides for a 10-week online version of CSDP 120. When Ms. Cui Fang completed the materials, he demanded that Ms. Cui Fang remove her name from the slides before they were used. Ms. Cui Fang raised a concern regarding the intellectual property implications of this request and asked which university policy permits the removal of a faculty member's name from their own instructional materials. Dr. Azemi did not provide a response.

Furthermore, no such demand appears to have been made of any other faculty members in the department. To Ms. Cui Fang's knowledge, no other instructor has been required to share their

personally developed instructional content for reuse by others under the condition that authorship be erased.

This selective treatment raises serious concerns about respect for intellectual property rights, fairness in workload expectations, and potentially retaliatory practices following Ms. Cui Fnag's maternity leave.

The Respondent advised that Ms. Fang displayed resistance to his efforts and insisted she did not require assistance, refusing to adjust her teaching methods. Dr. Azemi noted that Ms. Fang placed the blame for poor performance on the students and regularly claimed widespread cheating without substantiation. He further stated that, in the absence of any changes, students continued to struggle

Between Spring 2024 and Fall 2024, multiple Teaching Assistants (TAs) raised serious concerns about student cheating to Dr. Azemi via email and in grading reports. Despite repeated efforts, they never received any response. As course instructors, Ms. Cui Fang and other instructors also reported instances of cheating to Dr. Azemi, but he consistently ignored or dismissed our concerns.

On May 14, 2025, during the department's weekly Python meeting, Dr. Azemi explicitly stated: **"Cheating is not an issue. Cheating is a way for students to learn to solve a problem."**

This statement was deeply alarming, especially given the academic integrity standards we are expected to uphold. Furthermore, in the CSDP 490 senior capstone course, Dr. Azemi repeatedly encouraged students to use ChatGPT to search for solutions for linking databases and Python—without providing any clear academic guidelines for responsible or ethical AI use.

This directly contradicts the email sent by Dr. Dunn to all Computer Science faculty, which emphasized the importance of academic honesty and strictly forbade falsifying academic work. Such contradictory messaging from leadership undermines the values of academic integrity and fairness, and places undue pressure on instructors and TAs who are trying to maintain appropriate standards.

Dr. Azemi noted that since the investigation into the current matter started[15], Ms. Fang also displayed more overt aggression and took his feedback and comments (that she was not supposed to be working from home) as extremely personally, which was reflected in a very long reply email from the Complainant. A witness also noted a similar personal reaction from the Complainant

- **OIE bias in shifting the focus away from the real issues**

Dr. Azemi's characterization of Ms. Cui Fang's response as "overly personal" or "aggressive" is an attempt to deflect from the core issue: his pattern of unfair and discriminatory treatment toward me as a faculty member. Ms. Cui Fang's reactions were not emotional outbursts, but justified and professional responses to being subjected to unequal scrutiny and repeated disrespect.

For example, Dr. Azemi required Ms. Cui Fang alone to submit all her teaching materials for review, made unannounced appearances in her classes to take over instruction using her own slides, and demanded that Ms. Cui Fang remove her name from slides she personally created. These actions were never imposed on other faculty members. When Ms. Cui Fang asked what university policy permitted such use of my intellectual property, he never responded.

Labeling Ms. Cui Fang's reaction as "personal" ignores the power imbalance at play. It is not a "personal issue" to object when one's professional autonomy is repeatedly violated. It is not "aggression" to demand fair treatment. What Dr. Azemi calls a "very long email" was a reasoned, well-documented explanation of how his behavior diverged from university norms and targeted me unfairly.

It is deeply troubling that the OIE report adopted his framing of events without recognizing the context of discrimination and retaliation Ms. Cui Fang was responding to. This shift in focus—from his conduct to my reaction—is itself an example of OIE's bias.

In her response to the Preliminary Investigative Report, Ms. Fang stated that "the report contains statements falsely attributed to [her] or taken out of context." Ms. Fang did not provide any specific examples of statements that needed to be amended or further clarified. Additionally, she advised that the report "also omits substantial incidents of discriminatory and retaliatory behavior by Dr. Azemi," which "raise serious concerns about the fairness and integrity of this process." Ms. Fang did not provide any specific examples of omission or any supplemental information. Moreover, the Complainant did not submit any supporting documentation in connection with her allegations, as part of her response.

- **OIE bias in deceptive and manipulative statements violating procedural due process**

It is inaccurate and misleading to claim that Ms. Cui Fang did not provide specific examples or documentation in response to the Preliminary Investigative Report. Ms. Cui Fang was not given a copy of the report to review at home, but only allowed to view it in a controlled setting. This is in violation of due process and there is no rule or policy justification for not providing the report. The preliminary report is virtually identical to the final report so the refusal is just a scam.

Despite the lack of meaningful review opportunity, Ms. Cui Fang did clearly identify multiple concerns. Ms. Cui Fang stated that several statements attributed to her were taken out of context and written in a deceptive manner to convey a false impression, such as characterizing her professional objections as "aggression" or "overreaction." Ms. Cui Fang also pointed out that the report failed to address key incidents of differential treatment — for example, Dr. Azemi's repeated, unannounced classroom takeovers of Ms. Cui Fang courses using her teaching materials, a practice never applied to any other faculty.

Although Ms. Cui Fang's initial complaint letter did not include screenshots or emails, it did provide a detailed timeline and comprehensive written narrative of the discriminatory and retaliatory actions she experienced. Furthermore, during the intake and interview meetings with the OIE, she made every effort to provide accurate responses.

I pointed out early in the investigation that Ms. Martin's statements about what Ms. Cui Fang had alleged did not match what Ms. Cui Fang stated in the meeting.

To avoid further confusion, Ms. Cui Fang explicitly requested that OIE send follow-up questions via email so Ms. Cui Fang could respond clearly and accurately in writing. Despite this request, OIE never followed up with written questions and made no further effort to clarify why they were deceptive and manipulative.

The next communication Ms. Cui Fang received was a notice to review the Preliminary Investigative Report.

This lack of communication and refusal to accommodate Ms. Cui Fang's request for written follow-up questions directly undermined the accuracy and fairness of the investigation, and it placed Ms. Cui Fang at a disadvantage in documenting and clarifying my claims. It is an absolute violation of procedural due process.

Providing written questions and online meetings with the ability to record the meeting is costless to OIE. It is standard business practice and online meetings are common at UMES. There is no rational explanation for the denial except for a deliberate desire of Ms. Martin and Mr. Casares to deceive and manipulate responses to suit a predetermined outcome.

The Respondent also provided a semester-by-semester breakdown of DFW rates for Ms. Fang's classes starting with Fall 2021 through Fall 2024. A summary review of the percentages reveals that the highest rate 71.43% was recorded for CSDP 222 in Spring 2022, while other semesters had rates ranging from 12.5% to 69.23%.

- **OIE's bias in misunderstanding/deceptively characterizing academic matters**

From Fall 2021 to Fall 2024, some of the courses Ms. Cui Fang taught had relatively high DFW (Drop, Fail, Withdraw) rates, with the highest being 71.43% for CSDP 222 in Spring 2022. (It should be noted that in Spring 2022, Ms. Fang only taught for a little over one month before taking maternity leave in early March. The remainder of the course was taught by other instructors.) There is nothing surprising about this. Grades reflect the performance of students. UMES students come with very low high school GPAs and SAT/ACT scores. A student who has a 2.0 GPA in high school and a lifetime of very poor academic performance cannot be expected to miraculously score an A in an advanced computer science course. If such grades are seen, it immediately should raise red flags.

In Winter 2024, Dr. Azemi created an online version of CSDP 222 that was significantly less rigorous. The course featured online-only exams, no projects, and midterms that reused the same set of questions twice. Students would take the exam, receive feedback, and then retake the exact same questions to achieve a higher grade. This approach is textbook academic fraud. The resulting grades do not reflect actual learning or academic standards and were clearly intended to mislead. Unsurprisingly, the DFW rate for the Winter 2024 course dropped to 0%.

Dr. Azemi also established a prerequisite requiring that students must have enrolled in a regular semester version of CSDP 222 before being allowed to take these Winter or Summer courses. As a result, some students intentionally enrolled in Ms. Fang's regular CSDP 222 class and then withdrew after just one week solely to meet that prerequisite. These students often had attendance rates below 30%, did not submit assignments, and failed to appear for exams. Their enrollment was strategic, not academic, and undermined the integrity of the regular course.

However, this artificially low DFW rate did not hold up in a regular semester. In Spring 2024, Dr. Azemi taught CSDP 221, with Ms. Cui Fang serving as the secondary instructor and two graduate student TAs assisting. Despite this instructional support, the DFW rate for the course was 73.7%. This dramatic reversal further supports the argument that student outcomes are not solely dependent on instructor quality but are significantly shaped by student preparedness and course rigor. The stark contrast between the 0% DFW rate in a manipulated winter session and the 73.7% DFW rate in a standard semester raises serious ethical and academic concerns.

This created a serious issue of academic inequity and undermined fair evaluation of both student performance and instructor effectiveness, particularly in regard to how pass rates were measured and used.

> The Respondent went on to note the benefits and pervasiveness of team teaching in academia and his particular experience implementing it during his tenure at Pennsylvania State University, where he also published peer-reviewed research on the structure and effectiveness of team teaching in technical disciplines[18]. He regarded the practice as standard in academic leadership rather than

---

[17] Ms. Fang did not elaborate on or provide supporting documentation in connection to the alleged student confusion.
[18] i.e.: Azemi, A., & D'Imperio, N. (2009, June), *New Approach To Teaching An Introductory Computer Science Course* Paper presented at 2009 Annual Conference & Exposition, Austin, Texas. 10.18260/1-2--5730

OIE is obviously uninformed about academic matters and just swallows Dr. Azemi's worldview without any critical thought or consulting accreditation rules and UMES policies.

At UMES, and specifically within the Computer Science and Engineering Technology department, including courses taught by Dr. Dunn, there has never been a precedent or policy requiring a co-instructor to serve in a TA-like role—sitting at the back of the classroom to take attendance and only grade assignments, without engaging in instruction. Dr. Azemi claims experience at Penn State. But upon checking, Dr. Azemi did not work at the main Penn State campus. Penn State has many small rural campuses that are essentially like community colleges and do not have the same standards or reputation or rankings. This claim alone shows him for what he is: deceptive and manipulative. Regardless of Dr. Dr. Azemi's prior experience at a very small rural Pennsylvania State University's minor campus, UMES does not follow such a team-teaching structure. Furthermore, if Dr. Dr. Azemi truly regarded this as a standard practice, why was it only applied to me and not uniformly to all faculty under his supervision? This selective implementation highlights a clear pattern of disparate treatment. Ms. Cui Fang repeatedly raised this concern— that Ms. Cui Fang was being singled out—but OIE has consistently dismissed or ignored this core issue. Instead of acknowledging the discriminatory nature of this unequal treatment, OIE has

attempted to frame it as a leadership style, thereby undermining the credibility and fairness of the investigation.

---

[19] The survey was conducted on or about October 29, 2024, by a staff member in the Department for CSDP 101 and CSDP 120. The purpose of the survey session was "to understand why the students are not passing these courses in the midterm exams and to assist the department in improving the course structure." For Ms. Fang's class there were 13 answers/themes provided by the students (15 present). These included stated dissatisfaction with Ms. Fang's pedagogy, communication and language proficiency, her strictness about providing assistance during tutoring sessions and class times, marking absences instead of tardies, leaving questions unanswered, late availability of materials for quizzes, class time duration, etc. In contrast, there was 1 answer/theme identified for the other instructor. The results were communicated to Dr. Azemi via email on or about November 1, 2024.

- **Biased Failure to Address Item & in Ms. Cui Fang's Formal Complaint: "Addistional Concerns and Misleading Student Feedback Collection"**

In Ms. Cui Fang's formal complaint submitted to the Office of Institutional Equity (OIE), she explicitly identified ***Item 7: "Additional Concerns and Misleading Student Feedback Collection"*** as a critical issue. Ms. Cui Fang clearly stated that the student feedback process conducted under Dr. Azemi's direction was biased and misleading.

However, this point was completely ignored in the final investigation report. No inquiry was made into this concern, nor was any response provided. Meanwhile, the report relied heavily on the same problematic student feedback—without assessing its integrity—as evidence to evaluate Ms. Cui Fang's teaching performance.

This selective consideration of evidence severely violates **procedural fairness**, especially when the ignored information was part of Ms. Cui Fang's **official complaint**. The investigative office had an obligation to examine her allegation and respond to it accordingly. By failing to do so, the investigation denied Ms. Cui Fang a fair opportunity to clarify and defend herself.

Moreover, this omission raises serious questions about the objectivity and neutrality of the findings, as it reflects a clear imbalance in how the evidence was reviewed and interpreted.

The students selected by Dr. Azemi to participate in the so-called "retention survey" from Ms. Cui Fang's course had, in fact, very poor attendance records. Over 80% of those students had attendance rates below 30%. The TA and Ms. Cui Fang had repeatedly sent emails regarding their absences, with Dr. Azemi cc'd on these messages. Furthermore, our bi-weekly grading and behavior reports—submitted to Dr. Azemi—clearly documented these students' chronic problems, including not attending class, not submitting assignments, not responding to communications, and failing to take exams. Yet, Dr. Azemi completely disregarded these documented facts and chose to conduct a biased "retention survey" using these students, most of whom had clearly disengaged from the course. His decision to ignore the TA's formal reports and instead rely on the opinions

of academically non-participating students is not only unprofessional but also demonstrates retaliation and discriminatory intent against me.

---

[20] Dr. Azemi advised that standing "programming meetings" have been implemented as of Spring 2025 and include all faculty that teach CSDP 101, CSDP 121, and CSDP 150. They will remain in place continue until retention metrics reach the department's target benchmarks.

Dr. Azemi has never previously provided Ms. Cui Fang with any clear definition or documentation regarding the department's specific "retention metrics" or target benchmarks. It was not until the May 14, 2025 weekly Python programming meeting that Ms. Cui Fang first heard directly from him that the department expects a **minimum passing rate of 90%**. This expectation was shared verbally in response to instructors raising concerns about widespread cheating. Dr. Azemi stated that "UMES students are very weak—if we fail them, we will lose them," which he used to justify ignoring cheating reports and urging leniency in grading. However, this 90% retention metric is not listed in any official UMES policy, departmental meeting notes, or faculty contract Ms. Cui Fnag have received. Ms. Cui Fang was never informed of this standard before, and it was not uniformly communicated to other faculty members either.

If this is truly a departmental benchmark, why has it not been transparently documented, discussed in official meetings, or included in our contractual obligations? Moreover, why is this benchmark selectively enforced only against Ms. Cui Fang, especially when she have consistently reported cheating incidents and upheld academic standards?

Dr. Azemi repeatedly criticized Ms. Cui Fang's academic background and tutoring experience, questioning the effectiveness of her teaching. Yet despite his stated concerns, he appointed Ms. Cui Fang as the **Community Chair for Programming Language Courses** during the Fall 2024 departmental meeting and assigned me full responsibility for designing all instructional materials for the gateway programming courses (including CSDP 101, 120, and 150). These materials included **lecture slides, homework assignments, projects, quizzes, and exams**. Furthermore, Dr. Azemi was fully aware that the CSDP 101 slides being used by another instructor were originally created by Ms. Cui Fang, and he continued reviewing those same slides weekly during the semester. At the end of Fall 2024, he even requested that the instructor share Ms. Cui Fang's slides to him again for future use.

This inconsistency reveals a clear contradiction: while Dr. Azemi publicly undermined Ms. Cui Fang's qualifications and effectiveness, **he privately relied on her intellectual contributions and assigned her critical curriculum development responsibilities**. At the same time, he removed Ms. Cui Fang's direct teaching duties and used his authority to reassign courses she was originally scheduled to teach. His actions suggest he was lying, and he retained the benefits of Ms. Cui Fang's work while denying her equal professional standing and recognition.

---

[22] Dr. Azemi also included the Dean of the School of Business, Engineering, Applied Sciences, Technology, and Tourism Management on the email communication, which has been reviewed for accuracy.
[23] It should be noted there is no explicit provision prohibiting that an employee be contacted for information-sharing purposes during approved leave.

- **Bias in ignoring violations of Maternity protections**

**Disregard for Maternity Protections and Retaliation During Leave**

While the report's Footnote 23 claims, "there is no explicit provision prohibiting that an employee be contacted for information-sharing purposes during approved leave," this does not justify the treatment Ms. Cui Fang received during her legally protected parental leave. The Family and Medical Leave Act (FMLA) clearly prohibits employers from:

- Retaliating or discriminating against employees for taking leave;
- Failing to reinstate employees to their original or equivalent positions;
- Avoiding reasonable, good-faith communication regarding post-leave responsibilities.

**February 2025**: During her leave, Ms. Fang emailed Dr. Azemi seeking clarification on her post-leave (Spring 2025) responsibilities. He failed to respond for over a month.

**March 5, 2025**: Ms. Fang, still on leave, inquired via email about her **Fall 2025 teaching assignments and advising opportunities**. Dr. Azemi never replied.

**March 14, 2025**: Ms. Fang requested a meeting (for March 21, her first day back) to discuss her **Spring 2025 assignments**.

**March 20, 2025**: The department secretary notified all faculty that Fall 2025 schedules were finalized and any revisions must be submitted by 10 a.m. the next day. Ms. Fang was not assigned any teaching responsibilities.

**Same day**: Ms. Fang emailed both Dr. Azemi and the secretary to ask why she was excluded. Dr. Azemi did not respond.

The meeting on **March 21**, intended for Spring 2025 discussion, was repurposed **without notice** to address Fall 2025 scheduling—**after the deadline had passed**. This sequence demonstrates intentional exclusion and bad-faith manipulation.

Dr. Azemi **invited the HR Director, Ms. Hairston** to the March 21 meeting without notifying Ms. Fang, turning what was meant to be a workload clarification meeting into a confrontational encounter.

This was Ms. Fang's first day back from maternity leave—**a time when support and transparency are ethically required.**

The concealed purpose and surprise HR presence created a hostile and unequal power dynamic.

**Selective Enforcement and Retaliatory Actions**

1. Dr. Azemi **ignored all Ms. Fang's professional communication** during her leave.
2. He **unilaterally removed her from teaching** in Spring 2025 without informing her.
3. He **intentionally concealed** her Fall 2025 assignment status until it was too late for revisions.

Such conduct violates the professional responsibility of a department chair and reflects **retaliatory intent** based on protected leave status.

**Policy Loophole vs. Ethical Obligation**

Even if UMES policy does not prohibit contacting employees on leave, that does not excuse:

1. Withholding course assignments;
2. Ignoring inquiries;
3. Staging ambush meetings with HR;
4. Creating a hostile return-to-work environment.

Institutions must go beyond technical compliance and uphold ethical treatment, especially toward vulnerable employees returning from protected leave.

**Systemic Bias in OIE's Investigation**

1. Ms. Fang **repeatedly reported** these issues to the Office of Institutional Equity (OIE).
2. OIE **disregarded the factual record** and **ignored clear signs of retaliation and gender discrimination.**
3. Instead, they reframed Ms. Fang's responses as overly "emotional" or "personal," diminishing the validity of her concerns.
4. This reflects **institutional bias** and undermines confidence in the integrity of the OIE process

- **Bias in ignoring illegal and retaliatory work role changes**

On March 21, during the meeting scheduled under the topic "Discussion on Spring 2025 Work Assignments," Dr. Azemi abruptly informed Ms. Fang that her teaching responsibilities would be removed. This was done without providing any prior notice or psychological preparation, and the meeting took place on the very first day of Ms. Fang return from maternity leave, a period when both her emotional and physical states were in transition.

The report states, *"The Respondent advised that if Ms. Fang was unwilling or unable to take on the responsibilities, he would search for a replacement."* This statement was made directly to

Ms. Fang during that meeting and carried an implicit threat: if Ms. Fang did not accept the reassignment he unilaterally imposed, she would be replaced.

Such behavior inflicted serious emotional harm on Ms. Cui Fang. Instead of engaging in a collaborative or supportive discussion about workload adjustments post-maternity leave, Dr. Azemi used this meeting as a vehicle to enforce a punitive reassignment, signaling retaliation rather than accommodation. This treatment, especially under these circumstances, demonstrates a lack of sensitivity, fairness, and professional integrity.

Although Dr. Azemi claimed in the report that he presented Ms. Fang with three alternative paths during the March 21 meeting—aligned with USM Policy II-1.00 and the 90-day notice requirement and confirmed by Ms. Hairston—the meeting was in fact scheduled at Ms. Fang own request on March 14 to discuss Spring 2025 assignment details.

This was also Ms. Cui Fang's first day returning from maternity leave, which Dr. Azemi acknowledged in the report.

Ms. Cui Fang was not informed about the removal of her Fall 2025 teaching responsibilities until March 20, when Ms. Fang noticed she had no assigned courses and emailed the department. The secretary replied that Dr. Azemi would address this in the March 21 meeting. This clearly was not a case of transparent leadership or fair, timely communication about a role reassignment within the 90-day window, but rather a deliberate delay and concealment of critical employment information.

Under Option 1, the full-time reassignment proposal included the following responsibilities:
- Retention
- Managing teaching assistants (TAs)
- Developing online courses
- Setting up the department catalog
- Backup instructor
- Other assignments from the Department Chair

When Ms. Fang asked whether such duties—distinct from teaching—would still be classified under the "Lecturer" title for which she was originally hired, both Dr. Azemi and Ms. Hairston confirmed that Ms. Fang's title and salary would remain the same. Dr. Azemi suggested Ms. Fang could learn administrative work from the secretary and stated that she was "part of the team." He even added that the position could be reframed as "Department Chair Supporter" or "Project Coordinator"—titles more consistent with staff roles—while explicitly noting that I would not receive any staff benefits.

Dr. Azemi also emphasized that if Ms. Fang did not accept the reassignment, he would find a replacement. This was obviously a threat.

Dr. Azemi described that that upon sharing this information and the supporting rationale, Ms. Fang "initial reaction was focused solely on personal convenience than the department's or its students' interests." Dr. Azemi viewed Ms. Fang's inquiries as to whether she was going to be staff and if she needed to work 9 to 5 every day as "clear disinterest in contributing positively to the department's mission and goals." Dr. Azemi added that Ms. Fang's clear preference would be to teach her classes and go home. At the conclusion of the meeting, Ms. Fang did not commit to any of the options presented to her.

**First**, Ms. Fang have never stated that she "prefer to teach my classes and go home." What she asked Dr. Azemi was why he required *her specifically* to be in the office from 9 a.m. to 5 p.m. every day, and whether this requirement applied equally to all CS faculty. According to Ms. Cui Fang's employment contract at UMES, there is no clause mandating that lecturers must maintain fixed on-campus hours from 9 to 5. If such a policy exists, Ms. Fang respectfully request clarification of where it is documented and how it is applied consistently across all faculty. To interpret my inquiry as a sign of disengagement or lack of commitment is both unfounded and discriminatory.

In reality, Ms.Fang have consistently demonstrated her dedication to the department and to student success. For three consecutive semesters, Ms. Fang proactively requested to participate in the department's academic advising services. Despite repeated efforts, Dr. Azemi never responded to these requests or assigned her any advising responsibilities.

Moreover, Ms. Fang regularly go above and beyond her assigned teaching duties. Ms. Fang support our teaching assistants in tutoring and mentoring students, and she personally email every student in her class whose mid-term grade falls below a C to offer individual assistance. She help them develop personalized study plans to improve their academic performance and follow up to support their progress throughout the semester.

Ms. Cui Fang have also actively contributed to the department's academic goals through her involvement in computer science research. These efforts reflect Ms. Cui Fang's strong commitment to both instructional excellence and student success, contrary to the portrayal in Dr. Azemi's statement.

Dr. Azemi's actions are unlawful discrimination based on gender and race. He has been desperately trying to hire Iranians – his nationality – and trying to fire Ms. Fang to create a vacancy for his scheme.

There are significant inconsistencies that expose his false claims. Two male lecturers in the department, both of whom also had no prior experience teaching Python, were never required to

learn from a male graduate assistant before teaching the course. In contrast, Ms. Cui Fang was explicitly instructed to study from a male graduate assistant.

In teaching CSDP 101, Ms. Cui Fang was required to independently create her own lecture slides, whereas these male lecturers were allowed to directly use materials updated by a TA. Even the quiz and exam banks were prepared and maintained by graduate students on their behalf. These disparities reflect a clear lack of consistent application of any "framework" and indicate a gender-biased, inequitable distribution of workload and resources.

## Retaliation, Contradictions, and Procedural Violations

### Retaliation Following Protected Complaint

In Spring 2024, Ms. Cui Fang filed a complaint with Ms. Hairston regarding Dr. Azemi's inappropriate demands that she develop online course content for CSDP 120 (Spring 2024) and CSDP 150 (Summer 2024)—courses she was not assigned to teach. Ms. Cui Fang reasonable requests for clarification and my objections to these unjustified assignments were ignored.

Subsequently, in **November 2024**, Ms. Cui Fang formally notified Dr. Azemi, in accordance with HR policy, that she would be on partial maternity leave during Spring 2025. Not long after this notification—and in close proximity to her earlier complaint—Ms. Cui Fang was removed from all teaching responsibilities. This sequence strongly suggests retaliation, rather than any neutral decision "based on reasonably objective and bona fide criteria, with robust supporting documentation," as the report claims.

### Contradictory Justifications

In the investigation report, Dr. Azemi repeatedly asserted that Ms. Cui Fang was unfit to teach, citing alleged inadequacies in her academic background and teaching methods. However, he also claimed that Ms. Cui Fang reassignment to course development roles was designed to "beneficially utilize" her skills and meet "critical departmental needs," particularly for **online gateway courses**.

This contradiction is deeply problematic. If Ms. Cui Fang is considered unqualified to teach, it is illogical to place her in charge of independently developing **core course materials** that will influence the instruction of hundreds of future students. This inconsistency exposes that the reassignment was not based on academic merit but served as a **pretext** for removing me from teaching duties.

### Ambush Meeting and Emotional Distress

On **March 21, 2025**—Ms. Fang's first day back from maternity leave—She met with Dr. Azemi to clarify her Spring 2025 workload. Unknown to Ms. Fang, Dr. Azemi had **invited the HR Director** (Ms. Hairston) to the meeting but **never informed Ms. Fang in advance** or introduced Ms. Hairston properly.

When Dr. Azemi informed Ms. Fang that she would not be teaching, she was shocked and emotionally overwhelmed. Ms. Fang's eyes filled with tears, and she had difficulty continuing the conversation. Ms. Fang had to excuse herself to the restroom to compose myself. Although the report attempts to minimize this by stating that I was merely "sniffling," this phrasing erases the **emotional severity** of the experience and shows a lack of empathy and sensitivity.

**Lack of Clarity and Shifting Expectations**

Although Dr. Azemi told OIE he responded to Ms. Cui Fang's March 24 email promising to clarify her new responsibilities, **no such clarification was ever provided**. As of today, Ms. Cui Fang still have not received any formal written confirmation detailing my Spring 2025 or Fall 2025 assignments.

Instead, Ms. Cui Fang have faced vague, shifting expectations and ongoing pressure from Dr. Azemi to **report to campus daily**, despite the nature of Ms. Fang's work (e.g., course design, online content development) being fully compatible with remote delivery. This demand was not imposed on other faculty members and reflects **selective enforcement** targeted at Ms. Cui Fang.

**Canceled Evaluation and Lack of Feedback**

Ms. Cui Fang submitted her **2024–2025 Faculty Evaluation Form** before the April 28 deadline. Dr. Azemi acknowledged receipt and scheduled an in-person evaluation for **May 1 at 2:45 PM**, in line with department policy.

However, on **May 1 at 12:12 PM**, just hours before the scheduled meeting, the department secretary emailed Ms. Fang to say the meeting had been canceled, with no explanation. She stated it would be rescheduled, but **no new date was ever given**.

Importantly, this cancellation **coincided with Dr. Azemi receiving the formal OIE complaint notification** about my discrimination allegations—an event confirmed by Ms. Martin during Ms. Fang's OIE interview on the same day. The timing strongly suggests that the cancellation was retaliatory.

**Abandonment of Evaluation Responsibilities**

In the investigation report, Dr. Azemi openly admitted that he **withheld critical feedback** in Ms. Cui Fang's previous evaluations, claiming evaluations "are not used for good reason" and that assigning a poor evaluation would "make the department look bad." He claimed to rely on informal conversations instead.

However, Ms. Fang was never provided with such documented guidance, and she was **not asked to sign or review any formal evaluation for the 2023–2024 academic year**. These omissions not only violate university policy, but further demonstrate the **inconsistent, retaliatory, and unprofessional treatment** I have received following her protected activity.

**Conclusion:**

Given the serious and fatal errors committed by OIE and the manifest bias, the appeal authority is requested to throw out OIE's report and order a new impartial investigation of the toxic and hostile workplace environment created by Dr. Asad Azemi. It is known that Dr. Azemi was fired from his previous employment because of similar complaints by faculty. OIE's deception cannot make UMES blind to these objective facts.